## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TROY WRAGG, MICHAEL SCRONIC, LEONARD BOGDAN, and ELIEZER SOTO-CONCEPCION, individually and on behalf of all others similarly situated,<br><br>  *Petitioners*,<br><br>v.<br><br>DAVID E. ORTIZ, in his capacity as Warden of the Federal Correctional Institution, Fort Dix, and MICHAEL CARVAJAL, in his capacity as Director of the Bureau of Prisons,<br><br>  *Respondents*. | Case No. _____ cv _____<br><br>**COMPLAINT—CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

1. On April 11, Warden David Ortiz warned prisoners at the Federal Correctional Institution at Fort Dix, "social distancing is not possible in this environment." Just days earlier, the Federal Bureau of Prisons had reported that the first prisoner at Fort Dix had tested positive for COVID-19. Today, it reports 40.

2. Around the world, life has changed nearly overnight, as people and governments battle to slow the spread of COVID-19. In New Jersey, the second-hardest hit state in the United States, residents hear news from hospitals and nursing homes and understand the terrible toll the virus inflicts upon any population where it spreads unchecked: rampant illness and death, especially for people who are medically vulnerable because of their age or underlying health conditions. They understand that halting the spread of COVID-19 requires rigorous hand-washing,

personal protective equipment, and "social distancing" – the maintenance of a measurable distance between people that the virus cannot bridge.

3.      At Fort Dix, almost 3,000 prisoners hear the same news and understand the same requirements. Yet they are unable to protect themselves the way others outside the prison can. Most of them live in 12-person rooms in buildings that house 200 to 300 people, spending their days crowded into the same TV rooms, phone booths, bathrooms, and mealtime pickup lines. Approximately 230 of them live in Fort Dix's minimum-security satellite camp in large dorms with rows of bunks less than three feet apart. With nowhere else to go, many spend their days under their covers, quite literally hiding from the virus. Even then, most are still within arm's reach of other people in the bunk above or below them, and the beds to the left and the right. The impossibility of social distancing is not just a warden's warning, it is simply a fact.

4.      Respondents have compounded the risk to people incarcerated in Fort Dix by, until recently, refusing to test, medically isolate, or quarantine the overwhelming majority of Fort Dix prisoners, and by contravening the guidance of Attorney General William Barr to immediately transfer medically "at-risk" prisoners to home confinement. Respondents' failure to take appropriate and necessary action while a COVID-19 infection spreads through the prison is the kind of indifference proscribed by the Eighth Amendment.

5.      Without significant changes, Fort Dix is speeding towards a catastrophe. As Dr. Joe Goldenson, a physician with decades of experience in correctional health, cautions: "It is difficult to overstate the devastation that a COVID-19 outbreak could inflict on a correctional facility such as Fort Dix." [1] The only way of stopping the exponential spread of COVID-19 at Fort Dix, and the

_____

[1] Ex. 1, Declaration of Joe Goldenson ("Goldenson Decl.") ¶ 32.

serious illness and death of prisoners and BOP staff, is by significantly reducing the population density and rigorously adopting the Centers for Disease Control Guidance regarding testing, medical isolation, quarantine, and social distancing for those who remain, to ensure constitutionally-compliant custody.[2]

6.     For the 3,000 prisoners at Fort Dix, and especially for those who are medically vulnerable, every day brings increasing panic and increasing risk of serious illness or death. This petition may be their last chance before a COVID-19 catastrophe overwhelms the prison. Accordingly, Petitioners Troy Wragg, Michael Scronic, Leonard Bogdan, and Eliezer Soto-Concepcion, on behalf of themselves and a class of all medically vulnerable persons incarcerated at Fort Dix now and in the future, bring this action for declaratory and injunctive relief, for enlargement of custody, and ultimately, if they cannot be held in constitutional custody, for release.

**PARTIES**

7.     Petitioner Troy Wragg, BOP Register Number 67165-019, is 38 years old and classified by the BOP as a "chronic care inmate." He has a chronic autoimmune neuromuscular disease and a history of severe epilepsy, hypertension, and severe heart disease, including a history of heart attack. He sleeps on the bottom bunk of a 430-square-foot 12-man room, in which 6 bunk beds, 12 lockers, and a small table are crammed. He shares TV rooms, computers, phones, bathrooms, and mealtimes with 250 to 300 other men in his building in the west compound of Fort Dix's main facility. In the past two weeks, he has watched staff remove a man from the TV room who complained of chest pain and shortness of breath, seen medics rushing in and out of the building in which sick people are housed, and witnessed sick men pounding on windows in that

---

[2] *See id.* at ¶ 39.

building. Petitioner Wragg has no prior convictions and is serving a sentence for financial crimes. He is medically vulnerable to COVID-19 and has one or more disabilities recognized by the Rehabilitation Act. If his custody were enlarged to include home confinement or if he were released, he would live with his wife in Maryland, where he could safely socially distance and has a team of doctors familiar with his chronic medical conditions.[3]

8.      Petitioner Michael Scronic, BOP Register Number 79605-054, is 48 years old and has a history of abnormal heart symptoms, severe childhood asthma, and skin cancer. He is housed at the "Camp"—Fort Dix's minimum-security satellite facility—in a dorm-style room with, until recently, approximately 140 people. Over the last month and a half, he has watched people cough, vomit, collapse, sweat feverishly, and complain of other COVID-19-related symptoms. A number of people he has lived with have now tested positive for COVID-19. Petitioner Scronic is serving an eight-year sentence for financial crimes, his first offense. He is medically vulnerable to COVID-19 and has one or more disabilities recognized by the Rehabilitation Act. If his custody were enlarged to include home confinement or if he were released, he would live with his sister and her two children in New York where he could safely socially distance and where he has an existing team of doctors.[4]

9.      Petitioner Leonard Bogdan, BOP Register Number 07918-088, is 68 years old and is classified by the BOP as a "chronic care inmate." He has a heart condition, hypertension, high cholesterol, skin cancer, a potentially cancerous thyroid nodule that causes rapid heartbeat, and severe scoliosis that has displaced his kidneys and presses on his lungs causing chronic shortness

---

[3] *See generally*, Ex. 4, Declaration of Troy Wragg ("Wragg Decl.").
[4] *See generally*, Ex. 5, Declaration of Michael Scronic ("Scronic Decl.").

of breath. He is housed in an honor unit in the Fort Dix main facility's west compound. He comes into contact with hundreds of other people in his building each day, including through shared TV rooms, phones, computers, bathrooms, and mealtimes in which 230 people go to and from the dining hall to pick up food together. At least three people in his building have exhibited some symptoms of COVID-19 over the past month and a half. Petitioner Bogdan has already served a substantial share of his sentence for financial crimes. He has no prior offenses. He is medically vulnerable to COVID-19 and has one or more disabilities recognized by the Rehabilitation Act. If his custody were enlarged to include home confinement or if he were released, he would live with his wife in West Virginia, where he could safely socially distance.[5]

10. Petitioner Eliezer Soto-Concepcion, BOP Register Number 72850-067, is 38 years old and has high blood pressure, a history of heart attacks, and a nervous system condition that makes his hands shake. He lives in the Camp. For weeks, people around him have been exhibiting symptoms of COVID-19, and recently many of his friends tested positive. Petitioner Soto-Concepcion is serving a 12-year sentence for conspiracy to distribute and possession with intent to distribute controlled substances and has no prior convictions. He is medically vulnerable to COVID-19 and has one or more disabilities recognized by the Rehabilitation Act. If his custody were enlarged to include home confinement or if he were released, he would live with his grandmother in Puerto Rico, where he could safely socially distance.[6]

11. Respondent David E. Ortiz is the Warden at Fort Dix. As Warden, Respondent Ortiz is responsible for and oversees all day-to-day activity at Fort Dix. He is in charge of all

---

[5] *See generally*, Ex. 6, Declaration of Leonard Bogdan ("Bogdan Decl.").
[6] *See generally*, Ex. 7, Declaration of Eliezer Soto-Concepcion ("Soto-Concepcion Decl.").

aspects of the operations and functions of Fort Dix. His responsibilities include ensuring the safety of all in the institution and ensuring that the institution operates in an orderly fashion. Respondent Ortiz is aware of and has adopted and enforced policies that leave Petitioners and all those similarly situated exposed to infection, severe illness, and death due to COVID-19. Respondent Ortiz has also declined to release people who qualify under BOP and Department of Justice guidance despite having the authority to do so. Respondent Ortiz is the immediate and physical custodian responsible for the detention of the Petitioners. He is sued in his official capacity only.

12.     Respondent Michael Carvajal is the Director of the Federal Bureau of Prisons. As Director, Respondent Carvajal is responsible for all BOP policies implemented at Fort Dix, including those pertaining to resource distribution and factors that BOP facility leadership should consider in determining an incarcerated individual's eligibility for early release. His responsibilities include ensuring the safety of all in the BOP system and ensuring that institutions operate in an orderly fashion. Respondent Carvajal is aware of and has adopted and enforced policies that leave Petitioners and all those similarly situated exposed to infection, severe illness, and death due to COVID-19. He is sued in his official capacity only.

## JURISDICTION AND VENUE

13.     The Petitioners bring this action pursuant to 28 U.S.C. § 2241 for release from custody that violates the Eighth Amendments to the U.S. Constitution, and pursuant to 28 U.S.C. § 1331 for relief from conditions of confinement that are in violation of the Eighth Amendment and the Rehabilitation Act, 29 U.S.C. § 794.

14.     The Court has subject-matter jurisdiction over this Petition pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2241 (habeas corpus). In addition, the Court has

jurisdiction to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

15.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred and continues to occur in this district.

16.     This Court has personal jurisdiction over Respondents because at all times relevant to this action Respondent Ortiz has been employed at Fort Dix in Burlington County, New Jersey, and all the actions and omissions at issue occurred at Fort Dix. Respondent Carvajal has set policies and issued guidance that Respondent Ortiz has applied at Fort Dix in Burlington County, New Jersey.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

17.     Petitioner Wragg made three applications for Compassionate Release and/or Home Confinement to Respondent Ortiz. On April 24, he received a letter from Respondent Ortiz denying them.

18.     Petitioner Bogdan applied for Compassionate Release from Respondent Ortiz and was denied. He appealed the denial administratively to the BOP Regional Office and received an ultimate denial from Washington, D.C. He has not sought judicial review of the denial. On April 20, 2020, Petitioner Bogdan was also informed in writing by his case manager that he was denied release on Home Confinement.

19.     Petitioner Scronic applied for Compassionate Release from Respondent Ortiz on April 6 and/or April 9. Petitioner Soto-Concepcion applied for Compassionate Release from Respondent Ortiz in mid-April. Neither has received a response.

20.     All Named Petitioners have exhausted the administrative remedies available to them. To the extent they are deemed not to have exhausted, Petitioners are all excused from 28 U.S.C. § 2241's exhaustion requirement. The exhaustion requirement does not apply when the petitioner is likely to suffer an irreparable injury without immediate judicial relief or where the administrative remedy would be futile. Here, both exceptions are met. *See Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 239 n.2 (3d Cir. 2005) (noting that a petitioner's failure to exhaust will be excused where exhaustion would be futile); *Lyons v. U.S. Marshals*, 840 F.2d 202, 205 (3d Cir. 1988) (noting that "[e]xhaustion is not required if administrative remedies would be futile, if the actions of the agency clearly and unambiguously violate statutory or constitutional rights, or if the administrative procedure is clearly shown to be inadequate to prevent irreparable injury"); *United States v. Colvin*, No. 3:19-CR-179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (finding that petitioner seeking compassionate release relating to COVID-19 exhausted administrative remedies where exhaustion would be futile, the administrative process would be incapable of granting adequate relief, and pursuing agency review would subject petitioner to undue prejudice).

21.     Here, exhaustion is excused because no matter how quickly Petitioners pursue additional administrative process beyond what they already have, the harm they suffer while waiting for exhaustion is irreparable. The densely populated conditions and facility design at Fort Dix expose Petitioners, each of whom has medical conditions that make him more susceptible to severe illness and death from COVID-19, to heightened risk of exposure to the disease, in violation of their constitutional rights. Such constitutional injury is irreparable. As a practical matter, Petitioners cannot meaningfully engage in any administrative-remedy process quickly enough to protect them from the risk of contracting COVID-19 from the people in the facility who have already contracted the virus and the catastrophic health consequences such infection would cause.

Petitioners thus will remain exposed to irreparable injury if they do not receive immediate judicial relief.

22.       Independently, exhaustion is futile because Respondents cannot or will not provide the relief requested in this petition. The only administrative process even ostensibly available to Petitioners here is the BOP's Administrative Remedy Program (ARP). However, ARP is a lengthy process that does not provide the requested relief of enlargement of custody or, ultimately, release. It would have been futile for Petitioners to engage in ARP in advance of this case.

23.       In sum, the extraordinary circumstances of an existing COVID-19 outbreak already at Fort Dix—especially the risk it poses to medically vulnerable individuals housed there such as Petitioners—render further exhaustion a total barrier to any effective relief. For each of these independent reasons, to whatever extent Petitioners are deemed not to have exhausted by virtue of their compassionate release and/or home confinement applications, Petitioners are excused from the requirement of exhausting administrative remedies.

## FACTUAL ALLEGATIONS

### I.    The COVID-19 Crisis

24.       The novel coronavirus that causes COVID-19 has led to a global pandemic. As of May 4, 2020, worldwide there are over 3 million reported COVID-19 cases and 238,730 confirmed deaths.[7] In the United States, the case count stands at 1,122,486 and the death count at 65,735.[8]

---

[7] World Health Org., *Coronavirus disease (COVID-19) Pandemic*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last accessed May 4, 2020).
[8] Ctrs. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed May 4, 2020).

25.     New Jersey has been at the epicenter of the pandemic, ranking second in the United States in the number of people reported to have tested positive with the coronavirus, and in the number of people who have died. Its case count as of May 4 is 126,744, including 3,043 in Burlington County. The death count in New Jersey is 7,871, including 149 in Burlington County.[9]

26.     In addition to the 3,043 confirmed cases of COVID-19 reported in Burlington County, neighboring New Jersey counties (Atlantic, Camden, Mercer, Monmouth, and Ocean City) reporting another 22,713 confirmed cases, combined.[10] Approximately 20.3 percent of the 126,744 confirmed COVID-19 cases in New Jersey are in Burlington and its neighboring counties.[11] Moreover, Burlington's two neighboring Pennsylvania counties (Philadelphia County and Bucks County) report 13,179 and 3,286 confirmed cases, respectively.[12]

27.     The virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[13] Infected people can spread the virus to others even if they are asymptomatic, such that simply avoiding people who are coughing or visibly feverish is insufficient.

---

[9] New Jersey COVID-19 Dashboard, https://covid19.nj.gov/#live-updates (last accessed May 4, 2020).
[10] *Id.*
[11] *Id.*
[12] Pa. Dep't of Health, *COVID-19 Cases in Pennsylvania*, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last accessed May 4, 2020).
[13] *See* Goldenson Decl. ¶ 13; *see also* Ex. 2, Declaration of Nina Fefferman ("Fefferman Decl.") ¶ 4 (noting that COVID-19 infection spreads exponentially because the virus transmits very easily).

28.     According to the CDC, people who suffer from certain underlying medical conditions, many of which qualify as disabilities under the Rehabilitation Act, face elevated risk.[14] Such conditions include chronic lung disease, moderate to severe asthma, serious heart conditions, hypertension, high blood pressure, chronic kidney disease, liver disease, diabetes, compromised immune systems (such as from cancer treatment, HIV, autoimmune disease, or use of immunosuppressing medication for other conditions), and severe obesity.[15] One analysis found mortality rates of 13.2% for patients with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[16]

29.     In many people, COVID-19 causes fever, cough, and shortness of breath. But for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe. Most people in higher-risk categories who develop serious illness will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive-care physicians.[17]

30.     In patients who do not die, COVID-19 can severely damage lung tissue, requiring an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called

---

[14] CDC, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed Apr. 29, 2020).
[15] *Id.*
[16] World Health Org., *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* at 12 (Feb. 28, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf; *see also* Fefferman Decl. ¶ 7.
[17] *See* Fefferman Decl. ¶ 9 (noting that 30% of patients who develop severe symptoms require intensive care to survive).

myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.[18]

31.     Emerging evidence also suggests that COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days.[19]

32.     Even some younger and healthier people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.[20]

33.     The estimated fatality rate associated with COVID-19 has been estimated to range from 0.1 to 3.5 percent, meaning COVID-19 may be as much as 35 times more fatal than seasonal influenza.[21] Although many people who contract COVID-19 will exhibit relatively mild

---

[18] Cynthia Weiss, How does COVID-19 affect the heart?, Mayo Clinic News Network (Apr. 3, 2020), https://newsnetwork.mayoclinic.org/discussion/how-does-covid-19-affect-the-heart/.
[19] Lenny Bernstein et al., *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts and elsewhere*, Wash. Post (Apr. 15, 2020), https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-13e1ae0a3571_story.html; Aria Bendix, A Day-By-Day Breakdown of Coronavirus Symptoms Shows How the Disease COVID-19 Goes from Bad to Worse, Business Insider (Mar. 31, 2020), https://www.businessinsider.com/coronavirus-covid19-day-by-day-symptoms-patients-2020-2.
[20] *See* Fefferman Decl. ¶ 23.
[21] Goldenson Decl. ¶ 8.

symptoms, the virus will manifest in some 20 percent of cases as a "more severe disease requiring medical intervention and support."[22]

34.     There is no vaccine against COVID-19 and there is no known medication to prevent or treat infection from COVID-19. Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including frequently and thoroughly washing hands with soap and water and cleaning and disinfecting high-touch surfaces, are the only known effective measures for protecting people from COVID-19.[23] This is especially significant because the virus can spread through people who appear asymptomatic.[24]

35.     State and local officials have been taking aggressive action in New Jersey. On March 9, in response to then-emerging coronavirus outbreak, Governor Murphy signed Executive Order No. 103 declaring a State of Emergency and a Public Health Emergency in New Jersey,[25] doing so even before the President had declared a national emergency.[26] A week later, on March 16, Governor Murphy issued Executive Order No. 104, which limited gatherings to a maximum of 50 people; closed schools, casinos, movie theaters, gyms, and dine-in restaurants; and imposed a curfew between 8:00 PM and 5:00 AM on all but "essential" businesses (*e.g.*, grocery stores, pharmacies, gas stations, and health care facilities).[27]

---

[22] *Id.*
[23] *Id.* at ¶ 16; Fefferman Decl. ¶¶ 10–11, 25.
[24] Goldenson Decl. ¶ 28.
[25] N.J. Exec. Order No. 103 (Mar. 9, 2020), *available at* https://nj.gov/infobank/eo/056murphy/pdf/EO-103.pdf.
[26] *See* Charlie Savage, *Trump Declared an Emergency Over Coronavirus. Here's What It Can Do.,* N.Y. Times (Mar. 13, 2020), https://www.nytimes.com/2020/03/13/us/politics/coronavirus-national-emergency-html.
[27] N.J. Exec. Order No. 104 (Mar. 16, 2020), *available at* https://nj.gov/infobank/eo/056murphy/pdf/EO-104.pdf.

36.     On March 21, 2020, Governor Murphy issued Executive Order No. 107 requiring all New Jersey residents to "remain home or at their place of residence" unless it is for one of the enumerated exempted purposes, such as grocery shopping or seeking medical attention. [28]

37.     Local officials have also taken measures aimed at slowing the virus's spread. For example, on March 25, Newark Mayor Ras Baraka issued a "shelter-in-place" order similar in scope to Governor Murphy's E.O. 107.[29]

## II.     Incarcerated People and Staff Are Particularly Vulnerable.

38.     People in congregate environments such as correctional facilities, where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships[30] and nursing homes.[31] People who are confined in prisons, jails, and detention centers find it virtually impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission, even with the best laid plans. These settings are particularly vulnerable to what the CDC calls "community

---

[28] N.J. Exec. Order No. 107 (Mar. 21, 2020), *available at* https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf.

[29] *See* Eric Kiefer, *Entire City Of Newark Told To Shelter In Place: Coronavirus*, Patch (Mar. 26, 2020), https://patch.com/new-jersey/newarknj/entire-city-newark-told-shelter-place-coronavirus.

[30] *E.g.*, Jason Hanna & Melissa Alonso, *Coral Princess Docks in Miami With 2 Dead and Several Ill of Coronavirus, After Ports Shunned it For Days*, CNN (Apr. 4, 2020), https://www.cnn.com/2020/04/04/us/coral-princess-cruise-ship-docks-miami-coronavirus/index.html.

[31] *E.g.*, Stacey Burling, *Assume Coronavirus is Already There, Says a Philly Nursing Home Doctor Who Learned the Hard Way*, Phila. Inquirer (Apr. 3, 2020), *available at* https://www.inquirer.com/health/coronavirus/coronavirus-renaissance-nursing-home-philadelphia-20200403.html; *see also* Suzy Khimm & Laura Strickler, *Nursing Homes Overwhelmed By Coronavirus*, NBC News (Apr. 1, 2020), https://www.nbcnews.com/news/us-news/nursing-homes-overwhelmed-coronavirus-it-impossible-us-stop-spread-n1174171.

spread," where the virus spreads easily and sustainably within a community even where the source of the infection is unknown.[32]

39.     Correctional facilities increase the risk of rapid spread of an infectious disease, like COVID-19, because of the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others.[33]

40.     The CDC has issued guidance urging prison administrators to take action to prevent overcrowding of correctional and detention facilities during a community outbreak.[34] The CDC guidance emphasizes that social distancing is "a cornerstone of reducing transmission of respiratory disease such as COVID-19."[35] It calls not only for social distancing, but also measures for isolating and quarantining detainees and staff who have (or are suspected of having) COVID-19 from those who do not have (or presumably do not have) the virus.

41.     Many correctional facilities find implementation of these preventive strategies challenging without a significant reduction in prison populations.

---

[32] *See* Fefferman Decl. ¶ 19 ("[D]espite best efforts to increase personal hygiene and social distancing practices, and to reduce inmate movements and suspend access to members of the public (contractors, visitors, and legal professionals), prisons are inherently incapable of reducing the risks of transmission to those seen in the broader community.").

[33] *See generally* I.A. Binswanger et al., *Prevalence of Chronic Medical Conditions Among Jail and Prison Inmates in the USA Compared With the General Population*, 63 J. Epidemiology & Community Health 912 (2009) (concluding that people incarcerated in U.S. jails and prisons had a higher burden of most chronic medical conditions than the general population, even when adjusting for sociodemographic differences and alcohol consumption).

[34] U.S. Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (CDC Guidance) (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[35] *Id.*

42.     As a general matter, correctional facilities frequently lack sufficient medical supplies for the population, and, in times of crisis, medical staff may cease coming to the facilities. Hot water, soap, and paper towels are often in limited supply. Incarcerated people themselves, rather than professional cleaners, are often responsible for cleaning the facilities and often are not given appropriate supplies. This means there are more people who are susceptible to infection all congregated together in a location where fighting the spread of an infection is nearly impossible.[36]

43.     The difficulty correctional facilities have complying with CDC guidance is demonstrated by a few examples. A recent COVID-19 outbreak in an Arkansas state prison quickly spread to 43 out of 46 prisoners in a single housing unit.[37] In New Jersey, the New Jersey Department of Corrections (NJDOC) reported 29 prisoner deaths in New Jersey correctional facilities (as of April 27) and that of the 184 people incarcerated in NJDOC facilities who have been tested, almost 80 percent have tested positive.[38] The Essex County Correctional Facility, the first correctional facility in the state to screen its population, found that of the first 91 incarcerated people it tested, over half tested positive for the virus or for antibodies.[39] Other nearby correctional

---

[36] *See* Goldenson Decl. ¶ 36; Fefferman Decl. ¶ 22.

[37] *43 Arkansas state inmates test positive for COVID-19*, ABC 20/49 (Apr. 13, 2020), https://www.4029tv.com/article/43-arkansas-state-inmates-test-positive-for-covid-19/32131327; *see generally In Four U.S. State Prisons, Nearly 3,300 Inmates Test Positive for Coronavirus—96%Without Symptoms*, N.Y. Times (April 25, 2020), https://www.nytimes.com/reuters/2020/04/25/us/25reuters-health-coronavirus-prisons-testing-insight.html?searchResultPosition=8.

[38] NJDOC, *COVID-19 Updates* (last updated Apr. 27, 2020), https://www.state.nj.us/corrections/pages/COVID19Updates.shtml; *see also* Alice Speri, *In New Jersey Prisons, 29 Coronavirus Deaths and Only 184 Tests,* The Intercept (Apr. 28, 2020), https://theintercept.com/2020/04/28/coronavirus-new-jersey-prisons/.

[39] Blake Nelson, *Sick N.J. Corrections Officer Had to Get Coronavirus Test on His Own. Why Aren't Prisons Testing More?*, NJ.com (Apr. 20, 2020), https://www.nj.com/coronavirus/2020/04/sick-nj-prison-guard-had-to-get-coronavirus-test-on-his-own-why-arent-prisons-testing-more.html; Joe Atmonavage, *N.J. County Jail Will Be First to*

centers have found similarly high rates of transmission upon commencing testing.[40] This week, the BOP revealed that, of the 2,700 prisoners nationwide it had tested, nearly 2,000—over 70 percent—were positive.[41]

44.     For these reasons, correctional public health experts have recommended the release from custody of people most vulnerable to COVID-19. Exercising authority to enlarge custody or release detainees protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and it also allows for greater risk mitigation for all people held or working in a prison, jail, or detention center. Release of the most vulnerable people from custody also reduces the burden on the region's health-care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time. As leading pandemic-preparedness expert Professor Nina Fefferman observed, "Epidemiologically, the only way to meaningfully reduce the risks posed to the entire population—inmates, staff, and public—is to drastically reduce the prison population."[42]

45.     Courts have responded to this public call to reduce the incarcerated populations. For example, on March 22, in response to the "dangers posed by the Coronavirus," the New Jersey Supreme Court ordered the presumptive release of all people currently serving a county jail sentence, an order that resulted in the release of hundreds of people. *In the Matter of the Request*

---

*Screen All Inmates for Coronavirus Using New Test Method*, NJ.com (Apr. 16, 2020), https://www.nj.com/coronavirus/2020/04/nj-county-jail-will-be-first-to-screen-all-inmates-for-coronavirus-using-new-testing-method.html.

[40] Laura Benshoff, *Coronavirus Update: Montco Finds Widespread, Silent Spread in Prisons*, WHYY (Apr. 27, 2020), https://whyy.org/articles/coronavirus-update-air-force-navy-release-map-for-tuesdays-flyover-to-thank-frontline-workers/.

[41] Michael Balsamo, *Over 70% of tested inmates in federal prisons have COVID-19*, AP (Apr. 29, 2020), https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f.

[42] Fefferman Decl. ¶ 25; *see generally id.* ¶¶ 17–26.

*to Commute or Suspend County Jail Sentences,* Consent Order, No. 084230 (N.J. Mar. 22, 2020).[43]

High courts in other states have issued similar orders aimed at reducing state prison populations.[44]

46.     Officials in New Jersey have echoed the calls to release vulnerable people. Recognizing the possibility of such perilous outcomes, the "challenges associated with maintaining traditional social distancing in correctional settings," and the "heightened risk of death and serious injury" for "these particularly vulnerable individuals," Governor Murphy issued Executive Order No. 124 on April 10 to begin the process of "temporarily" releasing certain individuals in state prisons serving sentences for nonviolent crimes.[45]

47.     Absent such measures, transmission in prisons and jails will not only endanger the incarcerated, but also burden local hospitals and endanger the broader community. Correctional facilities lack adequate medical facilities to treat serious COVID-19 cases, so an outbreak in a

---

[43] The order provided a mechanism for prosecutors, within 24-to-48 hour, to object to the release of specific prisoners who "would pose a significant risk to the safety of the inmate or the public," with such objections to be considered by judges or special masters appointed by the Supreme Court, with provisional representation by the Office of the Public Defender for prisoners for whom objections were filed.

[44] *See*, *e.g.*, *In re: The Petition of the Pennsylvania Prison Society et al.*, No. 70 MM 2020 (Pa. Apr. 3, 2020), *available at* https://law.justia.com/cases/pennsylvania/supreme-court/2020/70-mm-2020.html (Pennsylvania Supreme Court ordered the chief judge of all counties to "immediately" engage in a review of the "current capabilities of their county correctional institutions . . . to address the spread of COVID-19," "to ensure that the county correctional institutions in their districts address the threat of COVID-19," as necessary "to identify individuals of incarcerated persons for potential release" and "to undertake efforts to limit the introduction of new inmates into the county prison system."); *Comm. for Pub. Counsel Servs. v. Chief Justice of the Trial Court*, No. SJC-12926 (Mass. Apr. 3, 2020), *available at* https://www.mass.gov/files/documents/2020/04/03/12926.pdf (Massachusetts Supreme Court ruled that pre-trial detainees not charged with certain violent offenses, as well as incarcerated individuals held on technical probation and parole violations, is entitled to a rebuttable presumption of release).

[45] N.J. Exec. Order No. 124 (Apr. 10, 2020), *available at* http://d31hzlhk6di2h5.cloudfront.net/20200410/c0/64/ce/2c/0ef068b5d2c6459546c33a46/EO-124.pdf.

prison could overwhelm local hospitals. And as correctional staff enter and leave the facility, they will carry the virus with them. Like the incarcerated people in the facilities where they work, correctional officers face an increased risk of COVID-19 exposure because they are less able to engage in social distancing and because of the shortage of personal protective equipment, also known as PPE. Indeed, as of May 3, the BOP had reported 498 confirmed past and present infections among its prison staff nationwide.[46]

48.     On an accelerating basis since mid-March of this year, courts in this Circuit and across the country have ordered the release of prisoners and detainees in response to the COVID-19 crisis.[47]

---

[46] *See* Fed. Bureau of Prisons, *COVID- 19*, https://www.bop.gov/coronavirus/ (last accessed May 4, 2020).

[47] *See, e.g.*, *Arriaga Reyes. v. Decker*, No. 2:20-cv-03600 (D.N.J. Apr. 12, 2020) (ordering five petitions for immediate release of ICE detainees from New Jersey facilities); *Basank v. Decker*, No. 1:20-cv-02518 (S.D.N.Y. Mar. 26, 2020) (ordering release of ten individuals detained by ICE housed in New Jersey county jails because of preexisting medical conditions); *United States v. Xue*, No. 18-CR-122, ECF 42 (E.D. Pa. Apr. 10, 2020) (ordering pretrial release in light of compelling reason of COVID-19, subject to requirements); *United States v. Giordano*, No. 14-CR-206, ECF 72 (E.D. Pa. Apr. 10, 2020) (granting release of petitioner with medical conditions rendering him particularly vulnerable to the effects of COVID-19 and that petitioner's fear of infection while incarcerated far outweighs any likelihood of fleeing); *United States v. Rodriguez*, No. 03-CR-271, ECF 135 (E.D. Pa. Apr. 1, 2020) (granting motion for compassionate release where the presence of COVID-19, the inmate's health conditions, the proximity to his release date, and his demonstration of rehabilitation created extraordinary and compelling reasons justifying release); *United States v. Colvin*, No. 3:19-CR-179, 2020 U.S. Dist. LEXIS 57962 (D. Conn. 2020) (waiving exhaustion requirement and granting motion or compassionate release for vulnerable inmate at FDC Philadelphia where "the risks faced by the Defendant will be minimized by her immediate release to home, where she will quarantine herself"); *Coronel v. Decker*, No. 20 Civ. 2472, ECF 26 (S.D.N.Y. Mar. 27, 2020) (granting release of four detainees with medical conditions that render them particularly vulnerable to severe illness or death if infected by COVID-19); *People of State of N.Y. ex rel. Stoughton v. Brann*, No. 451078/2020, 2020 NY Slip Op 20081 (N.Y. Sup. Ct. Apr. 6, 2020) ("[C]ommunicable diseases could not ask for a better breeding ground than a crowded prison. . . . Certainly no American prison is equipped to deal with a health crisis of the severity of this one.").

### III.        The Efforts of the Bureau of Prisons Are Inadequate.

49.        The BOP has failed to respond effectively to the COVID-19 pandemic. The BOP failed to anticipate and prepare for the magnitude of the threat that COVID-19 poses to its own staff and the people it detains; it then failed to respond in any meaningful way to initial signs of uncontrolled outbreaks at several of its facilities across the country, including Fort Dix; and it has continued to fail to implement even the baseline measures that would assure the safety of its own staff, of Petitioners and their fellow class members and others incarcerated by the BOP, and of the communities into which staff and others travel on a daily basis. BOP's primary and ongoing failure has been its unwillingness to implement social distancing, despite clear public health guidance that it is necessary to prevent COVID-19 infection.

50.        The BOP's preparations were inadequate from the start. Initial guidance from the BOP was not issued until March 9, and it addressed only the possibility of telework for some employees at an agency where the vast majority of workers must physically appear at facilities to do their jobs, and it mentioned restrictions only for people who had traveled to already-impacted countries.[48]

51.        Moreover, the BOP did not make any changes to protocols that call for prisoners to purchase their own cleaning supplies from commissary—preventing many indigent and poor prisoners from being able to buy those supplies—and for them to maintain responsibility for cleaning and sanitizing their spaces (whether they have supplies or not).[49]

---

[48] *See* BOP Memorandum (Mar. 9, 2020),
https://cdn.govexec.com/media/gbc/docs/pdfs_edit/031020cb.pdf.
[49] *See, e.g.*, *Inmate Information Handbook*, *Federal Bureau of Prisons FCI Elkton, Ohio* at 9,
Bureau of Prisons (2012), https://www.bop.gov/locations/institutions/elk/ELK_aohandbook.pdf.

52.     In fact, as late as March 26—weeks after many cities and states had closed restaurants and non-essential businesses, restricted travel, and ordered people to shelter in place—the BOP Director announced that the BOP had merely taken an inventory of soap, rather than taken steps to distribute it at no cost or even at a reduced cost.[50]

53.     Because of the BOP's failure to take the threat seriously or to take meaningful steps to prepare, stakeholders from every part of the system highlighted preparations that it had not undertaken, possible dangers faced by employees, and open questions that required urgent attention and answers.[51]

54.     Similarly, before the BOP began losing control of COVID-19 in its facilities, press accounts had already highlighted the impending storm.[52]

55.     Among other failures that contributed to spread at BOP facilities, officers reported that even as of late March, they were given only gloves—not masks, face shields, or other PPE—when interacting with prisoners sick enough to require transport to the hospital.[53] Those same

---

[50] That day the BOP Director issued a statement that "all cleaning, sanitation, and medical supplies have been inventoried. Ample supplies are on hand and ready to be distributed or moved to any facility as deemed necessary." Fed. Bureau of Prisons, *Statement from BOP Director* (Mar. 26, 2020), *available at* https://www.bop.gov/resources/news/20200326_statement_from_director.jsp.

[51] *See* Letter from U.S. Senators Warren, Booker et al., (Mar. 9, 2020), *available at* https://www.warren.senate.gov/imo/media/doc/2020-03-09%20Senator%20Warren%20Letter%20to%20BOP%20re%20Coronavirus.pdf; *see also* AFGE Testimony to House Oversight Committee (Mar. 11, 2020), *available at* https://www.afge.org/globalassets/documents/congressional-testimony/2020/afge-sfr-house-committee-on-oversight-and-reform-coronavirus-preparedness-and-response.pdf.

[52] *See, e.g.*, Michael Balsamo & Michael R. Sisak, *Federal Prisons Struggle to Combat Growing COVID-19 Fears*, AP (Mar. 27, 2020), https://apnews.com/724ee94ac5ba37b4df33c417f2bf78a2.

[53] Joseph Neff & Keri Blakinger, *Federal Prisons Agency "Put Staff in Harm's Way" of Coronavirus: Orders at Oakdale in Louisiana Help Explain COVID-19 Spread*, The Marshall

officers were ordered back to the job in defiance of CDC guidance that called for self-isolation by correctional staff who had been exposed.[54]

56.     Unicor, an entity that runs prisoner work programs for the BOP, continued operating throughout the pandemic and did not began distributing masks to prisoner workers and correctional officers until about April 2, 2020.[55]

57.     Across facilities, the BOP has been "scrambling" to address staffing and resource needs. Despite this, the BOP has continued to limit the number of contractors who can supply PPE, does not have enough tests, and has been sued by its own staff for requiring them to work in hazardous working conditions.[56]

58.     When the BOP loses control at a facility, dozens of prisoners must go to local hospitals, straining the local healthcare infrastructure, as well.

59.     The consequences of BOP's failures have been dramatic. Nationwide, in the first ten days after the BOP announced positive cases in its facilities, the average percentage increase in infections in BOP facilities was 2,500 percent.

60.     Federal facilities all over the country—including in the Mid-Atlantic region—have been overrun with the virus. Facilities with uncontrolled outbreaks include:

---

Project (Apr. 3, 2020), https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus.
[54] *Id.*
[55] Cary Aspinwall, Keri Blakinger, & Joseph Neff, *Federal Prison Factories Kept Running as Coronavirus Spread*, The Marshall Project (Apr. 10, 2020), https://www.themarshallproject.org/2020/04/10/federal-prison-factories-kept-running-as-coronavirus-spread.
[56] Luke Barr, *Federal Prisons Facing Shortages of Resources Amid Coronavirus Outbreak*, ABC News (Apr. 1, 2020), https://abcnews.go.com/Health/federal-prisons-facing-shortages-resources-amid-coronavirus-outbreak/story?id=69920966.

- FCI Danbury, in Connecticut (43 combined current positive tests as of April 28 and 1 prisoner death);

- FCI Butner, in North Carolina (221 combined current positives as of April 28 and 5 prisoner deaths);

- USP Lompoc, in California (85 combined current positives as of April 28 and 1 prisoner death);

- FMC Fort Worth, in Texas (242 combined current positives as of April 28 and 3 prisoner deaths);

- FCI Terminal Island, in California (453 combined current positives as of April 28 and 2 prisoner deaths);

- FCI Elkton, in Ohio (93 combined current positives as of April 28 and 7 prisoner deaths); and

- FCI Forrest City, in Arkansas (44 combined current positives as of April 28).[57]

61.     Even those figures are almost certainly an undercount. The BOP has repeatedly understated the scope of the problem and refused to take steps to assess the situation transparently. For example, as of April 6, the BOP had reported eight prisoners and one staff had tested positive at FCI Elkton.[58] Press accounts, however, reported that medical staffing had fallen to fifty percent of capacity, and that three prisoners had already died as of April 6.[59] The full scope of the problem

---

[57] *See* Fed. Bureau of Prisons, *COVID- 19*, https://www.bop.gov/coronavirus/ (accessed Apr. 29, 2020).
[58] *Id.*
[59] *Ohio Gov. Mike DeWine Authorized Ohio National Guard to Assist Elkton Prison*, WKYC (Apr. 6, 2020), https://www.wkyc.com/article/news/health/coronavirus/ohio-gov-mike-dewine-authorizes-ohio-national-guard-to-assist-elkton-prison/95-d620f3c6-c560-486f-9eac-ebce7c09d4e7.

did not become clear until a federal judge ordered the facility to increase testing, after the BOP admitted that it only had 55 tests on hand for a facility of more than 2,400 prisoners.[60]

62.     Conditions had already deteriorated so thoroughly that Ohio Governor Mike DeWine called in the state's National Guard to FCI Elkton, a federal prison.[61] At the press conference announcing that decision, Governor DeWine called on the BOP to stop sending new prisoners to Elkton.[62] And the accuracy of the BOP's reporting of COVID-19 cases in Elkton is in doubt.[63]

63.     Ultimately, the U.S. District Court for the Northern District of Ohio ordered enlargement of custody for medically vulnerable prisoners at FCI Elkton pending resolution of a class habeas petition on the merits, because of the outbreak already raging at the facility.[64]

64.     Such conditions at numerous facilities across the country have led BOP employees including corrections officers to file a complaint with the Occupational Safety and Health

---

[60] *Judge grills federal prisons lawyer on lack of coronavirus tests at Ohio facility in wake of Trump's claim that 'anybody' can get tested*, Cleveland.com (Apr. 18, 2020), https://www.cleveland.com/court-justice/2020/04/judge-grills-federal-prisons-lawyer-on-lack-of-coronavirus-tests-at-ohio-facility-in-wake-of-trumps-claim-that-anybody-can-get-tested.html.
[61] *Ohio Gov. Mike DeWine Authorized Ohio National Guard to Assist Elkton Prison*, WKYC (Apr. 6, 2020), https://www.wkyc.com/article/news/health/coronavirus/ohio-gov-mike-dewine-authorizes-ohio-national-guard-to-assist-elkton-prison/95-d620f3c6-c560-486f-9eac-ebce7c09d4e7.
[62] Cory Shaffer, *Ohio National Guard Will Assist With Response at Elkton Federal Prison*, Cleveland.com (Apr. 6, 2020), https://www.cleveland.com/coronavirus/2020/04/ohio-national-guard-will-assist-with-coronavirus-response-at-elkton-federal-prison.html; *see also* Brandon Brown, *Sen. Portman Urges Prisoners Not to be Transferred to FCI Elkton*, WFMJ (Apr. 6, 2020), https://www.wfmj.com/story/41979544/sen-portman-urges-prisoners-not-be-transferred-to-fci-elkton.
[63] *Elkton Union President Reports Different COVID-19 Stats Than Federal Bureau of Prisons*, WKVB (Apr. 9, 2020), https://www.wkbn.com/news/coronavirus/elkton-union-president-reports-different-covid-19-stats-than-federal-bureau-of-prisons/.
[64] *Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 1940882, at *10 (N.D. Ohio Apr. 22, 2020).

Administration (OSHA) alleging unsafe conditions at numerous federal prisons nationwide, including Fort Dix. Among other things, the officers' OSHA complaint points to the BOP having "directed staff through the Bureau of Prisons who have come in contact with, or been in close proximity to, prisoners who show or have shown symptoms of COVID-19, to report to work and not be self-quarantined for 14 days per the CDC guidelines." It also complains of the BOP having failed to undertake any workplace or administrative controls to address transmission, to require social distancing or other measures in the CDC guidance, or to provide sufficient PPE.[65]

65.      In apparent response, the BOP released a short document titled "Correcting Myths and Misinformation about BOP and COVID-19."[66] In attempting to rebut the assertion that staff who had been in contact with prisoners who showed symptoms of COVID-19 still had to come to work, the BOP simply confirmed that such employees *were* required to come to work, with masks.[67]

66.      The Coronavirus Aid, Relief, and Economic Security (CARES) Act, signed into law on March 27, makes funding available for federal prisons to purchase PPE and test kits for COVID-19 and authorizes the Department of Justice to lengthen the maximum amount of time

---

[65] *See* Notice of Alleged Safety or Health Hazards (March 31, 2020), *available at* https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf.

[66] *See* Fed. Bureau of Prisons, *Correcting Myths and Misinformation About BOP And COVID-19* (Apr. 11, 2020),
https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf.

[67] *Id.* at 3 ("In keeping with CDC 'Guidance for Safety Practices for Critical Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19,' the BOP performs pre-screening of all employees reporting to work and requires exposed workers to wear a mask for 14 days after last exposure. They are also expected to perform regular self-monitoring for symptoms, practice social distancing and to disinfect and clean their work spaces. Anyone who develops signs or symptoms of illness are sent home.").

that a prisoner can be placed in home confinement during the pandemic.[68] Acting under that authority, Attorney General Barr made a finding that emergency conditions are materially affecting the functioning of the BOP, and on April 3 he directed Respondent Carvajal to review prisoners with COVID-19 risk factors to determine their eligibility for home confinement, stating that the BOP's efforts to prevent COVID-19 from entering BOP facilities and infecting prisoners have "not been perfectly successful at all institutions."[69]

67.     Attorney General Barr also released guidance in the form of a series of letters suggesting that some BOP prisoners should be released.[70] Those letters merely encourage the BOP to exercise discretion that it has declined to use, and they do not actually direct the release of categories of prisoners, much less on a scale that would allow for safe social distancing in the facilities or with the speed that the health crisis requires. Of the relatively small number of people released, the BOP has not reported the number who subsequently died.

68.     On April 22, the BOP issued a memo purporting to interpret Attorney General Barr's guidance, substantially limiting the number and types of people who might qualify for home confinement under the Attorney General's memos.[71] Even though the April 3 Barr memo directed the BOP to "immediately maximize appropriate transfers to home confinement," including

---

[68] CARES Act, Pub. L. No. 116-136, § 12003(b), 134 Stat. 281 (2020).

[69] Memorandum from Attorney General Barr to Director Carvajal (Apr. 3, 2020), *available at* https://www.justice.gov/file/1266661/download.

[70] *See* Mar. 26, 2020 and Apr. 3, 2020 Memoranda For Director of Bureau Prisons from Attorney General Barr, *available at* https://www.justice.gov/coronavirus.

[71] Memorandum from Correctional Programs Division Acting Assistant Director Andre Matevousian & Reentry Services Division Assistant Director Hugh J. Hurwitz to Chief Executive Officers (Apr. 22, 2020), *available at* https://famm.org/wp-content/uploads/bop-memo-4.23.2020.pdf.

prioritizing those at "outbreak prisons," the BOP's own guidance excludes the vast majority of prisoners in its custody by adding a number of barriers to consideration for release.

69.     The BOP's April 22 guidance gives wardens virtually unchecked discretion to deny a request for release and imposes unnecessary and impractical barriers on prisoners seeking release. For example, pursuant to the BOP's guidance: (i) prisoners must have had no disciplinary infractions of any kind for 12 months; (ii) prisoners must provide verification that they would have a lower risk of contracting COVID-19 outside the prison than inside of it, and, (iii) prisoners with any on-going medical care must show their medical needs can be met outside the prison, and that they have a 90-day supply of prescribed medications.

70.     The appalling conditions of BOP facilities across the country, and the BOP's failures to address the constitutional rights of prisoners in its care, have forced federal courts to address BOP failures in a large number of individual cases seeking compassionate release;[72] bail

---

[72] *E.g.*, *United States v. Rodriguez*, No. 03-cr-271, ECF 135 (E.D. Pa. Apr. 1, 2020) (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); *United States v. Foster*, No. 14-cr-324-02, ECF 191 (M.D. Pa. Apr. 3, 2020) (noting the "unprecedented" circumstances facing "our prison system" and finding that COVID-19 is an extraordinary and compelling basis for release; indeed, "[n]o rationale is more compelling or extraordinary"); *United States v. Smith*, No. 12-cr-133, ECF 197 (S.D.N.Y. Apr. 13, 2020) (granting release; finding exhaustion waivable and waived); *United States v. Zukerman*, No. 16-cr-194, ECF 116 (S.D.N.Y. Apr. 3, 2020) (waiving exhaustion and granting immediate compassionate release in light of COVID-19 to defendant convicted in multi-million dollar fraud scheme); *United States v. Sawicz*, No. 08-cr-287, ECF 66 (E.D.N.Y. Apr. 10, 2020) (releasing child-pornography offender); *United States v. Clagett*, No. 97-cr-265, ECF 238 (W.D. Wash. Apr. 9, 2020); *United States v. Oreste*, No. 14-cr-20349, ECF No. 200 (S.D. Fla. Apr. 6, 2020); *United States v. Hakim*, No. 05-cr-40025, ECF 158 (D.S.D. Apr. 6, 2020); *United States v. Hernandez*, No. 18-cr-20474, ECF 41 (S.D. Fla. Apr. 2, 2020).

pending appeal, trial, or sentencing;[73] delayed self-surrender;[74] writs of habeas corpus;[75] class-wide relief for groups of prisoners;[76] and furloughs.[77]

71.     As noted, the Northern District of Ohio ordered FCI Elkton to release potentially hundreds of medically vulnerable prisoners who face a greater threat from COVID-19. It did this because Elkton had "altogether failed" to follow CDC guidance for correctional settings, and that the measures were "necessary to stop the spread of the virus and save lives."[78]

72.     Rather than proactively address any of the conditions that place people in BOP custody at risk of illness or death, the BOP has focused instead on spending money on purchasing

---

[73] *E.g.*, *United States v. Chavol*, No. 20-50075 (9th Cir. Apr. 2, 2020) (stipulation in a FRAP(9) appeal to release on conditions); *United States v. Nkanga*, No. 18-cr-713, ECF 120 (S.D.N.Y. Apr. 7, 2020); *United States v. Hector*, No. 2:18-cr-3-2, ECF 748 (W.D. Va. Mar. 27, 2020).
[74] *United States v. Roeder*, No. 20-1682, ___ F. App'x ___ (3d Cir. Apr. 1, 2020) (reversing district court's denial of defendant's motion to delay execution of his sentence because of the COVID-19 pandemic); *United States v. Garlock*, No. 18-CR-418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (observing that "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Matthaei*, No. 19-CV-243, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of pandemic).
[75] *E.g.*, *Xochihua-James v. Barr*, No. 18-71460, ___ F. App'x ___ (9th Cir. Mar. 23, 2020) (*sua sponte* releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *Fraihat v. Wolf*, No. 5:20-CV-590, ECF 18 (C.D. Cal. Mar. 30, 2020).
[76] *E.g.*, *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19).
[77] *E.g.*, *United States v. Stahl*, No. 18-cr-694, ECF 53 (S.D.N.Y. Apr. 10, 2020); *United States v. Underwood*, No. 18-cr-201, ECF 179 (D. Md. Mar. 31, 2020) (noting that although there has not yet been a positive COVID-19 test in elderly petitioner's facility, "there is significant potential for it to enter the prison in the near future").
[78] *Wilson*, 2020 WL 1940882, at *8.

hydroxychloroquine, an unproven remedy that medical authorities do not believe will work to treat COVID-19.[79]

73.      For all of these reasons, the threat posed to people incarcerated by the BOP remains ongoing and acute. As of May 3, at least 2,441 prisoners have tested positive, along with 498 BOP staff.[80] Even that data understates the true scope of the spread, because COVID-19 testing remains widely unavailable in federal prisons.[81] At least one BOP facility responded to an outbreak by announcing that it would simply stop testing any prisoners.[82]

74.      Notably, the BOP's own data shows that among closed cases, the fatality rates for prisoners in its care may dwarf rates among any other populations. Of cases the BOP has marked as closed as of May 3, 515 prisoners have recovered while 38 have died.[83]

75.      Even in the midst of the virus's rapid spread across the country, the BOP persists in transferring detainees between prisons. In their recently filed OSHA complaint, BOP employees

---

[79] Lachlan Markay, *The Bureau of Prisons Just Bought a Ton of Hydroxychloroquine, Trump's COVID-19 Miracle Drug*, The Daily Beast (Apr. 7, 2020), https://www.thedailybeast.com/the-bureau-of-prisons-just-bought-a-ton-of-hydroxychloroquine-trumps-covid-19-miracle-drug.

[80] This figure combines reported numbers for current positives and recovered cases. Fed. Bureau of Prisons, *COVID-19*, https://www.bop.gov/coronavirus/ (last accessed May 4, 2020).

[81] Michael Balsamo, *Over 70% of tested inmates in federal prisons have COVID-19*, AP (Apr. 29, 2020), https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f. (noting that only 2,700 federal prisoners out of a total federal prisoner population of over 170,000 have been tested; Samantha Michaels, *Why Are We Transferring Potentially Sick Inmates Across the Country Without Testing Them First?*, Mother Jones (Apr. 2, 2020), https://www.motherjones.com/crime-justice/2020/04/why-are-we-transferring-people-from-covid-stricken-prisons-without-testing-them-first/; Luke Barr, *Federal Prisons Facing Shortages of Resources Amid Coronavirus Outbreak*, ABC News (Apr. 1, 2020), https://abcnews.go.com/Health/federal-prisons-facing-shortages-resources-amid-coronavirus-outbreak/story?id=69920966.

[82] Greg LaRose, *Oakdale Federal Prison Stops Testing Inmates with COVID-19 Symptoms*, WDSU News (March 31, 2020), https://www.wdsu.com/article/oakdale-federal-prison-stops-testing-inmates-with-covid-19-symptoms/31989498#.

[83] Fed. Bureau of Prisons, *COVID-19*, https://www.bop.gov/coronavirus/ (last accessed May 4, 2020).

report that BOP "continuously mov[es] inmates by bus and/or airlift to various prison sites across the nation. They have authorized movement of infected inmates, inmates suspected of being infected, inmates who have been in close contact or proximity to infected inmates, to areas of the country that do not have any rate of infections, or to facilities that otherwise have not shown signs of any introduction of the virus, thus introducing the virus into an uninfected area."[84]

### IV.     The Design of Fort Dix Makes Social Distancing Impossible.

76.     The conditions at Fort Dix pose a grave public health risk for the spread of COVID-19. This risk is substantially greater than the risk faced by the public—or even at many other federal prisons, given Fort Dix's design.

77.     Fort Dix is a low security facility with an adjacent minimum-security Camp. The main facility currently holds more than 2,700 people, and the Camp has, until recently, held approximately 230.[85] Perversely, the design of Fort Dix means the fact that those confined at Fort Dix are designated by the BOP as the least dangerous prisoners face heightened risk from COVID-19.[86]

78.     Except for disciplinary and medical isolation, Fort Dix has *no* separate one-person housing cells.[87]

_____

[84] OSHA Complaint (Mar. 31, 2020), *available at* https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf.

[85] Fed. Bureau of Prisons, *FCI Fort Dix,* https://www.bop.gov/locations/institutions/ftd/ (last accessed May 4, 2020).

[86] BOP Program Statement P5100.08 (Sept. 12, 2006), *available at* https://www.bop.gov/policy/progstat/5100_008.pdf; Fed. Bureau of Prisons, "About Our Facilities," https://www.bop.gov/about/facilities/federal_prisons.jsp (last visited Apr. 29, 2020).

[87] PREA Audit: Auditor's Summary Report (May 31, 2014), https://www.bop.gov/locations/institutions/ftd/FTD_prea2.pdf.

79.     Instead, people confined at Fort Dix are housed close together in group quarters. Those at the Camp are divided into two communal dorms, referred to as A-wing (or A-unit) and B-wing (or B-unit). Each wing has typically housed approximately 150 people in a grid of bunk beds two to three feet apart.[88] People in the bunks are so close that they can reach out and touch the people in the bunks on both sides.[89] At least in some areas, the bunks appear to be arranged three-deep: people sleep not only with bunks to their left and right, but also at their head and feet.[90] Social distancing, as a matter of dorm design, is simply impossible.[91]

80.     The main facility is divided into East and West Compounds, with approximately five buildings on each side that can house more than 300 people each. The buildings are three stories high and consist mostly of 12-person rooms, with a smaller number of two-person rooms. The 12-person rooms can be as small as 430 square feet. Within that space are squeezed six two-person bunk beds, 12 lockers, and a card table. Prisoners maintain free movement within the building, sharing common TV rooms, computers, telephones, and bathrooms.[92] Even for the few prisoners in two-person rooms, prisoners come into contact with hundreds of people in their building each day.

81.     The bathrooms at Fort Dix are communal. In both the main facility and the Camp, each person shares a limited number of sinks, showers, and toilets with dozens of other prisoners

---

[88] Scronic Decl. ¶ 4.
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *See* Bogdan Decl. ¶ 7.

within just feet of them. In the Camp, for example, a single bathroom with shared sinks and toilets is used by some 150 people.[93]

82.     The fundamental structure of the low- and minimum-security Fort Dix facility makes it a COVID-19 deathtrap. It is not possible for people to engage in social distancing or self-quarantine precautions as recommended by the CDC. As correctional-health expert Dr. Goldenson explains, Fort Dix's communal set-up makes the social distancing essential to preventing the spread of infection "impossible."[94]

### V.     Fort Dix Is Failing to Take Proper Precautions, Placing People at an Unconstitutional Risk of Contracting COVID-19.

83.     Fort Dix's actions to protect prisoners from COVID-19 have been slow and inadequate. Although the BOP purported to impose a nationwide quarantine on April 1, Fort Dix failed to impose effective quarantine measures. The prison did not distribute masks to prisoners until early April, and not all prisoners received masks at that time. Correctional officers, who live all over the greater Philadelphia and central New Jersey area, continued to move in and out of Fort Dix each day without sufficient medical screening or protective equipment. They to move between the Camp and main facility compounds to this day, potentially spreading the virus between the various areas of the prison. And prisoners continued to move between wings of the Camp and within single buildings in the main facility. Indeed, as late as on May 1, a 67-year-old prisoner from another building was added to Petitioner Wragg's room. He was not tested for COVID-19 before he was moved to a building in which he would come into daily contact with hundreds of people.

---

[93] *See* Scronic Decl. ¶ 6.
[94] Goldenson Decl. ¶ 36.

84.    Fort Dix's failure to contain movement by prisoners and staff throughout otherwise separate areas of the facility ensured that, once infection arrived, it would not be confined to particular areas, but would spread to other areas, as in fact happened.

85.    The conflicting announcements about masks by Respondent Ortiz and his staff are also telling. The BOP reported the first confirmed case at Fort Dix, a staff member, on its website on March 30. That same day, Respondent Ortiz sent a notice prohibiting prisoners from: "enter[ing] the kitchen on either the East or West compounds for meals with their faces concealed with makeshift masks due to COVID-19 concerns." For a week following this, staff told prisoners they could not wear masks not issued by the prison and ordered them to remove such masks.

86.    On April 7, the BOP reported Fort Dix's first prisoner positive on its website. On April 9, it reported its second. That same day, a memorandum from the facility medical staff announced: "a second [C]amp offender has been determined to be positive for COVID-19 and a third Camper has been isolated for evaluation of symptoms and is awaiting COVID-19 test results. . . . [I]t is strongly recommended that you d[on] your surgical mask upon issue."[95]

87.    By April 11, the BOP was reporting four prisoner positives and Respondent Ortiz reversed course, issuing a notice to prisoners that read: "In order to maintain the health of staff and inmates, the following is expected from all inmates: wear your surgical masks! Since social distancing is not possible in this environment, masks will help keep you and others from spreading viruses." [96]

---

[95] Scronic Decl. ¶ 10.
[96] *Id.* at ¶ 11.

88.     By April 16, the BOP was reporting six prisoner positives and Respondent Ortiz's notice directed prisoners it was mandatory to use "face coverings provided by staff." [97] Of course, by then, it was too late—hundreds of prisoners and staff had surely already been exposed.

89.     On April 8, Fort Dix converted the B-wing of the Camp into a makeshift quarantine for 63 people who believed they were being considered for potential release on home confinement pursuant to the CARES Act. Those 63 people were drawn from both A and B-wings. The remaining 160 or so prisoners in the Camp were packed into A-wing, with no efforts to test them nor any attempt to limit mingling groups of people who had previously not been exposed.[98]

90.     After the April 8 conversion, A-wing and B-wing went at different times to get their food from the Camp cafeteria and use the common rooms, but prisoners did not observe the facilities being thoroughly cleaned between uses.[99]

91.     Upon information and belief, during mid to late April, dozens of people exhibited symptoms of COVID-19 in both A-wing and B-wing, including coughing, feverish sweating, vomiting, and loss of consciousness. Many were removed from the Camp and brought to Building 5851 in the West compound. Prisoners who had previously been considered for release were not advised and did not know if this restarted the clock for their quarantine before release.

92.     Upon information and belief, Fort Dix has still not changed the set-up within its main facility buildings. It continues to house the overwhelming majority of prisoners in 12-person rooms where prisoners cannot social distance. Fort Dix made no effort to stagger or isolate bathroom use, ensuring that people from one 12-person room would encounter others from the

---

[97] *Id.* at ¶ 13.
[98] *Id.* at ¶ 16.
[99] *Id.* at ¶ 20.

same building.[100] Worse, it took no action to limit access to, or impose shift-based use of, common television rooms, computers, and phones in each building.[101] As a result, large groups of prisoners congregate regularly in those rooms to this day.

93.     In the main facility, although communal eating in the dining hall has ceased, prisoners go to and from the dining hall to pick up their food with all 200 to 300 people in their building.[102] They crowd into the building's entryway and adjoining hallway waiting to leave because they are only allowed five minutes to exit the building.[103] Three times per day, hundreds of people congregate and move to and from meal pickup in this way.[104] Back at their buildings, they can still eat in each other's rooms or in the TV rooms, because there are no social distancing requirements.[105]

94.     Upon information and belief, at various hours throughout the day in the Camp, Fort Dix makes prisoners line up shoulder-to-shoulder for counts, despite its obvious danger for spreading the infection. Staff now regularly take prisoners' temperatures using an electronic thermometer that works by holding it close to someone's forehead. In some cases, it may touch prisoners' foreheads, but staff do not sanitize the device between uses. In the main facility, prisoners go to their room doors and have their temperatures taken approximately once every two days. They are not asked whether they are experiencing other symptoms of COVID-19 or whether they have recently been exposed to someone with the virus.

---

[100] *Id.* at ¶ 8.
[101] *Id.*
[102] *Id.* at ¶ 9.
[103] *Id.*
[104] *Id.*
[105] *Id.*

95.    Fort Dix has also failed to provide prisoners with adequate cleaning supplies. For weeks, Fort Dix maintained its practice of requiring prisoners to buy soap through commissary to wash their hands.[106] Upon information and belief, Fort Dix did not reduce prices for soap, much less make it free. The prison exacerbated this problem by limiting commissary for people in the main facility and terminating it entirely for people at the Camp. Fort Dix took weeks to install soap dispensers in some bathrooms. Even where there were soap dispensers, many remained empty as of the end of March; in at least one building, notices were posted urging prisoners to donate their own meager soap supply to fill the dispensers.[107] At present, many of the dispensers are empty because any soap provided by the prison runs out immediately.[108]

96.    The scant soap that is provided to those in the main facility—two small bottles a month, barely bigger than what a person can carry on a plane—is what most prisoners must rely on to shower, wash their hands throughout the day, and try to disinfect surfaces in their shared living space if they cannot buy soap at the commissary.[109]

97.    Beyond the limited provision of masks, prisoners have been given no other personal protective equipment or cleaning supplies. They have not been provided gloves or detergents or other sanitizing agents, and some rely on toilet paper and water to wipe down surfaces they touch.[110]

98.    Upon information and belief, Fort Dix has also refused to exercise authority it has to release people at high risk from infection, which would protect both those individuals and others

---

[106] Wragg Decl. ¶ 11; Scronic Decl. ¶ 6.
[107] Wragg Decl. ¶ 11.
[108] *Id.*
[109] *Id.*
[110] *Id.* at ¶ 17.

who remained in a less-crowded facility. Prison staff have told several prisoners that they will not release anyone unless forced to, presumably by a Court. Some prisoners have been told their requests for home confinement are denied on bases not stated in the Attorney General memos, including that prisoners have not served 50 percent of their sentence.[111]

99.     Upon information and belief, today—over seven weeks after the WHO declared a global pandemic, a month after Fort Dix's first confirmed positive case, and 26 days after the Attorney General directed the BOP to immediately begin releasing people to home confinement from prisons with outbreaks—the number of prisoners that Fort Dix has used its power to release into home confinement remains zero.

### VI.     The COVID-19 Spread Continues Unabated at Fort Dix.

100.     As a result of Fort Dix's failures, COVID-19 has begun to spread through the facility like wildfire. On April 6, a 75-year old man was removed from the Camp after he had been sick and bedridden for four days. Prisoners believed he was later hospitalized.[112] Over the next two weeks, some 15 people were removed from the Camp with symptoms.[113]

101.     In mid-April, an older man was removed from B-wing with COVID-19 symptoms. He had been placed in B-wing because Fort Dix was considering him for release on home confinement.[114]

102.     On April 20, a man in A-wing collapsed as a nurse walked by performing temperature checks. He spit up blood and green phlegm into his mask. As the man lay on the floor,

---

[111] Scronic Decl. ¶ 28; Bogdan Decl. ¶ 12.
[112] Scronic Decl. ¶ 15.
[113] *Id.* at ¶ 16.
[114] *Id.*

an officer sprayed the man's body and his pillow and bed with disinfectant while prisoners watched. Eventually, he was taken out in a wheelchair to the Camp's medical office. He left the Camp with an IV in his arm.[115]

103.     On April 21, at around 8:30 PM, a prisoner in A-wing who had been working in the Camp kitchen and had been visibly sick for almost a week told officers he needed medical attention. He was told to wait until after count. Count finished at 9:30 PM. He was not removed from the dorm until 11:00 PM.[116]

104.     On April 22, the 62 remaining people in B-wing who had been told they were being considered for release were tested for COVID-19.[117] On April 24, prisoners learned from staff that 21 of them had tested positive. Many had underlying medical conditions that made them especially vulnerable.[118]

105.     Later on April 24, those in B-wing were moved to the main facility. The prisoners who tested positive were sent to what is known as the laundry building, Building 5851. The prisoners who tested negative were housed in a Unicor warehouse.[119] On April 25, the group in A-wing was separated. Half went to B-wing and half remained in A-wing. They were not tested for COVID-19.[120]

106.     On April 25, medics were seen going in and out of Building 5851 with at least 20 people on stretchers. On April 29, healthy prisoners went to pick up clean linen at Building 5851.

---

[115] *Id.* at ¶ 18.
[116] *Id.* at ¶ 19.
[117] *Id.* at ¶ 22.
[118] *See id.*
[119] *Id.* at ¶ 23.
[120] *Id.* at ¶ 25.

Sick prisoners gathered at the upper floor windows. Some yelled and pounded at the windows, trying to get their attention.[121]

107.    Upon information and belief, on April 30, prisoners in B-wing were tested and told to pack up their belongings because anyone who tested positive would be moved the following day. On May 1, 19 people were told they were positive and removed from the Camp. Until then, nine of the 19 had been working as kitchen workers.

108.    Although on May 1 BOP reported 40 positive prisoner cases at Fort Dix,[122] upon information and belief the true number of positives results is at least 55, and the true number of people infected but not yet tested is substantially higher.

109.    BOP reported no current positive prisoners or staff as recently as April 3.[123] On April 11, BOP still reported only six positives; just three weeks later, it reported 40. By its own account, even the BOP's under-reported numbers show the rate of infection spread at Fort Dix has been exponential:

---

[121] Wragg Decl. ¶ 20.
[122] Fed. Bureau of Prisons, *COVID-19*, https://www.bop.gov/coronavirus/ (last accessed May 4, 2020).
[123] The BOP announced its first staff positive at Fort Dix on March 30 but that figure was removed the following day.



110.    But even these alarming reported numbers likely dramatically understate the scale

of the crisis. The BOP reports only *current* positives at each prison, omitting anyone it has

transferred or whom it considers recovered, no matter how long they were in the prison spreading

infection. The BOP's public data regularly lags days behind what the prison has told people in

custody. Most importantly, the BOP reports only lab-confirmed positive tests: not prisoners with

symptoms, and not even prisoners who have been diagnosed by a physician with COVID-19 but

have not been tested. Yet only a small minority of prisoners at Fort Dix have been tested, even

those with symptoms. The BOP has not revealed the number of people in custody it has tested at Fort Dix, but from numerous prisoner reports it is almost certainly fewer than 10%. This is consistent with testing data BOP has been forced to divulge about its other prisons.[124] Fort Dix has not been testing people in its custody on a regular basis or in substantial quantities, ensuring that it does know the full scope of the problem.

111.　　People who contract COVID-19 can deteriorate rapidly, even before a test result can be received. Incarcerated individuals who do contract COVID-19 are at higher risk for developing acute symptoms than if they were in the community, because Fort Dix lacks the medical resources to care for symptomatic individuals.

112.　　Upon information and belief, Fort Dix is housing all prisoners who have tested positive on the upper two floors of Building 5851. Upon information and belief, a nurse and a doctor make two rounds per day, and there is no constant medical supervision. There are no ventilators or respirators, dialysis machines, or other hospital machinery or infrastructure. Prisoners are provided Tylenol.

---

[124] *See, e.g.*, Eric Heisig, Ohio Sen. Rob Portman Decries 'Unacceptable' Lack of Coronavirus Testing at Elkton Federal Prison, Cleveland.com (Apr. 28, 2020), https://www.cleveland.com/open/2020/04/ohio-sen-rob-portman-decries-unacceptable-lack-of-coronavirus-testing-at-elkton-federal-prison.html; Jane Wester, *Just 2 Coronavirus Tests Performed in 12 Days at New York City's Federal Lockups, Report Shows*, New York Law Journal (Apr. 21, 2020), https://www.law.com/newyorklawjournal/2020/04/21/just-2-coronavirus-tests-performed-in-12-days-at-new-york-citys-federal-lockups-report-shows/; Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates For Coronavirus Due to 'Sustained Transmission'*, The Lens (Mar. 31, 2020), https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/;Michael Balsamo, *Over 70% of tested inmates in federal prisons have COVID-19*, AP (Apr. 29, 2020) (only 2,700 prisoners tested by BOP nationwide), https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f.

113.    With the reported number of COVID-19 positives escalating rapidly, it is just a matter of time before the infection claims its first fatality at Fort Dix. As correctional health expert Dr. Goldenson warns about Fort Dix: "The infection rate will increase substantially before it starts to diminish without major interventions. The number at risk for death is substantial."[125]

## VII.    Petitioners Are Particularly Vulnerable.

114.    Petitioner Troy Wragg is classified as a BOP "chronic care inmate." In November 2014, he was diagnosed with epilepsy and suffers from grand grand-mal seizures that can be so violent and debilitating that he has broken bones during them.[126] Between April 8 and 23, he had 12 seizures at Fort Dix.[127] He had a thirteenth in the early morning of April 26 and awoke to find his bunkmate holding his head to prevent concussion.[128] Certain symptoms of COVID-19, especially fever, as well as a weakened body from illness, risk triggering more seizures. Petitioner Wragg is also vulnerable to COVID-19 because of hypertension and a heart condition, for which he takes three daily medications.[129] He had a heart attack in 2012.[130] Finally, he is vulnerable as a person with Myasthenia Gravis, a chronic autoimmune neuromuscular disease.[131]

115.    Petitioner Michael Scronic has a history of skin cancer, childhood asthma and steroidal medication use, and abnormal heart symptoms.[132] He had a tumor removed from his chest in 1991 and was instructed to return to a pathologist periodically, and in 2018, had Mohs

---

[125] Goldenson Decl. ¶ 36.
[126] Wragg Decl. ¶ 3.
[127] *Id.* at ¶ 4.
[128] *Id.*
[129] *Id.* at ¶ 6.
[130] *Id.*
[131] *Id.* at ¶ 7.
[132] Scronic Decl. ¶ 2.

Micrographic surgery to remove another tumor on his chest. Pathologists reported a skin cancer diagnosis.[133] According to his family, throughout childhood, he had recurring serious asthma attacks, had to have the house sterilized, slept with a vaporizing tent over his bed, and for years used steroidal inhalers.[134] Finally, his medical records from his last physical before his incarceration show a heart murmur, heart palpitations, elevated blood pressure, and shortness of breath. All these conditions make Petitioner Scronic vulnerable to COVID-19.[135]

116.    Petitioner Leonard Bogdan, at 68 years old, is vulnerable to COVID-19 from his age alone. Additionally, he has serious medical conditions that classify him as a BOP "chronic care inmate."[136] Since his incarceration at Fort Dix, he developed a nodule on his thyroid, diagnosed as potentially cancerous, which causes a rapid heart rate for which he takes twice daily medications.[137] He has a heart diseases called "bifascicular bundle branch block," which impacts the valves of his heart, as well as hypertension, high cholesterol, and "actinic keratosis" skin cancer.[138] Finally, he has extensive physical disability due to a severe case of scoliosis, which causes contortion of his ribcage and impacts his organs. As a result, he has chronic shortness of breath and displacement of the kidneys.[139] For a combination of these conditions, at least four times per year he receives treatment at various regional hospitals, including St. Francis Medical

---

[133] *Id.*
[134] *Id.*
[135] *Id.*
[136] Bogdan Decl. ¶ 2.
[137] *Id.*
[138] *Id.*
[139] *Id.*

Center, Robert Wood Johnson University Hospital, and Deborah Lung and Heart Center, and other specialty offices.[140] These conditions make him even more vulnerable to COVID-19.

117.     Petitioner Eliezer Soto-Concepcion takes daily medications for a heart condition and high blood pressure.[141] He also has a nervous system condition that causes his hands to shake and has been told he has clogged arteries.[142] Over the last 13 years, he has been hospitalized three times following heart attacks.[143] As a result of these conditions, he is especially vulnerable to COVID-19.

## LEGAL GROUNDS FOR PETITION

I.     **Section 2241 is an Appropriate Vehicle to Address Unconstitutional Conditions of Confinement Affecting the Fact or Duration of Custody.**

118.     Section 2241(c)(3) authorizes courts to grant habeas corpus relief when a person is "in custody in violation of the . . . laws or treaties of the United States." The Third Circuit has long allowed § 2241 to challenges regarding "'conditions' of [] confinement." *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 241 (3d Cir. 2005) (granting habeas petition alleging that the BOP must consider in good faith whether the petitioner could complete the last six months of his sentence in a Community Corrections Center rather a Federal Correctional Institution). Courts have allowed challenges solely on the basis of detention conditions that pose a threat to petitioners' medical well-being. *See e.g., Roba v. United States*, 604 F.2d 215, 218–19 (2d Cir. 1979) (approving the use of Section 2241 to challenge a prisoner's transfer where that transfer created a risk of fatal

---

[140] *Id.* at ¶ 3.
[141] Soto-Concepcion Decl. ¶ 2.
[142] *Id.*
[143] *Id.*

heart failure). Given the plain language of § 2241, courts are authorized to grant relief to convicted prisoners.

119.     In this case, the unconstitutional threat to Petitioners' health and life posed by being held in Respondents' custody is ongoing, not simply imminent. Every hour that Petitioners are held in Fort Dix, they are at a significantly elevated risk of contracting coronavirus, and because of their medical conditions, their risk of dying from coronavirus is significant.

## II.     Respondent's Failure to Take Steps to Mitigate Transmission of COVID-19 Constitutes Deliberate Indifference to the Serious Medical Needs of Plaintiffs.

120.     Respondents are violating Petitioners' Eighth Amendment rights by continuing to incarcerate them in conditions where it is impossible to prevent transmission of an infectious disease and to protect themselves against serious illness that may prove deadly because of Petitioners' vulnerable conditions.

121.     All individuals held at Fort Dix have been convicted and assigned by the BOP to serve time at Fort Dix. Therefore, the treatment of all individuals incarcerated at Fort Dix, including the treatment of Petitioners, is governed by the Eighth Amendment. As such, they are entitled to be protected from conditions of confinement that create a serious risk to health or safety, including through release from custody when necessary. *Brown v. Plata*, 563 U.S. 493, 531–32 (2011) (upholding lower court's order releasing people from state prison even though release was based on prospect of future harm caused by prison overcrowding); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (correctional official violates Eighth Amendment by consciously failing to prevent "a substantial risk of serious harm"). The threat of exposure to a deadly infectious disease such as COVID-19 constitutes a serious risk to health, particularly for the Petitioners because of their unique vulnerability to COVID-19. *Helling v. McKinney*, 509 U.S. 25, 34 (1993)

(noting with approval Eighth Amendment claims based on exposure to serious contagious diseases).

122.     Under Fort Dix's current conditions, Respondents have not and cannot protect Petitioners and the class from this risk of serious harm. In these circumstances, enlargement of custody and, if necessary, release, is required to protect Petitioners and other prisoners with high-risk health conditions from unconstitutional custody.

123.     Government officials act with deliberate indifference when they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33. This Court need not "await a tragic event" to find that Respondents are maintaining unconstitutional conditions of confinement. *Id.* This is so not only because a tragedy is ongoing, but because even petitioners and class members who have not yet tested positive have a constitutional right to be free from conditions of confinement "pose an unreasonable risk of serious damage to [Petitioners'] future health." *Id.* at 35.

124.     The reach of the Eighth Amendment includes "exposure of inmates to a serious, communicable disease." *Helling*, 509 U.S. at 33; *see also Karolis v. N.J. Dep't of Corr.*, 935 F. Supp. 523, 527 (D.N.J. 1996) ("[P]rison officials have an affirmative duty to protect inmates from infectious disease.") (citations omitted). The Third Circuit Court of Appeals has allowed prisoners to maintain a cause of action for mental anguish suffered as a result of exposure to tuberculosis, even when the risk had subsided. *Plummer v. United States,* 580 F.2d 72, 76 (3d Cir. 1978).

125.     In this case, as established by the facts above, Petitioners face a significant risk of exposure to COVID-19, with the attendant risk of death that follows given their vulnerable conditions. Respondents are well aware of this risk, having been alerted to it by the CDC, the

Attorney General, BOP guidance, widespread news reporting, and the ongoing outbreak at various BOP facilities including Fort Dix itself. Indeed, the Second Circuit Court of Appeals, unprompted, acknowledged over a month ago the "grave and enduring" risk posed by COVID-19 in the correctional context. *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, __ F.3d __, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020); *see also Jovel v. Decker*, No. 20 Civ. 308, 2020 WL 1467397, at *1 (S.D.N.Y. Mar. 26, 2020) (finding "extraordinary circumstances" of COVID-19 pandemic justified release of immigration detainee from federal detention).

126.    Finally, as established above, Respondents have not taken steps sufficient to protect Petitioners from the grave risks that are present every moment they are incarcerated at Fort Dix. Respondent Ortiz has recklessly failed to follow or implement CDC guidance or directives from Attorney General Barr or the BOP. Respondents are not capable of managing the risk to Petitioners in the facility's current environment. Respondents are holding Petitioners in violation of their Eighth Amendment rights by detaining them in the face of significant threats to their health and safety without taking sufficient steps to prevent or address that harm.

III.    **The Number of People Currently in the Facility Ensures that Respondents Cannot Implement Recommended Measures Required to Protect Petitioners' Health, and Violates the Eighth Amendment.**

127.    Respondents are violating Petitioners' Eighth Amendment rights by continuing to incarcerate them in conditions where it is impossible to prevent transmission of an infectious disease and to protect themselves against serious illness that may prove deadly because of Petitioners' vulnerable conditions.

128.    As alleged above, the BOP has thus far failed to implement effective social distancing across its facilities, including particularly at Fort Dix, with disastrous effects. Part of this failure reflects the nature of correctional confinement; however, a large part here owes to the

particular circumstances of Fort Dix's design, capacity, and deliberate choices about policies by Respondents.

129.     While a facility like Fort Dix might not be overcrowded under normal circumstances, emergency situations like this one have rendered an otherwise constitutionally-acceptably-populated facility overcrowded relative to its maximum safe capacity. The current Fort Dix population of approximately 3,000 prisoners might not present a constitutional problem in ordinary circumstances, but that population in the context of the ongoing pandemic ensures that effective social distancing is impossible, and it stymies Respondents' ability to follow and implement the CDC Interim Guidance and other viral-transmission prevention measures.

130.     Courts have long found that facilities' populations may exacerbate existing harms entirely unrelated to the fact of crowding itself, including cases where populations may inhibit a facility's ability to mitigate incarcerated individuals' risk of contracting dangerous diseases. The Supreme Court itself has recognized that correctional defendants can violate the Eighth Amendment when they crowd prisoners into shared spaces with others who have "infectious maladies." *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see also Hutto v. Finney*, 437 U.S. 678, 682–85 (1978) (recognizing the need for a remedy where prisoners were crowded into cells and some had infectious diseases).

131.     Subsequent decisions have recognized that such crowding can happen across facilities. *See Lareau v. Manson*, 651 F.2d 96 (2d Cir. 1981) (medical services strained by overcrowding could amount to a constitutional violation).

132.     Such decisions make particular sense in light of substantial corroborating evidence that transmission becomes more likely in light of, among other factors, relative crowding of people together. *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious

48

Diseases 1047, 1047 (Oct. 2007) ("The probability of transmission of potentially pathogenic organisms is increased [in jails and prisons] by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise."), *available at* https://bit.ly/2QZA494.

133.     In this case, Petitioners face an elevated risk of serious illness both because of particular failures on the part of Respondents as alleged above, and because of the number of people in the facility. The current population of Fort Dix, both of incarcerated individuals and the staff who come through on a daily basis and work in the same confined space, ensures that any effective measures that would mitigate Petitioners' exposure to and risk of serious illness from COVID-19 are impossible to implement.

## CLASS ACTION ALLEGATIONS

134.     Petitioners bring this representative habeas action pursuant to 28 U.S.C. § 2241 and as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on their own behalf and on behalf of all persons similarly situated.

135.     Petitioners seek to represent a class consisting of all current and future people in post-conviction custody at Fort Dix who are over the age of 50 or who experience medical conditions that make them uniquely vulnerable to COVID-19, including (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease, or other chronic conditions associated with impaired heart function; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) neurological and neurologic and neurodevelopment conditions, including disorders of the brain, spinal cord, peripheral nerve, and

49

muscle such as cerebral palsy, epilepsy (seizure disorders), stroke, intellectual disability, moderate to severe developmental delay, muscular dystrophy, or spinal cord injury; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; (l) a current or recent (last two weeks) pregnancy; or (m) severe obesity. (the "Class").[144]

136.     Petitioners also seek to represent a subclass consisting of all current and future people in post-conviction custody at Fort Dix who have qualifying disabilities within the meaning of the Rehabilitation Act ("the Subclass").

137.     The members of the Class are too numerous to be joined in one action, and their joinder is impracticable.

138.     Several common questions of law and fact apply to all Class members. These common questions of fact and law include but are not limited to: (1) whether the conditions of confinement described in this Petition amount to constitutional violations; (2) what measures Respondents have taken and is taking in response to the COVID-19 crisis; (3) whether Respondents have implemented and are implementing an adequate emergency plan during the COVID-19 crisis; (4) whether Respondents' practices during the COVID-19 crisis have exposed and are exposing prisoners at Fort Dix to a substantial risk of serious harm; (5) whether the Respondents have known of and disregarded a substantial risk of serious harm to the safety and

---

[144] Goldenson Decl. at 8 n.20.

health of the Class; and (6) what relief should be awarded to redress the harms suffered by members of the Class as a result of the conditions.

139.     As to the Subclass in particular, there is also common questions as to whether (7) Respondents have adequately accommodated the disabilities that make Subclass members more likely to contract COVID-19 and suffer greater harm if they do; and (8) what relief should be awarded to redress the harms suffered by members of the Subclass as a result of Rehabilitation Act violations.

140.     Absent class certification, individuals incarcerated at Fort Dix during the COVID-19 pandemic would face a series of barriers in accessing the relief sought. Fort Dix has suspended visitation and individuals incarcerated there have limited access to communication with the outside world, impeding their ability to obtain legal representation and pursue litigation. Because the Class and Subclass are all sentenced prisoners, they do not have defense attorneys already working with them on their criminal proceedings. And a large portion of the Class and Subclass has limited educational backgrounds and financial means.

141.     Respondents' practices and the claims alleged in this Petition are common to all members of the Class and members of the Subclass.

142.     The claims of Petitioners are typical of those of the Class and the Subclass. Petitioners, like all other at Fort Dix, are currently being held in unconstitutional custody at Fort Dix. Petitioners, like other members of the Subclass, have qualifying disabilities that entitle them to accommodations that they are not receiving in violation of the Rehabilitation Act.

143.     The legal theories on which Petitioners rely are the same or similar to those on which all Class and Subclass members would rely, and the harms suffered by them are typical of those suffered by all the other Class and Subclass members.

51

144.    Petitioners will fairly and adequately protect the interests of the Class and the Subclass. The interests of the Class and Subclass representatives are consistent with those of the Class and Subclass members. In addition, counsel for Petitioners are experienced in class action and civil rights litigation and in criminal law.

145.    Counsel for Petitioners know of no conflicts of interest among Class or Subclass members or between the attorneys and Class or Subclass members that would affect this litigation.

### FIRST CAUSE OF ACTION
(Eighth Amendment)

**Unconstitutional Conditions of Confinement in Violation of the
Eighth Amendment to the U.S. Constitution**
28 U.S.C. § 2241
*Class versus All Defendants*

146.    Petitioners incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

147.    Petitioners bring this claim on their own behalf and on behalf of the Class.

148.    The Eighth Amendment guarantees sentenced prisoners custody free of "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling*, 509 U.S. at 33; *see also* U.S. Const. Amend VIII. The government's failure to protect the prisoners in its custody from a widespread outbreak of a serious contagious disease that causes potentially permanent damage or death constitutes deliberate indifference in violation of the Eighth Amendment to the United States Constitution.

149.    Petitioners and the Class are uniquely vulnerable to serious complications or death from contracting COVID-19 because of their age and/or because they suffer from medical conditions that render them uniquely vulnerable.

150.    Because of the conditions at Fort Dix, Petitioners cannot take steps to protect themselves—such as social distancing, hand-washing hygiene, or self-quarantining—and the government has not provided adequate protections. As COVID-19 rapidly spreads inside Fort Dix, the already deplorable conditions at the prison will continue to deteriorate, and incarcerated individuals there will continue to contract COVID-19 at staggering rates.

151.    Respondent's failure to adequately protect Petitioners from these unconstitutional conditions, or release them from the conditions altogether, constitutes deliberate indifference to a substantial risk of serious harm to Petitioners, and all members of the Class, thereby establishing a violation of the Eighth Amendment to the United States Constitution.

152.    Respondents were aware or should have been aware of these conditions, which were and are open and obvious throughout the entire prison.

153.    Respondents knew of and disregarded an excessive risk to health and safety.

154.    Respondents failed to act with reasonable care to mitigate these risks, subjecting Petitioners to a grave and serious risk of harm of serious illness, permanent injury, or death.

155.    Because Respondents failed to act to remedy Petitioners' and the Class's degrading and inhumane conditions of confinement in violation of their Eighth Amendment rights, Petitioners seek relief under this Writ of Habeas Corpus Petition and Class Action Complaint.

156.    Because of the unlawful conduct of Respondents, Petitioners and the Class are threatened with imminent physical injury, pain and suffering, emotional distress, humiliation, and death.

**SECOND CAUSE OF ACTION**
**(Rehabilitation Act)**

**Unconstitutional Conditions of Confinement in Violation of Rehabilitation Act**
28 U.S.C. § 1331
*Subclass versus All Defendants*

157.     The Rehabilitation Act requires entities that receive federal funding, such as the

BOP and Fort Dix, not to discriminate against Americans with qualifying disabilities.

158.     Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, requires entities

such as Fort Dix to reasonably accommodate people with disabilities in all programs and services

for which people with disabilities are otherwise qualified.

159.     Petitioners, and other members of the Subclass, qualify as individuals with

disabilities under the meaning of the RA.

160.     Access to safe conditions of confinement and adequate preventative and responsive

medical treatment are programs or services that Fort Dix must provide—but is not presently

providing—to people in its custody to comply with the RA.

161.     Respondents intentionally discriminate against people with disabilities by denying

them reasonable accommodations, including but not limited to those set out in the CDC guidance,

that are necessary to protect them from COVID-19.

162.     In a facility with reduced population that might allow adequate social distancing,

reasonable accommodations for people with qualifying disabilities include but are not limited to:

separate living spaces rather than high-capacity shared rooms and dorms with people in close

proximity; free distribution of adequate cleaning supplies, including soap; free distribution of

adequate personal protective equipment, including masks and gloves; staggered access to

bathrooms, meals, and other shared resources; assignments of correctional staff that mitigates the

possibility staff will transmit COVID-19, even asymptomatically, from one building to another; and adequate access to tests and information about risk.

163.    Failing to provide these reasonable accommodations violates the Rehabilitation Act, which entitles Petitioners and members of the disability subclass to injunctive and declaratory relief.

## RELIEF REQUESTED

WHEREFORE, Petitioners, the Class, and the Subclass respectfully request that the Court enter a class-wide judgment:

A. Declaring Fort Dix's custody of Petitioners and the Class violates the Eighth Amendment right against cruel and unusual punishment, and the Rehabilitation Act with respect to Petitioners and the Subclass;

B. Ordering temporary enlargement of custody (or bail pending habeas corpus) with appropriate precautionary public health and safety measures for all Class Members— including the Petitioners, the Class, and the Subclass, during the pendency of this petition for a writ of habeas corpus;

C. Ordering respondents to comply with the Constitution for any members of the Class who do not receive temporary enlargement and remain at Fort Dix during the pendency of the petition, and with the Rehabilitation Act for any members of the Subclass who remain;

D. If temporary enlargement does not bring the conditions at Fort Dix into compliance with the Eighth Amendment and the Rehabilitation Act, issuing writs of habeas corpus;

E. Certifying this petition as a class action, for the reasons stated herein;

F.   Awarding Plaintiffs' attorneys' fees and costs, as provided by statute and law; and

G.   Ordering such other and further relief as this Court deems just, proper and equitable.

Respectfully submitted,

*/s/ Tess Borden*
Tess Borden (260892018)
Jeanne LoCicero
AMERICAN CIVIL LIBERTIES UNION
OF NEW JERSEY FOUNDATION
570 Broad Street, 11th floor
P.O. Box 32159
Newark, NJ 07102
973-854-1733
tborden@aclu-nj.org

Jim Davy*
2362 E. Harold Street
Philadelphia, PA 19125
609-273-5008
jimdavy@gmail.com

Matthew Stiegler*
Law Office of Matthew Stiegler
7145 Germantown Avenue, Suite 2
Philadelphia, PA 19119
(215) 242-1450
Matthew@StieglerLaw.com

*Counsel for Petitioners
and Proposed Class Members*

 **Petition for permission to file pro hac vice
forthcoming*

Dated:  May 4, 2020