**Declaration of Joe Goldenson, MD**

1. I am a medical physician with 33 years of experience in correctional health care. For 28 years, I worked for Jail Health Services of the San Francisco Department of Public Health. For 22 of those years, I served as the Director and Medical Director. In that role, I provided direct clinical services, managed public health activities in the San Francisco County jail, including the management of HIV, tuberculosis, Hepatitis C, and other infectious diseases in the facility and the planning and coordination of the jail's response to H1N1, and administered the correctional health enterprise, including its budget, human resources services, and medical, mental health, dental, and pharmacy services.

2. I served as a member of the Board of Directors of the National Commission on Correctional Health Care for eight years and am past President of the California chapter of the American Correctional Health Services Association. In 2014, I received the Armond Start Award of Excellence from the Society of Correctional Physicians, which recognizes its recipient as a representative of the highest ideals in correctional medicine.

3. For 35 years, I held an academic appointment as an Assistant Clinical Professor at the University of California, San Francisco.

4. I have worked extensively as a correctional health medical expert and court monitor. I have served as a medical expert for the United States District Court for the Northern District of California for 25 years. I am currently retained by that Court as a medical expert in *Plata v. Newsom*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate patients in the California Department of Correctional Rehabilitation. I have also served as a medical expert and monitor at Cook County Jail in Chicago; Los Angeles County Jail; at other jails in Washington state, Texas, and Florida; and at prisons in Illinois, Ohio, and Wisconsin.

5. My curriculum vitae is attached as exhibit A.

**The nature of COVID-19**

6. The SARS-nCoV-2 virus, and the human infection it causes, COVID-19 disease, is a global pandemic and has been termed a global health emergency by the World Health Organization ("WHO"). Cases first began appearing between December 1 and December 31, 2019, in Hubei Province, China. Most of these cases were associated with a wet seafood market in Wuhan City.

7. On January 7, 2020, the virus was isolated. The virus was analyzed and discovered to be a coronavirus closely related to the SARS coronavirus that caused the 2002–2003 SARS epidemic.

8. COVID-19 is a serious disease. The overall case fatality rate has been estimated to range from 0.1 to 3.5%, which is up to 35 times the fatality associated with influenza infection. COVID-19 is characterized by a flu-like illness. While more than 80% of cases are self-limited and generally mild, overall some 20% of cases will have more severe disease requiring medical intervention and support.

9. The case fatality rate varies significantly depending on the presence of certain demographic and health factors. The case fatality rate varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardiovascular disease, respiratory disease, diabetes, and immune compromise.

10. Among patients who have more serious disease, some 30% will progress to Acute Respiratory Distress Syndrome (ARDS), which has a 30% mortality rate overall, higher in those with other health conditions. Some 13% of these patients will require mechanical ventilation, which is why intensive care beds and ventilators have been in insufficient supply in Italy, Iran, and in parts of China.

11. COVID-19 is widespread. Since it first appeared in China in late 2019, outbreaks have subsequently occurred in more than 160 countries and all populated continents; heavily affected countries include Italy, Spain, Iran, South Korea, and the U.S. The U.S. is now the world's most affected country. As of April 29, 2020, there have been 3,142,942 confirmed human cases globally and 218,564 known deaths.[1] It is not contained, and cases are growing exponentially.

12. In the United States alone, the Centers for Disease Control and Prevention ("CDC") reports 981,246 cases and 55,258 deaths as of April 28.[2] The New Jersey Department of Health reports 113,856 cases and 6,442 dead as of April 28.[3] All these numbers are likely underestimates because of limited availability of testing.

13. SARS-nCoV-2 is now known to be fully adapted to human-to-human spread. This is almost certainly a new human infection, which also means that there is no pre-existing or "herd" immunity, allowing for very rapid chains of transmission once the virus is circulating in communities.

14. The U.S. CDC estimates that the reproduction rate of the virus, the R0, is 2.4-3.8, meaning that each newly infected person is estimated to infect on average 3 additional persons. This is highly infectious and only the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity. This again is

---

[1] https://coronavirus.jhu.edu/map.html (last accessed April 29, 2020)
[2] https://www.cdc.gov/covid-data-tracker/index.html ((last accessed April 29, 2020)
[3] https://covid19.nj.gov/#live-updates ((last accessed April 29, 2020)

likely a function of all human populations currently being highly susceptible. The attack rate given an exposure is also high, estimated at 20–30% depending on community conditions, but may be as high as 80% in some settings and populations. The incubation period is thought to be 2–14 days, which is why isolation is generally limited to 14 days.

15. CDC has recently added to the list of possible signs and symptoms of COVID-19 to include fever, cough, shortness of breath or difficulty breathing, chills, repeated shaking with chills, muscle pain, headache, sore throat, or new loss of taste or smell.[4] This means the questionnaires currently used to screen staff and prisoners need to be updated and the numbers of suspect cases will increase.

16. There is currently no vaccine for COVID-19, and no cure. The only known ways to prevent the spread of SARS-nCoV-2 involve measures such as thorough handwashing, frequent decontamination of surfaces, and maintaining six feet of physical distance between individuals ("social distancing").

**The risks of COVID-19 in detention facilities**

17. COVID-19 poses a serious risk to prisoners, workers, and anyone else in detention facilities. Detention facilities, including prisons like Fort Dix, have long been associated with high transmission probabilities for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.

18. The severe epidemic of tuberculosis in prisons in Central Asia and Eastern Europe was demonstrated to increase *community* rates of tuberculosis in multiple states in that region, underscoring the risks prison outbreaks can lead to for the communities surrounding a prison.

19. Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities, as social distancing and proper decontamination of surfaces are virtually impossible.

20. For example, several deaths were reported in the U.S. in immigration detention facilities associated with ARDS following influenza A, including a 16-year old male immigrant child who died of untreated ARDS in custody in May 2019.

21. Current recommendations for social distancing, frequent hand washing, and frequent cleansing of surfaces to prevent infection and the spread of the virus are extremely difficult, if not impossible, to implement in the correctional setting. A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical

---

[4] Centers for Disease Control and Prevention, Symptoms of Coronavirus, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

complications of these infectious diseases. These include physical/mechanical risks such as overcrowding; population density in close confinement; insufficient ventilation; shared toilet, shower, and eating environments; and limits on hygiene and personal protective equipment such as masks and gloves in some facilities. Shared spaces and equipment (such as telephones) are commonly not adequately disinfected, especially during the current pandemic when more frequent cleaning and disinfecting are required. Limits on soap (copays are common) and hand sanitizer, since they can contain alcohol, are also risks for spread. The nationwide shortage of personal protective equipment (PPE), as well as ancillary products (such as cleaning supplies and thermometer probes) further impacts the ability of correctional facilities to implement necessary precautions.[5]

22. The risk of exposure to and transmission of infectious diseases, as well as the risk of harm from developing severe complications or death if infected, is significantly higher in jails, prisons, and detention centers than in the community.

23. Close, poorly ventilated living quarters and often overcrowded conditions in these facilities foster the rapid transmission of infectious diseases, particularly those transmitted by airborne droplets through sneezing, speaking, or coughing. In these congregate settings, large numbers of people are closely confined and forced to share living spaces, bathrooms, eating areas, and other enclosed spaces.  Groups of persons are often moved from space to space, for example, from a dormitory to a cafeteria. Persons congregate and come in close contact while standing in lines for medication, commissary, fresh laundry, telephones, or court appearances. These group movements, which may cluster large numbers of people together in small spaces, increase the risk of transmission. It is common for detainees in a given housing unit to routinely be subjected to such group movements multiple times each day. They are physically unable to practice social distancing, which the CDC has identified as the "cornerstone of reducing transmission of respiratory diseases such as COVID-19."[6]

24. This forced congregation spreads infection from one area of a prison to other areas, too. In addition, detention facilities often rely on detainees to perform work that supports the operation of the facility, such as food service, laundry, and cleaning. To perform these work assignments, they typically travel from their housing units to other parts of the facility. Officers and other detention facility staff routinely have direct physical contact with detainees, especially when handcuffing or removing handcuffs from detainees who are entering or exiting the facility Staff members also move around within the facility, which creates opportunities for transmission both among staff in different parts of the

---

[5] *Study of COVID-19 in Correctional Facilities*, Harvard University and National Commission on Correctional Health Care, April 9, 2020
[6] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

facility and transmission to and from detainees in different parts of the facility. This regular circulation makes the spread of infection throughout a prison all but inevitable.

25. While jails, prisons, and detention centers are often thought of as closed environments, this is not the case. Custody, medical, and other support staff and contractors enter and leave the facility throughout the day. New detainees arrive on a frequent basis. Since there is no effective way to screen for newly infected or asymptomatic individuals, they can unknowingly transmit COVID-19 to those housed in the facility. Detainees and inmates are often transferred between housing units, to other facilities, and to and from court. This further increases the likelihood of transmission of COVID-19.

26. It has long been known that jails, prisons, and detention centers can be hotbeds of disease transmission. Due to the frequent ingress and egress of employees at these facilities, an outbreak within a jail, prison, or detention center can quickly spread to surrounding communities. For example, the tuberculosis epidemic that broke out in New York City in the early 1990s began in jails and was spread to the community by jail employees who became infected and then returned home to their families and communities.

27. In addition to the nature of the prison environment, prison and jail populations are also at additional risk due to high rates of chronic health conditions, substance use, mental health issues, and, particularly in prisons, aging and chronically ill populations who may be vulnerable to death or severe illnesses after infection from COVID-19 disease.

28. Testing kits are widely unavailable, and it can take anywhere from a day to a week or more to obtain test results. Someone who is tested shortly after he or she was infected may test negative. Non-test-based screens like taking people's temperatures or asking them for subjective reports of symptoms—cannot adequately screen for new, asymptomatic or pre-symptomatic infections. COVID-19 has a typical incubation period of 2 to 14 days, commonly five days, and transmission often occurs before presentation of symptoms. According to the CDC, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[7] Similarly, infected individuals may experience only mild symptoms. These newly infected, asymptomatic, and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread. As a result, such inadequate screening presents a critical problem. The possibility of asymptomatic transmission means that monitoring staff and incarcerated people for symptoms and fever is inadequate to identify all who may be infected and to prevent transmission.

29. While every effort should be made to reduce exposure in detention facilities through internal mitigation efforts, this may be extremely difficult to achieve and sustain quickly

---

[7] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html

enough. Further, no mitigation effort can change the inherent nature of detention facilities, which force people to live in close proximity to one another. It is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible. Indeed, that is the only public health solution available at this time to reduce the spread of COVID-19 and potentially save lives.

30. Given the experience in China as well as the literature on infectious diseases in jail, additional outbreaks of COVID-19 among the U.S. jail and prison populations are highly likely. Releasing as many inmates as possible is important to protect the health of inmates, correctional facility staff, health care workers at jails and other detention facilities, and the community as a whole. Indeed, according to the WHO, "enhanced consideration should be given to resorting to non-custodial measures at all stages of the administration of criminal justice, including at the pre-trial, trial and sentencing as well as post-sentencing stages."[8]

31. For these reasons, the pandemic has prompted prisoner releases around the world. France has freed 5,000 inmates[9], and, in the United States, California officials are planning to release up to thousands of prisoners.[10] In Britain, the Ministry of Justice is planning to grant thousands of prisoners early release within weeks in an effort to contain the spread of the virus in cells and facilities where it said social distancing rules are impossible to maintain.[11] Many cities and counties across the US, including San Francisco, Los Angeles, Chicago, Cleveland and New York, are also releasing prisoners to reduce the risk of COVID-19.[12]

32. It is difficult to overstate the devastation that a COVID-19 outbreak could inflict on a correctional facility such as FCI Fort Dix. At Rikers Island jail in New York, between April 1 and April 15, 2020, the number of COVID-19 positive incarcerated individuals and staff members grew by 104 and 114 people, respectively, upping the jail's total numbers of confirmed cases to 288 among the incarcerated population, 488 among

---

[8] World Health Organization, Regional Office for Europe, Preparedness, prevention and control of COVID-19 in prisons and other places of detention: Interim guidance (Mar. 15, 2020), http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf.
[9] *Coronavirus: Low-risk prisoners set for early release*, BBC News (Apr. 4, 2020), https://www.bbc.com/news/uk-52165919.
[10] Paige St. John, *California to release 3,500 inmates early as coronavirus spreads inside prisons*, L.A. Times (Mar. 31, 2020), https://www.latimes.com/california/story/2020-03-31/coronaviruscalifornia-release-3500-inmates-prisons.
[11] *Britain plans to free many inmates early as it reports a on-day death toll*, New York Times, 4/3/20.
[12] Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirusprisons-jails.html.

correction staff, and 78 among health care workers.[13,14] The first known case of COVID-19 at Rikers was confirmed on March 18,[15] illustrating just how quickly this disease can and will overwhelm detention facilities. Two Ohio prisons, Marion Correctional Institution and Pickaway Correctional Institution, have emerged as the largest-known sources of U.S. coronavirus infections, according to data compiled by The New York Times. To date 3,808 cases have been connected to the two prisons.[16] Over 80% of the approximately 2,500 prisoners in Marion tested positive.[17] In addition, 169 staff have tested positive for COVID-19.[18] Eight of the ten largest-known infections sources in the U.S. are jails or prisons.

33. At Ohio's Marion Correctional, close to 95% of those who tested positive were asymptomatic and would otherwise not have been tested.[19] This underscores the risk of the spread of COVID-19 by asymptomatic individuals.

34. According to the Bureau of Prisons, 27 detainees and 3 staff members at FCI Fort Dix currently have tested positive for COVID-19. Dozens more have symptoms. Even these dozens may represent the tip of the iceberg, since newly-infected people typically do not show symptoms for 2–14 days, many infected individual are asymptomatic, and since the infection spreads rapidly to additional people. While no detainees are reported to have died from COVID-19 in FCI Fort Dix yet, the death toll is likely to mount rapidly given the way the disease has progressed elsewhere.

35. It is my understanding that FCI Fort Dix has two open bay / dormitory housing units; at least seven housing units with 2-, 10-, and 12-man dormitory-style rooms; and a segregation unit. It also my understanding that FCI Fort Dix has roughly 2,900 detainees in the facility on any given day; that staff enter and leave the facility regularly; and that detainees share restroom and shower facilities and eat communally prepared food.

36. Based on these understandings, it is my opinion that the exponential infection of rate for COVID-19 we already see in the community would be magnified within FCI Fort Dix.

---

[13] Julia Craven, *Coronavirus Cases Are Spreading Rapidly on Rikers Island*, Slate (Apr. 2, 2020), https://slate.com/news-and-politics/2020/04/rikers-coronavirus-cases-increase.html.
[14] Jan Ranson, *Jailed on a Minor Parole Violation, He Caught the Virus and Died*, N.Y. Times (Apr. 10, 2020)
[15] *As Testing Expands, Confirmed Cases of Coronavirus in N.Y.C. Near 2,000* (Mar. 18, 2020), N.Y. Times, https://www.nytimes.com/2020/03/18/nyregion/coronavirus-new-york-update.html.
[16] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=Top%20Stories&pgtype=Homepage&action=click&module=Spotlight&pgtype=Homepage#states (last accessed April 29, 2020).
[17] Ohio Department of Rehabilitation & Correction, COVID-19 Inmate Testing Updated 4/28/2020, https://coronavirus.ohio.gov/static/DRCCOVID-19Information.pdf.
[18] *Id.*
[19] https://www.nytimes.com/reuters/2020/04/25/us/25reuters-health-coronavirus-prisons-testing-insight.html?searchResultPosition=8

Adequate social distancing would be impossible to achieve. What's more, the infection in FCI Fort Dix would not stay limited to the facility, but would worsen infection rates in the broader community. The infection rate will increase substantially before it starts to diminish without major interventions. The number at risk for death is substantial. This is why leaving implementation in the hands of local officials alone, who lack the expertise and resources and were incapable of preventing the outbreak in the first place, is insufficient.

**Conclusions**

37. For the reasons above, it is my professional opinion that persons currently detained at FCI Fort Dix are at significantly greater risk of contracting COVID-19 than if they were permitted to shelter in place in their home communities. If infected, many are at increased risk of suffering severe complications and outcomes.

38. It is my professional opinion that conditions in FCI Fort Dix threaten the health and safety of every individual within the prison—detained persons and staff alike—and in their surrounding communities.

39. It is my professional opinion that a necessary component of bringing FCI Fort Dix into compliance with the recommendations of the CDC to minimize the risk of COVID-19 transmission within the facility and to the larger community is to substantially reduce the population. Doing so will allow the facility to significantly reduce the risk of infection for both incarcerated people and correctional officers, which in turn protects the communities where corrections staff live.

40. It is my professional opinion that those who are medically vulnerable[20] need to be moved out of FCI Fort Dix to the absolute maximum extent possible. In addition, the overall population needs to be significantly lowered to reduce the density in the jails to allow for adequate social distancing, minimize the strain on the jail's medical care system, ensure adequate space is available for necessary quarantining.

---

[20] Persons held at Fort Dix over the age of 50, as well as all current and future persons held at Fort Dix of any age who experience (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease, or other chronic conditions associated with impaired heart function; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (last two weeks) pregnancy.

41. It is my public health recommendation that a public health expert be appointed to oversee operations related to preventing further spread of COVID-19 in FCI Fort Dix, which may include authorizing further staggered release of detainees until it is possible to maintain consistent social distancing and appropriate hygiene within the facility.

**Dr. Turner-Foster's declaration indicates deficient attempts to ensure social distancing and therefore my professional opinions and recommendations have not changed.**

42. On May 18, the government filed a brief in support of a motion to dismiss and in opposition to the petitioners' motion for a preliminary injunction. Attached to this brief was the declaration of Dr. Nicoletta Turner-Foster, Clinical Director at FCI Fort Dix. I have reviewed this declaration.

43. Dr. Turner-Foster's declaration indicates that Fort Dix has taken certain steps to educate prisoners and staff; screen prisoners, staff, and contractors entering the prison; and reduce the spread of COVID-19 within the prison. However the fundamental problem remains that prisoners cannot effectively social distance. My professional opinion remains that the prison is not doing what is reasonably necessary to prevent further spread of COVID-19 infection.

44. Although Dr. Turner-Foster states that various steps have been taken, these steps are described too vaguely to determine their effectiveness. For example, she describes a Bureau of Prisons policy whereby newly arriving asymptomatic inmates with reported risk of exposure are placed in quarantine, and she states that at Fort Dix new prisoners are put into an automatic 14-day quarantine only for those inmates. But Dr. Turner-Foster does not indicate whether inmates who enter the prison on different dates are all quarantined together. It is necessary to maintain separate quarantine groups based on date of entry or exposure to prevent cohort cross-exposure. Dr. Turner-Foster's description does not indicate whether that is being done.

45. Similarly, Dr. Turner-Foster describes the prison's practice for screening staff members of taking their temperatures and administering a medical questionnaire. But requiring staff members to take a questionnaire would not be adequate if staff members are not being asked about specific COVID-19 symptoms. This is particularly important because throughout March and April the public were told of only three symptoms (fever, cough, and shortness of breath), but in late April the CDC substantially expanded the list of symptoms to add chills, muscle pain, sore throat, and new loss of taste or smell. The CDC also notes that other reported symptoms include nausea, vomiting, and diarrhea. Awareness of COVID-19's symptoms cannot be assumed, so administering a questionnaire is adequate only if it covers the specific symptoms.

46. Dr. Turner-Foster indicates that the prison is using two floors of a housing building to serve as a quarantine unit for prisoners who have tested positive and have symptoms (on one floor) and who are recovering (on another floor). Separating infected inmates is a necessary step but is not sufficient on its own. The quarantine unit would need adequate staffing, equipment, and resources, and Dr. Turner-Foster's declaration fails to provide that essential information.

47. Most concerningly, Dr. Thomas-Foster describes efforts to promote social distancing but does not give any details necessary to assess whether effective social distancing is occurring. She states that Health Services appointments are limited to 20 inmates at a time so that inmates can socially distance, that prisoners are encouraged to maintain social distancing, that prisoners who tested positive were moved to another building to assist in social distancing, and that the current camp population of 124 inmates provides sufficient space for social distancing. But she provides no information about the size of the different spaces or the social distance that prisoners actually are able to maintain within them. Without the concrete information absent from her declaration, it is impossible to independently assess whether the prison's efforts are adequate.

48. The lack of necessary detail in Dr. Thomas-Foster's report reinforces my original recommendation for the appointment of a public health expert to review COVID-19-related operations at Fort Dix. Allowing an expert to examine conditions at the prison firsthand is the most efficient and effective way to determine whether the steps it is taking are reasonable.

49. Dr. Thomas-Foster states that the prison does not plan to consolidate medically vulnerable inmates and that it is safer to spread them out across the prison. I disagree with her view. Housing medically vulnerable inmates together would be safer because the inmates' overall health and COVID-19 symptoms could be monitored more easily, access in and out of the housing unit could be controlled more effectively, and staff could be designated for that unit in order to reduce the number of sources of potential infection. For these reasons, consolidating at-risk prisoners is safer.

50. Another specific concern that emerges from Dr. Thomas-Foster's declaration is the prison's reliance on the Abbott rapid testing machine to determine which prisoners are infected. The Food and Drug Administration has issued an alert about the accuracy of the the Abbott test.[21] The FDA issued this alert due to scientific studies casting doubt on the reliability of negative test results, and it warned that negative results from the Abbott machine may need to be confirmed. One study found that 15 to 20 out of 100 tests

---

[21] *See Coronavirus (COVID-19) Update: FDA Informs Public About Possible Accuracy Concerns with Abbott ID NOW Point-of-Care Test* (May 14, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-informs-public-about-possible-accuracy-concerns-abbott-id-now-point.

produce false negative results, while another reported that it could be missing as many as 48% of infections.[22] Dr. Thomas-Foster's declaration makes no mention of the FDA's alert or the studies which led to it. Worse, she indicates that the prison is relying on negative results from the Abbott machine to decide when to house inmates together, without social distancing. Fort Dix's reliance on unreliable test results creates a clear danger of spreading infection.

51. I am informed by counsel for the petitioners of reports that a staff member who scanned in each prisoner at mealtimes in one of the compounds of the main facility has tested positive for COVID-19. If that report is accurate, it would mean that all of the prisoners in that compound were likely exposed to infection. Any prisoners who were exposed to a person who tested positive should, at a minimum, be quarantined with social distancing. This would be true even if the staff member wore a mask and did not touch the prisoners. Dr. Thomas-Foster's declaration does not mention this report, and indeed does not mention any of the Fort Dix staff members who BOP has reported testing positive. Her silence about any steps taken to prevent the spread of infection from staff members who tested positive reinforces my conclusion that the prison is failing to take necessary steps to protect inmates.

52. Accordingly, Dr. Thomas's declaration does not change my professional opinions. In fact, given the 21-day period between my original declaration and this one, the continuing spread of COVID-19 in federal prisons, and the continuing failure to implement social distancing at Fort Dix, I believe the urgency of taking effective action has increased even more.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of May, 2020, in Alameda County, California.

_Joe Goldenson_

Joe Goldenson, MD

---

[22] *See* Joe Neel & Hannah Hagemann, *FDA Cautions About Accuracy of Widely Used Abbot Coronavirus Test*, NPR (May 14, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/05/14/856531970/fda-cautions-about-accuracy-of-widely-used-abbott-coronavirus-test.

**References**

1. Dolan K, Wirtz A, Maazen B., et al. Global Burdern of HIV, viral hepatitis, and tuberculosis in prisoners and detainees. *The Lancet,* July 14, 2016.

2. Stuckler D, Basu S, McKee M, King I. Mass incarceration can explain population increases in TB and multi-drug resistant TB in European and Central Asian countries. Proceedings of the National Academy of Science USA, 2008. 105:13280-85.

3. Beyrer C, Kamarulzaman A, McKee M; Lancet HIV in Prisoners Group. Prisoners, prisons, and HIV: time for reform. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30829-7. doi: 10.1016/S0140-6736(16)30829-7. [Epub ahead of print] No

   abstract available. PMID: 27427447.

4. Marusshak LM, Sabol W, Potter R, Reid L, Cramer E. Pandemic Influenza and Jail Facilities and Populations. American Journal of Public Health. 2009 October; 99(Suppl 2): S339–S344.

5. Nakamoto Group, Prison Rape Elimination Act Audit Report of FCI Fort Dix (2017), https://www.bop.gov/locations/institutions/ftd/PREA_final_report_ftd.pdf.

6. Rubenstein LS, Amon JJ, McLemore M, Eba P, Dolan K, Lines R, Beyrer C. HIV, prisoners, and human rights. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30663-8. doi: 10.1016/S0140-6736(16)30663-8

7. Wang J, Ng, CY, Brook R. Response to COVID-19 in Taiwan: Big Data Analytics, New Technology, and Proactive Testing. March 3, 2020. *JAMA.* Published online March 3, 2020. doi:10.1001/jama.2020.3151.

   FCI Fort Dix Admissions & Orientation Handbook, https://www.bop.gov/locations/institutions/ftd/FTD_aohandbook.pdf.