[Dkt. Ent. Nos. 9 and 28]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

```
TROY WRAGG, et al.,        :
                           :
          Petitioners,     :    CIVIL  NO. 20-5496 (RMB)
                           :
          v.               :
                           :
DAVID E. ORTIZ, et al.,    :         OPINION
                           :
          Respondents.     :
_____:
```

Appearances:


Jeanne Locicero, Esquire
Tess Meiling Borden, Esquire
American Civil Liberties Union
 Of New Jersey Foundation
89 Market Street, 7th Floor
P.O. Box 32159
Newark, New Jersey 08102

     Attorneys for Petitioners


John Francis Basiak, Jr., AUSA
Mark E. Coyne, AUSA
Elizabeth A. Pascal, AUSA
J. Andrew Ruymann, AUSA
John T. Stinson, AUSA
United States Department of Justice
Office of the U.S. Attorney
401 Market Street
P.O. Box 2098
Camden, New Jersey 08101

     Attorneys for Respondents

1

**Bumb,** United States District Judge:

## I. INTRODUCTION

In January 2020, the Centers for Disease Control and Prevention began issuing Guidelines to the American public to protect against the coronavirus disease 2019 (COVID-19), a vicious and insidious disease that had suddenly attacked the country. One of the later Guidelines recommended that people stay at least six feet apart (about two arms' length) from other people and stay out of crowded places and avoid mass gatherings. Ubiquitous reminders to "social distance" or "physical distance" are now part of everyday life.  But what if such distancing is not possible – such as in a prison setting? Should inmates (no matter the length of their sentences) be released to a setting where they can physically distance? Particularly the aged and medically vulnerable inmates? Petitioners, inmates at the Federal Correctional Institution at Fort Dix, New Jersey, say yes.  They contend that they, as well as several hundreds of other vulnerable inmates, are being held in violation of the Eighth Amendment because "there is no set of protective measures that [prison officials] can feasibly implement to contain the spread of COVID-19 in Fort Dix." (Dkt. No. 30, at 38.) The only adequate remedy, they insist, is a "temporary enlargement of custody" – a term they  purposefully use. In reality, Petitioners seek the immediate large-scale release of

2

hundreds of inmates to various places outside the prison's walls: "a hospital, halfway house, a person's home, or other setting" which would be determined on an inmate-specific basis "so they can begin to practice distancing and protect themselves against [COVID-19]." (Dkt. No. 9-1, at 14, 15.) Petitioners have filed a "Complaint-Class Action for Declaratory and Injunctive Relief and Petition for Writ of Habeas Corpus."

Respondents, the Warden of FCI Fort Dix and the Director of the Bureau of Prisons, respond that the Federal Bureau of Prisons has made "extraordinary efforts" to safeguard its inmates. And while even their best efforts have not spared all inmates from contracting COVID-19, their efforts have been particularly successful at FCI Fort Dix. To date, only one inmate has been hospitalized due to COVID-19.[1] All have recovered. This demonstrates that there are clearly measures in place at FCI Fort Dix that can mitigate effectively the spread of COVID-19. But more to the point, Respondents contend that Petitioners' claims are the clever product of linguistic legerdemain in an effort to invoke this Court's habeas corpus jurisdiction. Petitioners' challenges to the conditions of their confinement at FCI Fort Dix are merely dressed up as challenges to the "fact" of their confinement

---

[1] The parties dispute this number, Petitioners contend that there have been four hospitalizations. In reply, Respondents provided the medical records of other inmates who were hospitalized because of serious medical conditions but also tested positive for COVID-19.

3

to avoid dismissal of their lawsuit on jurisdictional grounds. Simply put, but for the conditions related to the COVID-19 pandemic, Petitioners' claims would not exist. Thus, because these kinds of conditions-of-confinement challenges are not cognizable in a petition for writs of habeas corpus, Respondents have moved to dismiss the Petition. Respondents have also moved to dismiss Petitioners' claims under the Rehabilitation Act for failure to state a claim because there is no allegation that the prison officials denied them any benefit solely by reason of their alleged disabilities. In the alternative, Respondents contend that Petitioners cannot satisfy the requirements for either class certification under Federal Rule of Civil Procedure 23(a) or a preliminary injunction.

For the reasons set forth below, the Court grants Respondents' motion in its entirety and denies Petitioners' motion for preliminary injunctive relief and dismisses the Complaint.

## II. STATEMENT OF FACTS

A. <u>Background: Security at Fort Dix and Inmate Placement</u>

The Federal Correctional Institution at Fort Dix ("FCI Fort Dix") is the largest federal prison in the United States in terms of capacity, capable of housing up to 5,000 inmates, but currently housing approximately 2,900 inmates. (Declaration of James Reiser ("Reiser Decl.") ¶3, Dkt. No. 28-2.) It is a "low security" facility

4

"with an adjacent minimum security satellite camp." <u>See</u> FCI Fort Dix, Bureau of Prisons website.[2] The satellite camp ("the Camp") is completely separate from the low compounds. (<u>Id.</u>)The Camp has a relatively low staff-to-inmate ratio and dormitory-style housing. (<u>Id.</u> ¶6.) The Camp currently has approximately 124 inmates, all of whom tested negative for COVID-19. (<u>Id.</u>; Declaration of Nicoletta Turner-Foster, M.D. ("Turner-Foster Decl. I") ¶28, Dkt. No. 28-6.)

The majority of FCI Fort Dix's inmates reside in its low-security facility (referred to as the "Low"). (Reiser Decl. ¶5.) The Low is divided into two compounds ("East" and "West"), which are divided into 370-person-capacity "units." (<u>Id.</u> ¶¶3, 4.) The East and West compounds are separated by fencing and roadways and have military-style dormitories, which were converted into a prison in the early 1990s. (<u>Id.</u>) The housing units have three floors, consisting of 12-man rooms and a small number of 2-man rooms, with communal showers and television rooms. (<u>Id.</u> ¶4.) The determination of whether to place an inmate in the Camp or in the Low is based on a number of individualized assessments of an inmate, one of which is called a "security designation and custody classification." BOP Program

---

[2] Available at https://www.bop.gov/locations/institutions/ftd/ (last visited May 26, 2020).

Statement No. P5100.08, Inmate Security Designation & Custody Classification, at 1.[3]

Petitioners Troy Wagg and Leonard Bogdan are currently housed in the west compound of the Low. (Compl. ¶¶7, 9.) Petitioners Michael Scronic and Eliezer Soto-Concepcion are currently housed at the Camp. (Id. at ¶¶ 8, 10.) All Petitioners allege that they have medical conditions that make them medically vulnerable to COVID-19. Those conditions are described below.

B.  BOP's Action Plan to Combat the Spread of COVID-19

Since January 2020, BOP has been coordinating with subject-matter experts, including the World Health Organization and the Centers for Disease Control ("CDC"), on a COVID-19 action plan.[4] As a result, BOP implemented a multi-phased operational plan called the "Action Plan," which seeks to "mitigate the spread of COVID-19" among inmates and staff, continue effective operations of the federal prison system, and ensure that staff remain healthy and available for duty. Id. To be clear, there is little dispute between the parties that these measures proscribed by the CDC and other agencies, as described herein, are being taken. The heart of the dispute is Respondents'

_____

[3] Available at https://www.bop.gov/policy/progstat/5100_008.pdf (last visited May 26, 2020).

[4] Available at Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/ (last checked May 26, 2020).

6

belief that no measures, absent their release to afford social
distancing, would address their concerns. Indeed, as set forth below,
Respondents even disagree with the CDC's interim guidance regarding
correctional institutions.

As of May 18, 2020, the time of the filing of the Motion to
Dismiss, BOP was in "Phase 6" of its Action Plan, an extension of the
measures taken in Phase 5 as of April 1, 2020. (Turner-Foster Decl.
I ¶14, Dkt. No. 28-6.) All inmates in every BOP institution must be
secured in their assigned cells/quarters for a period of at least 14
days, to stop the spread of COVID-19. (Turner-Foster Decl. I ¶12(a),
Dkt. No. 28-6.) Group gathering is limited, with attention to social
distancing to the extent possible, for commissary, laundry, showers,
telephone, and Trust Fund Limited Computer System (TRULINCS) access.
(Id. ¶12(e)). Staff and inmates are issued appropriate face coverings
and strongly encouraged to wear the face coverings in public areas
when social distancing cannot be achieved. (Id. ¶12(h)).

When inmates are newly admitted to FCI Fort Dix, they are
screened for COVID-19 exposure risk factors and symptoms. (Id. ¶¶6,
20.) "Asymptomatic inmates with risk of exposure are placed in
quarantine." (Id.) "Symptomatic inmates are placed in isolation until
they test negative for COVID-19 or are cleared by medical staff as
meeting CDC criteria for release from isolation." (Id.) In addition,
all staff were subjected to enhanced health screening in areas of

"sustained community transmission," as determined by the CDC, and at medical referral centers. (Id. ¶7.) "Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone." (Id.)

Contractor access to FCI Fort Dix is restricted to those performing essential services (e.g., medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. (Id. ¶12(i)). Contractors who require access are screened for symptoms and risk factors. (Id. ¶12(i)). Social visits were stopped as of March 13, 2020. (Id. ¶12(j)). Legal visits are permitted on a case-by-case basis; lawyers are subject to health screening before admission. (Id.)

As of the writing of this Court's Opinion, BOP is now in Phase 7 of the Action Plan. This phase extends all measures from Phase 6 (as described above) through June 30, 2020, at which time the plan will be evaluated. (Declaration of Nicoletta Turner-Foster, M.D. ("Turner-Foster Decl. II"), Ex. 1, Dkt. No. 34 at 13-15.) Phase 7 includes an extension of plans to significantly decrease movement between BOP facilities nationwide. (Turner-Foster Decl. II ¶3, Dkt. No. 33-1.) BOP stated that it is unable to offer staff testing at institutions at present, but BOP encouraged Wardens to identify and publish testing sites in the community where interested staff could obtain testing. (Id. ¶5.)

C.  FCI Fort Dix's Implementation of the Action Plan

To implement the Action Plan, FCI Fort Dix has a Health Services Department, with clinical staff consisting of four physicians, ten mid-level providers, eleven registered nurses, two infection control/improving performance nurses, two medication technicians and four pharmacists. (Turner-Foster Decl. I ¶15, Dkt. No. 28-6.) From the outset of the COVID-19 pandemic, FCI Fort Dix officials have educated inmates and staff regarding the virus and measures that they should take to stay healthy. (Id. ¶17.)

Beginning on March 16, 2020, all staff and contractors entering FCI Fort Dix must complete a medical questionnaire and temperature check. (Turner-Foster Decl. I ¶18, Dkt. No. 28-6.) If they have COVID-19 symptoms or fever, they are sent home. (Id.) All new inmates arriving at FCI Fort Dix are also screened for fever or symptoms. (Id. ¶20). New inmates are placed in an automatic 14-day quarantine in a housing unit designated only for new inmates, prior to release to their assigned housing units. (Id.)

In accordance with CDC guidance, quarantine and isolation areas were established at the outset. (Id. ¶22.) Upon the outbreak at the Camp, it was decided to use housing unit 5851 ("5851") in the Low security as the isolation unit, because there was not a facility large enough in the Camp. (Id.) Staff must wear N-95 masks for entry to the isolation unit and for escorting inmates on medical trips to

other facilities. (Id. ¶19.) COVID-19 positive inmates are housed on the second floor of 5851; and, upon a ten-day isolation and symptom-free period, recovering inmates are housed on the third floor until release back to the general population. (Id. ¶22.) Only essential staff wearing full PPE are permitted to enter this housing unit. (Id. ¶27.)

On March 20, 2020, FCI Fort Dix issued updated cleaning and disinfection guidance, directing that frequently touched surfaces must be cleaned every hour. (Declaration of Adam Sassaman[5] ("Sassaman Decl.") ¶¶14-15, and Att. 3, Dkt. No. 28-4.) With respect to personal hygiene, on March 22, 2020, FCI Fort Dix installed 300 hand soap dispensers for inmate areas, which are continuously supplied with soap. (Sassaman Decl. ¶¶8, 17-18.) Prior to installation of soap dispensers, inmates were provided all-in-one soap for showering and hand-washing. (Id. ¶8.) They could also purchase hand soap and sanitizer in the commissary. (Id.)

As of April 3, 2020, staff and orderlies regularly and comprehensively clean all facilities at FCI Fort Dix, including: (1) hourly disinfection of frequently touched surfaces; (2) regular cleaning of all electronics and equipment, including all inmate restraints; (3) following new protocols for laundry and the cleaning

---

Adam Sassaman is the Safety and Occupational Health Administrator at FCI Fort Dix. (Sassaman Decl., ¶1, Dkt. No. 28-4.)

10

of soft, porous items; (4) using backpack sprayers during each orderly shift (multiple times daily) to disinfect telephone booths, trash receptacles, drinking fountains, bathrooms and bathroom fixtures, offices, doors, furnishings, and all walking surfaces including stairs; and (5) disinfecting all cleaning tools including mops. (Id. ¶21 and Atts. 4-5.) Guidance is provided for staff and orderlies to maintain personal hygiene on the job. (Id.) Cleaning and disinfection protocols at FCI Fort Dix are designed to meet or exceed guidance from BOP and the CDC. (Id. ¶¶5, 31.)

All staff at the Camp began wearing full PPE, including surgical masks, as of April 3, 2020, the date of the first positive COVID-19 result at the Camp. (Turner-Foster Decl. II ¶13 and Ex. 2, Dkt. No. 33-1). As of April 5, 2020, all inmates and staff received surgical masks. (Id.)

In April 2020, FCI Fort Dix obtained an Abbott testing machine that allows the facility to test approximately 75 inmates in a 24-hour period. (Turner-Foster Decl. I ¶23, Dkt. No. 28-6.) The FDA has issued an alert about the accuracy of this test. (Declaration of Joe Goldenson, M.D.[6] ("Goldenson Decl.") ¶50, Dkt. No. 30-1.) Studies have shown a 15 to 48 percent false negative rate. (Id.)

---

[6] Dr. Goldenson is a physician with 33 years of experience in correctional healthcare. (Goldenson Decl. ¶1, Dkt. No. 30-1.)

FCI Fort Dix has more than 400 Abbott test kits on hand and expects to receive 250 more test kits per week going forward. (Turner-Foster Decl. I ¶23, Dkt. No. 28-6.) The tests take twenty minutes per inmate and provide immediate results. (Id.) If an inmate were to complain about symptoms associated with COVID-19, he would immediately be escorted to the health services building and examined by a clinician. (Id.) If COVID-19 was suspected, he would be tested immediately using the Abbot machine; and if positive, he would be immediately isolated in 5851. (Id.) One inmate from Low has been tested for COVID-19 after examination by a clinician and he tested negative. (Id.)

On behalf of Respondents, Dr. Turner-Foster states that the rapid Abbott testing machine is FDA-approved. (Turner-Foster Decl. II ¶7, Dkt. No. 33-1.) Use of the Abbott testing machine has allowed FCI Fort Dix to significantly increase testing capability. (Id.) As with most viral diagnostic tests, the Abbott test machine has a margin of error, and staff are aware of the possibility of a false negative. (Id.) Given the possibility of a false negative, clinical decisions are made regarding diagnosis, treatment, isolation, quarantine, inmate movement and management of institution operations to address all concerns. (Id.)

On April 16, 2020, staff and inmate masks became mandatory. (Turner-Foster Decl. I ¶24, Dkt. No. 28-6.) Staff and inmates were

issued a weekly supply of surgical masks. (Id.) During the week of April 29, 2020, inmates and staff were supplied three reusable cloth masks. (Id.) Laundry staff wash inmate masks twice weekly, and staff were issued guidance on how to wash and use masks. (Id.)

   D.  Current Conditions and Health and Screening Protocols

   FCI Fort Dix has implemented different protocols for the Low, the Camp, and 5851. (Gov't Brief, Dkt. No. 28-1 at 23.) All inmates are regularly screened for symptoms of infection and all activities are managed so as to minimize congregate activity and promote distancing. (Id.)

      1.  Circumstances at the Camp

   The first inmate at FCI Fort Dix tested positive for COVID-19 on April 3, 2020, and he was isolated in the Camp. (Turner-Foster Decl. I ¶25, Dkt. No. 28-6.) Twice daily temperature checks were initiated at the Camp. (Id.) Inmates showing or reporting symptoms of the virus were also isolated and tested. (Turner-Foster Decl. I ¶25, Dkt. No. 28-6.) The Camp was quarantined and any staff member entering the Camp had to wear PPE including surgical masks, gowns, face shields, goggles and gloves. (Id.) All services were provided within the Camp. (Id.)

   According to Petitioner Scronic, the last COVID-19 test was performed at the Camp on May 5, 2020, and nine prisoners tested

positive and were moved to 5851. (Declaration of Michael Scronic[7] ("Scronic Decl.") ¶¶4, 6, Dkt. No. 30-6.)  Among those nine was an inmate kitchen line server who had been out sick from his work assignment the previous week but had worked on May 5 and during the breakfast shift on May 6, before receiving his positive test result. (Id. ¶4.) Also among those nine who tested positive was a man who had been experiencing symptoms the previous week and was told to wait until the mass testing was performed for his wing. (Id.) Scronic reports rumors that inmates are afraid to report their COVID-19 like symptoms because they are "afraid of going to Building 5851" (Id.) where those inmates who test positive are quarantined.[8] As of May 18, 2020, only 124 inmates, who have tested negative for COVID-19 virus, remain at the Camp where there is space to social distance. (Turner-Foster Decl. I ¶28, Dkt. No. 28-6.) As of that date, FCI Fort Dix had administered 274 tests using the Abbott testing machine, which

---

[7] Michael Scronic, one of the four petitioners, is an FCI Fort Dix inmate who is housed in the B-wing of the Camp. (Scronic Decl. ¶¶1-5.)

[8] As the Respondents point out, much of what Petitioner Scronic states is based upon anecdotal information or speculation. For example, Scronic speculates that because he sees prison officers working double shifts he believes that staff are calling in sick or taking vacation more often. Respondents have disputed that with evidence of officers' work shifts. Moreover, Scronic's claim that inmates are afraid to voice that they have COVID-19 symptoms for fear of going to 5851  is also disputed by Respondents. As Dr. Turner-Foster explained there are no communications between inmates in the Unit and the Camp.

included testing of the entire Camp population. (Id. ¶27.) In all, 58 Camp inmates tested positive for COVID-19. (Id.) Test results have been available to inmates upon request but on May 20, 2020, FCI Fort Dix was able to attach a printer to the Abbott testing machine; thus, starting on May 21, 2020, test results from the Abbott machine will be printed and scanned into the inmates' electronic medical records. (Turner-Foster Decl. II, ¶¶8-10, Dkt. No. 33-1.)

Petitioners note Respondents have represented that there are no further plans for mass testing. (Petrs' Opp. Brief, Dkt. No. 30 at 19.) Petitioner Scronic asserts there are people in the Camp who have continued to experience symptoms, including at least one person who was told he tested was negative on May 1 but was nevertheless bedridden for days and certain he had COVID-19. (Scronic Decl. ¶5, Dkt. No. 30-6.) Petitioner Scronic also observed four inmates, who sleep in bunk beds in the same row, exhibiting dry throat, coughs, chills, weakness and who registered high temperatures during temperature check. (Id.) Petitioners claim, through Petitioner Scronic's Declaration, that although there are daily temperature checks at the Camp, as of May 13, people who trigger a high reading are not evaluated by medical staff as a matter of course. (Id. ¶15.) Further, temperature readings and associated names are not being recorded or otherwise noted for patterns of recurring high temperatures or contact tracing. (Id.)

15

Dr. Turner-Foster addresses the temperature taking concerns by first stating that, given the staffing resources initially available, it was not possible to develop a realistic plan that could be executed, and it was not possible to record every temperature reading and negative symptoms into each inmate's medical record. (Turner-Foster Decl. II ¶12, Dkt. No. 33-1.) For all COVID-19 positive inmates housed in isolation unit 5851, a full set of vital signs and a complete symptom assessment is recorded daily. (Turner-Foster Decl. II ¶12, Dkt. No. 33-1.)

Dr. Turner-Foster also reported that as of May 21, 2020, the Camp lifted from a 14-day quarantine period. (Id. ¶21.) This quarantine period derived from the final COVID-positive tests on May 6, 2020. (Id.) In an effort to destroy any virus remaining on Camp surfaces, the institution hired a commercial COVID-19 disinfecting service thoroughly clean the entire Camp, using EPA approved disinfectant. (Id.) All inmates were provided new bedrolls. (Id.) Inmates were instructed to wash clothing on the warmest water possible prior to the scheduled cleaning. (Id.) Finally, inmates were instructed to keep all personal items locked in their locker. (Id.; Ex. 3.)

Petitioners assert there is no regular monitoring or testing of symptoms, beyond temperature checks, at either the Camp or the Low.

16

(Scronic Decl. ¶13; Declaration of Tommie Telfair[9] ("Telfair Decl.") ¶¶ 4-5, Dkt. No. 30-4; Valas ("Valas Decl.") ¶27[10], Dkt. No. 30-5; Goldenson Decl. ¶45.) On behalf of Respondents, Dr. Turner-Foster disagrees, stating that medical staff who perform temperature checks have addressed inmates who present with COVID-19 symptoms. (Turner-Foster Decl. II ¶11, Dkt. No. 33-1.) Any inmate with a fever or symptoms is immediately separated from other staff and inmates and made to wear a mask and then escorted to Health Services for further evaluation. (Id.)

Finally, Petitioners contend that correctional officers and nursing staff move between the Camp and East and West compounds at the Low, and 5851, due in part to officers working double shifts and assisting with counts. (Scronic Decl. ¶¶9-12; Valas Decl. ¶¶12-13.) At least one officer goes directly from the Camp to the Low in a double shift. (Scronic Decl. ¶¶10-11.) Nursing staff acknowledged to prisoners as recently as May 13 that they rotate between the Camp and the Low, including Unit 5851. (Id. ¶12.) Dr. Turner-Foster responded to these allegations. Only essential staff can enter the Camp and 5851, and they must wear full PPE. (Turner-Foster Decl. II ¶15, Dkt.

---

[9] Tommie Telfair is an FCI Fort Dix inmate housed in the East compound in the Low. (Telfair Decl. ¶¶1-5, Dkt. No. 30-4.)

[10] Raymond Valas is an FCI Fort Dix inmate housed in the West compound in the Low. (Valas Decl. ¶¶1, 8, 13, Dkt. No. 30-5.)

No. 33-1.) The doctors and nurses remain in their assigned compounds, with the exception that four nurses and two doctors who are assigned to West compound have entered the isolation unit in 5851 to provide treatment for COVID-19 positive inmates; and, on one single occasion, a nurse practitioner assigned to the Camp entered the isolation unit to assist with daily assessments. (Id.)

## 2.   Circumstances in Unit 5851 and Hospitalizations

Inmates who test positive for COVID-19 are quarantined in the isolation unit in 5851. (Turner-Foster Decl. I ¶¶26-27, Dkt. No. 21-6.) As of May 18, 2020, twenty-two COVID-19 positive inmates remained in isolation in 5851, and 27 were on the third floor in recovery, pending return to the Camp. (Turner-Foster Decl. I ¶27, Dkt. No. 21-6.) Inmates are moved to the recovery floor after a 10-day period of isolation and symptom free. (Id.) Staff must wear full protective PPE including N-95 mask, face shield, a gown and gloves. (Id.)

According to Petitioners, Unit 5851 is designed like the other housing units in the Low, with predominately 12-person rooms. (Declaration of Ezra McCombs[11] ("McCombs Decl.") ¶¶2-3, Dkt. No. 30-

---

[11] Ezra McCombs is an FCI Fort Dix inmate, initially housed in the West compound, then housed in the Camp, and housed in Building 5851 after testing positive for COVID-19. (McCombs Decl. ¶¶1-3, Dkt. No. 30-3.)

3; (Declaration of Rodolfo Quiambao[12] ("Quiambao Decl.") ¶11, Dkt. No. 30-2.) The first floor is a laundry facility; the second floor houses inmates with active symptoms; and the third floor houses those deemed recovered, before they are released back to the general population. (McCombs Decl. ¶¶4, 8; Scronic Decl. ¶7.)

Petitioners assert that medical care in Unit 5851 has been limited to two daily rounds by nurses or doctors, with no nurses or doctors remaining on site. (Quiambao Decl. ¶10.) (Quiambao Decl. ¶10.) Inmates were treated with regular Tylenol or Tylenol with codeine to make them sleep. (Quiambao Decl. ¶9, Dkt. No. 30-2.)

Petitioners maintain that at least four people have become so sick with COVID-19 at Fort Dix that they have required hospitalization. (McCombs Decl. ¶¶4-7, Dkt. No. 30-3; Quiambao Decl. ¶¶1, 15, Dkt. No. 30-2.) Among those, at least one required a ventilator and/or oxygen support before returning to 5851. (McCombs Decl. ¶4.) Inmate Quiambo, a 75-year-old man who was released to home confinement on April 13, 2020, was transported home but had to be taken to a hospital that day, and he ended up in the ICU. (Quiambao Decl. ¶15.) Over a month later, he is still at a rehabilitation and nursing center. (Id. ¶16.) He believes he would have died had he not

---

[12] Rodolfo Quiambo is an FCI Fort Dix inmate who was housed in the Camp when he tested positive for COVID-19 on April 7, 2020. He had been working as a kitchen food server in the Camp. (Quiambao Decl. ¶¶3-8, Dkt. No. 30-2.)

been transported to the hospital. (Id. ¶17.) Dr. Turner-Foster replied that of the four FCI Fort Dix inmates who were hospitalized, three were hospitalized for other illnesses and tested positive for COVID-19 while at the hospital. Respondents have produced the medical records to demonstrate that only one was transferred to the hospital specifically for COVID-19 and the other three were transferred to the hospital emergency room for other non-COVID related reasons. (Turner-Foster Decl. II ¶26, Dkt. No. 33-1.)  Three of the four inmates have returned to FCI Fort Dix and are currently in the recovery in 5851. The fourth inmate remains hospitalized and has a suspected cancer diagnosis.

### 3.  Circumstances at the Low

All inmates at the Low have temperature checks and a symptom assessment every other day (alternating by East and West compound). (Turner-Foster Decl. I ¶21, Dkt. No. 28-6.) Sick call slips are distributed in the housing units to minimize movement of inmates. (Id.) All inmates, including those with COVID-19 symptoms, are seeing in the Health Services Building; appointments are scheduled by housing unit and limited to approximately 20 inmates to allow social distancing. (Id.) Those inmates with COVID-19 symptoms are seen immediately. (Id.) Medications are distributed through the "pill line," one unit at a time, at the same time inmates are obtaining their "grab and go" meal in their housing units. Id.

BOP does not currently plan to test the entire Low, but FCI Fort Dix has testing capacity and supplies to address issues if they arise. (Id. ¶23.) BOP can conduct approximately 75 tests in a 24-hour period, and FCI Fort Dix currently has more than 400 kits on hand now with weekly deliveries on the way. (Id.) BOP does not currently have a plan to house inmates with preexisting medical conditions into a single space. (Id. ¶22.) Medical professionals at BOP currently believe that it is safer to spread those inmates out across the institution. On behalf of Petitioners, Dr. Goldenson disagrees with this assessment. (Goldenson Decl. ¶49, Dkt. No. 30-1.)

Petitioners note that by Respondents' account only one person in the Low has been tested for COVID-19. (Turner-Foster Decl. I ¶23.) Petitioners, however, assert Respondents have not acknowledged the 25 tests performed in the Low in early May. (Petr's. Opp. Brief, Dkt. No. 30 at 24.) As noted, according to Petitioner Scronic, no tests have been performed at the Camp since May 6. (Scronic Decl. ¶4, Dkt. No. 30-6.)[13] Further, Respondents have not explained why they have no plans to test people housed at the Low, despite the capacity to test 75 people a day. (Petr's Opp. Brief, Dkt. No. 30 at 21.) Petitioners submit that inmates at the Low who have not been tested have exhibited

---

[13] According to Dr. Turner-Foster, as of May 21, 2020, the Camp lifted from a 14-day quarantine period which had been as a result of  the final CIVID-positive tests on May 6, 2020. (Turner-Foster Decl. II ¶21, ECF No. 33-1.)

symptoms typical of COVID-19, including one man on the east compound who was sick for two months and fainted twice; and four people housed in the same housing unit who have exhibited vomiting, coughs, chills, and other symptoms associated with COVID-19. (Telfair Decl. ¶¶2-4, Dkt. No. 30-4.)

In reply, Dr. Turner-Foster states that on April 22, 2020, they began testing asymptomatic Camp inmates who were pending release from BOP custody. (Turner-Foster Decl. II ¶18, Dkt. No. 33-1.) On May 15, 2020, FCI Fort Dix proposed a plan to begin testing asymptomatic inmates on the East and West Compounds. (Id.) This plan established goals and priority groups for testing. (Id.) That plan was submitted to the Regional Health Services Administrator, Regional Medical Director, and Regional Infectious Disease Nurse. To date, their approval is pending. (Id.)

FCI Fort Dix continues to use guidelines and advice from multiple sources, including but not limited to, the BOP's Health Services Division - Central Office, the Centers for Disease Control, the State of New Jersey's Health Department, and the Burlington County Health Department. (Turner-Foster Decl. II ¶19, Dkt. No. 33-1.)

Petitioners assert, in addition to staff movement between the Camp and the Low, food and beverage carts have been moved between the medical isolation unit at 5851 and the rest of the west compound. (Scronic Decl. ¶¶9-12, Dkt. No. 30-6; Valas Decl. ¶¶12-13, Dkt. No.

22

30-5.) Staff go back and forth between 5851 and other units to transport laundry. (Valas Decl. ¶13, Dkt. No. 30-5.) Prisoners on the west compound go to the first floor of 5851 for clean linens. (Id. ¶13.) Many officers in the West Compound do not always wear masks, and many or all do not wear gloves. (Id. ¶¶14–16.)

As to staff movements, Dr. Turner-Foster states that only essential staff may enter 5851 and the Camp. (Turner-Foster Decl. II ¶15, Dkt. No. 33-1.) They must wear full protective PPE including an N-95 mask, a face shield, a gown, and gloves. (Id.) From the beginning of the COVID-19 pandemic, to the greatest extent possible, the nurses and doctors assigned to East have remained assigned to East and the nurses and doctors assigned to West have remained assigned to West. (Id. ¶16.) Only four nurses and two doctors, all assigned to West, have entered the isolation unit in 5851 to provide evaluation and treatment for COVID-19 positive inmates. (Id.) The only exception was on one single occasion, when a nurse practitioner assigned to the Camp entered the isolation unit to assist with daily assessments. (Id.) Further, only three correctional officers are assigned to work in the Camp, covering all three shifts, during which they don full PPE. (Turner-Foster Decl. II ¶17, Dkt. No. 33-1.) If one of those officers signs up for overtime, he/she is allowed to work only on West. (Id.) By donning full PPE in this manner, the likelihood of spread is negligible. (Id.)

Further, as to moving equipment between facilities, Dr. Turner-Foster responds that staff use the food and beverage carts to feed the inmates in isolation unit 5851 because those inmates are not permitted to leave the unit. (Turner-Foster Decl. II ¶20, Dkt. No. 33-1.) Staff sanitize this equipment both before and after exiting the isolation unit, at all times wearing full PPE. (Id.) Additionally, inmates confined to isolation unit 5851 wash their own laundry with a designated washer and dryer on the first floor. (Id.) Laundry staff wash all other inmate (non-isolation unit 5851) laundry and transport the clothing to centralized laundry via laundry carts. (Id.) Inmates who work in the laundry do not enter  5851. (Id.)

### 4.   Staff Members

Petitioners note that on or around May 3, an officer tested positive for COVID-19 and is now understood by prisoners and staff to be very sick. (Valas Decl. ¶¶17, 21, Dkt. No. 30-5.) It is rumored that the officer worked five days per week scanning the IDs of all prisoners in the West who go for daily meal pickups in the compound's sole dining hall. (Id. ¶18.) He wore a mask and did not touch the IDs, but in order to scan them was required to come within six inches of nearly every prisoner on the west compound several times per week. (Id. ¶21; see also Compl. ¶93 (describing meal pickups from the dining hall)). Between meal shifts, he was known usually not to wear a mask. (Valas Decl. ¶22, Dkt. No. 30-5.)

24

In addition to the contact he had with prisoners picking up morning and/or mid-day meals, the officer had contact with prisoners who worked in the kitchen. The officer worked the morning shift and was in almost daily contact with the 25 prisoners who worked that shift. (Id. ¶¶18-20.) Further, because he had a one-to-two-hour overlap with the afternoon shift, he also had regular contact with the 25 prisoners who worked the afternoon shift. (Id. ¶¶18-20, 23.) On May 5 or 6, the 25 prisoners who worked the morning shift were tested for COVID-19. (Id. ¶23.) The afternoon shift was not tested. Respondents have not acknowledged this positive staff test result.

Dr. Turner-Foster responded that since the beginning of the pandemic, five staff members tested positive for the virus. (Turner-Foster Decl. II ¶24, Dkt. No. 33-1.) All staff have fully recovered and returned to work. (Id.) The fifth staff member, referenced by Petitioners as having contact with inmates while scanning IDs, returned to work on May 16, 2020. (Id.) If any inmate exhibited symptoms of COVID-19 based on interaction with this staff member, they would have been identified during temperature checks/symptoms assessments and tested for the virus. (Id.)

E.   BOP's Individualized Determinations for Home Confinement

1.   CARES Act

BOP is exercising its discretion and authority under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act to place

inmates in "prerelease custody" under 18 U.S.C. 3624(c)(2), which includes "home confinement." <u>See</u> BOP Program Statement No. 7320.01, Home Confinement.[14] The CARES Act, as implemented by the Attorney General, expanded the authority for BOP to review "all at-risk inmates—not only those who were previously eligible for transfer."[15] BOP is still obligated to protect public safety; "[t]hat means [BOP] cannot simply release prison populations en masse onto the streets." <u>Id.</u>

On March 26, 2020, the Attorney General issued guidance for "prioritizing" home confinement for "at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities."[16]

In home confinement determinations under the CARES Act, BOP is to "consider the totality of circumstances for each individual inmate" based on the following non-exhaustive factors:

> • The age and vulnerability of the inmate to COVID-19, in accordance with the Centers

---

[14] Available at https://www.bop.gov/policy/progstat/7320_001_CN-1.pdf (last visited May 26, 2020).

[15] Available at https://www.justice.gov/file/1266661/download (last visited May 26, 2020).

[16] Available at (last visited May 26, 2020).

for Disease Control and Prevention (CDC) guidelines;
• The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;
• The inmate's conduct in prison, with inmates who have engaged in violent or gang related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;
• The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;
• Whether the inmate has a demonstrated and verifiable re- entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility; and
• The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

See supra n. 13 at 1-2.

Any inmate granted home confinement under this guidance is required to be "in a mandatory 14-day quarantine period" and is "subject to location monitoring services and, where a court order is entered, [is] subject to supervised release." Id.

On April 3, 2020, the Attorney General updated his home confinement guidance to BOP and identified specific BOP facilities

"experiencing significant levels of infection," FCI Oakdale, FCI Danbury, and FCI Elkton. Id.

BOP has generally prioritized home confinement for those inmates who have a short amount of time remaining on their sentences or who have served at least 50% of the sentence imposed. (Reiser Decl. ¶24, Dkt. No. 28-2.) FCI Fort Dix referred 56 inmates for transfers to home confinement under the CARES Act. (Id. ¶¶24-25.) Twenty-one of those inmates have already transferred to home confinement, and nineteen are scheduled to transfer to home confinement through the month of May. (Id. ¶25.)

    2.  First Step Act

Home confinement under the CARES Act is not the same as another form of relief available to an inmate called "compassionate release" (which is also called "early release" or "Reduction in Sentence") under the First Step Act, 18 U.S.C. § 3582(c)(1)(A). BOP does not have authority to provide inmates with a reduction in sentence through compassionate or "early release." Id. However, BOP may make a motion to an inmate's sentencing court to reduce a term of imprisonment. Id. BOP is guided by Program Statement 5050.50, which requires "extraordinary or compelling circumstances that could not reasonably

28

have been foreseen by the court at the time of sentencing."[17] Under the First Step Act, effective December 18, 2018, an inmate may file a motion to reduce his sentence directly in the sentencing court, after exhaustion of administrative remedies, or 30 days from the date the warden receives the inmate's request from the inmate, whichever is earlier. See 18 U.S.C. § 3582(c)(1)(A). The sentencing courts have released ten inmates from FCI Fort Dix since April 7, 2020. (Gov't Brief, Dkt. No. 28-1 at 32.)

    F.  BOP's Administrative Exhaustion Procedures

    BOP's administrative remedies have several tiers allowing "an inmate to seek formal review of an issue relating to any aspect of his/her own confinement." 28 C.F.R. § 542.10. An inmate must first "present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy." 28 C.F.R. § 542.13(a). Second, if the inmate is not satisfied, he may file a "formal written administrative Remedy Request, on the appropriate form (BP-9)," within "20 calendar days following the date on which the basis for the Request occurred." § 542.14(a). Third, if the inmate "is not satisfied with the Warden's response," which must issue within 20

---

[17] Available at https://www.bop.gov/PublicInfo/execute/policysearch?todo=query&series=5000# (last visited May 26, 2020.)

days, the inmate may "submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response." §§ 542.15(a), 542.18. Finally, "[a]n inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response." § 542.15(a). The General Counsel has 40 days to respond. 28 C.F.R. § 542.18. If an issue raised by the inmate concerns "an emergency" that "threatens the inmate's immediate health or welfare, the Warden shall respond not later than the third calendar day after filing." 28 C.F.R. § 542.18.

According to BOP's administrative records, Petitioners Wragg, Scronic and Soto-Concepcion have never filed an administrative grievance while incarcerated at FCI Fort Dix. (Declaration of Christina Clark[18] ("Clark Decl.") ¶5, Dkt. No. 28-3 and Exs. 1-3.) Petitioner Bogdan has not filed a grievance since the COVID-19 pandemic began in 2020. (Id. and Ex. 4.)

G. Petitioners' Compassionate-Release Requests

Petitioner Wragg is a 38-year-old inmate serving a 22-year aggregate sentence for engaging in fraud offenses. (Gov't Brief, Dkt.

_____

[18] Christina Clark is a Senior Attorney with the Federal Bureau of Prisons).

No. 28-1 at 34.) Assuming he receives all good time credit available to him, his projected release date is August 7, 2037. (Reiser Decl. ¶27, Dkt. No. 28-2 and Ex. 8 at 001.) Wragg has served approximately 6.7% of his sentence. (Id. and Ex. 8 at 004.)

Wragg filed a request for compassionate release with Warden Ortiz. (Reiser Decl. ¶9 and Ex. 1.) On April 17, 2020, the BOP denied Wragg's request because he did not meet the necessary criteria for compassionate release under BOP policy. (Id.) On May 8, 2020, and then again on May 13, 2020, Wragg moved his sentencing court for a reduction of sentence under the First Step Act. (Id. and Ex. 2.) This motion is currently pending. United States v. Wragg, Case No. 15-cr-00398-JHS (E.D. Pa.), ECF No. 301 (Mot. To Modify).

Petitioner Scronic is a 49-year-old inmate who pleaded guilty to securities fraud and was sentenced to 96 months' imprisonment. (Id. ¶29 and Ex. 12.) Assuming he receives all good conduct time available to him, his projected release date is September 18, 2025. (Id.) Scronic has served approximately 18% of his sentence. (Id.) According to the petition, Scronic has "a history of abnormal heart symptoms, severe childhood asthma, and skin cancer," as well as "one or more disabilities recognized by the Rehabilitation Act." (Compl. ¶8, Dkt. No. 1.) He is currently housed at the Camp at FCI Fort Dix and he has tested negative for COVID-19. (Turner- Foster Decl. I ¶30, Dkt. No. 28-6; Reiser Decl. ¶6, Dkt. No. 28-2.) If he were released

to home confinement, he would "live with his sister and her two children in New York." (Compl. ¶8, Dkt. No. 1.)

On April 7, 2020, pursuant to the First Step Act, Scronic filed a motion for compassionate release with the sentencing court. (Gov't Brief, Dkt. No. 28-1 at 36.) On April 20, 2020, the Court denied the motion without prejudice because Scronic had not exhausted his administrative remedies, noting he did not appear to be a good candidate based in part by how little of his sentence he had served. (Id.) While that motion was pending, on April 16, 2020, Scronic submitted a request to the Warden of FCI Fort Dix for compassionate release. (Reiser Decl. ¶10 and Ex. 3, Dkt. No. 28-2.)  Scronic can now return to his sentencing court and seek a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A). (Gov't Brief, Dkt. No. 28-1 at 36.)

Petitioner Leonard Bogdan is a 68-year-old inmate who was sentenced in 2007 to an aggregate 360-month term of incarceration for fraud offenses. (Gov't Brief, Dkt. No. 28-1 at 36-37.) In the petition, Bogdan claims he "has a heart condition, hypertension, high cholesterol, skin cancer, a potentially cancerous thyroid nodule that causes rapid heartbeat, and severe scoliosis that has displaced his kidneys and presses on his lungs causing chronic shortness of breath," as well as "one or more disabilities recognized by the Rehabilitation Act." Compl. ¶9.) He is housed in the West. (Id.) If released, he would "live with his wife in West Virginia." (Id.)

On April 20, 2020, Bogdan filed a motion for a reduction of sentence in the sentencing Court. (Gov't Brief, Dkt. No. 28-1 at 27-28.) The sentencing court denied the motion, finding that it lacked jurisdiction to order home confinement and noting that the Second Chance Act gave that authority exclusively to the BOP. (Id. at 38.)

BOP determined that Bogdan qualified for home confinement through the CARES Act. (Reiser Decl. ¶26and Ex. 6, Dkt. No. 28-2.) However, on May 13, 2020, the United States Probation Department notified FCI Fort Dix that Bogdan's wife refused to allow him in their home. (Id. ¶26 and Ex. 7.) Bogdan was notified and given the opportunity to provide another release residence, but he was unable to provide another location. (Id.)

Petitioner Eliezer Soto-Concepcion is a 38-year-old inmate who pleaded guilty to a drug trafficking crime and was sentenced to a 144-month term of incarceration. (Gov't Brief, Dkt. No. 28-1 at 28.) Assuming he receives all available good time credit, his projected release date is September 5, 2025. (Reiser Decl. ¶28 and Ex. 10 at 001, Dkt. No. 28-2.) He has served approximately 41% of his sentence. (Id. ¶28 and Ex. 10 at 003.)  Soto-Concepcion alleges he requested the warden to make a motion for compassionate release in mid-April and is waiting for a response. (Compl. ¶19, Dkt. No. 1.)

In the petition, Soto-Concepcion says he "has high blood pressure, a history of heart attacks, and a nervous system condition

that makes his hands shake," as well as "one or more disabilities recognized by the Rehabilitation Act." (Compl. ¶10, Dkt. No. 1.) If released to home confinement, he would "live with his grandmother in Puerto Rico." (Id.) He is housed in the Camp. (Id.)

### H. Other Inmates at FCI Fort Dix

Of the roughly 3,000 inmates at FCI Fort Dix, at BOP's last count, 24 inmates in addition to the four Petitioners here have filed § 2241 petitions demanding transfer to home confinement because of their fear of COVID-19. (Declaration of Mark E. Coyne[19] ("Coyne Decl.") ¶2, Dkt. No. 28-5.) Other FCI Fort Dix inmates have requested reductions in sentence, many relying on fear of COVID-19, and ten have been granted. (Id. ¶4; Reiser Decl. ¶8, Dkt No. 28-2.) Yet other inmates at FCI Fort Dix have invoked their fear of COVID-19 to demand release on bail pending the disposition of their appeals. (Coyne Decl. ¶¶7, 9, Dkt. No. 28-5.)

## III.  JURISDICTION UNDER 28 U.S.C. § 2241

### A. Rule 12(b)(1) Standard

Federal courts, as courts of limited jurisdiction, possess only that power authorized by the Constitution and statute. Cardona v. Bledsoe, 681 F.3d 533, 535 (3d Cir. 2012) (citing Kokkonen v. Guardian

---

[19] Mark Coyne is Supervisory Assistant U.S. Attorney for the United States Attorney's Office for the District of New Jersey, Chief of the Appeals Division. (Coyne Decl. ¶1, Dkt. No. 28-5.)

Life Ins. Co. of Am._, 511 U.S. 375, 377 (1994)). Federal Rule of Civil Procedure 12(b)(1) provides a mechanism for challenging subject matter jurisdiction of a federal court.[20] A court may also dismiss for lack of subject-matter jurisdiction at "any time[.]" Fed. R. Civ. P. 12(h)(3).

"A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction." Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000), holding modified by Simon v. United States, 341 F.3d 193 (3d Cir. 2003) (citing Mortensen v. First Fed. Sav. and Loan Ass'n_, 549 F.2d 884, 891 (3d Cir. 1977)). If the motion to dismiss presents a factual attack on the complaint, a court may consider evidence outside the pleadings. Gould, 220 F.3d at 176 (citing Gotha v. United States_, 115 F.3d 176, 178-79 (3d Cir. 1997). It is the plaintiff's burden to establish jurisdiction. Gould, 220 F.3d at 176 (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)). "A claim may be dismissed under Rule 12(b)(1) only if it 'clearly appears to be immaterial and made solely for the purpose of obtaining

---

[20]   The Federal Rules of Civil Procedure are "applicable to habeas petitions to the extent they are not inconsistent with the Habeas Rules." Robinson v. Johnson, 313 F.3d 128, 134 (3d Cir. 2002). (3d Cir. 2016). The Rules Governing Section 2254 Cases in the United States District Courts govern habeas corpus petitions under 28 U.S.C. § 2241, pursuant to Rule 1(b), scope of the rules; "[t]he district court may apply any or all of these rules to a habeas corpus petition not covered by Rule 1(a)."

jurisdiction' or is 'wholly insubstantial and frivolous.'" Id. (internal quotations omitted).

Under Rule 12(b)(1), "[i]f the defendant contests any allegations in the pleadings, by presenting evidence, the court must permit the plaintiff to respond with evidence supporting jurisdiction." Id. (citing International Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc., 673 F.2d 700, 712 (3d Cir. 1982)). "The court may then determine jurisdiction by weighing the evidence presented by the parties." Id. "However, if there is a dispute of a material fact, the court must conduct a plenary trial on the contested facts prior to making a jurisdictional determination." Id. "Improper consideration of a merits question under Rule 12(b)(1) significantly raises both the factual and legal burden on the plaintiff." Davis v. Wells Fargo, 824 F.3d 333, 349 (3d Cir. 2016). Thus, courts must be cautious not to treat "what is, in essence, a Rule 12(b)(6) challenge to the complaint" as a Rule 12(b)(1) motion. Kehr Packages, 926 F.2d at 1409. If the challenge to the complaint is, in essence, failure to state a claim, the Court must accept the well-pled allegations as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

B.   Rule 12(b)(6) Standard

A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ.

36

P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556.) Legal conclusions, together with threadbare recitals of the elements of a cause of action, do not suffice to state a claim. Id.

Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id.

C. Challenge to this Court's Jurisdiction

Respondents move to dismiss the § 2241 Petition under Federal Rule of Civil Procedure 12(b)(1) because Petitioners' claims amount to challenges to their conditions of confinement which are not cognizable in a petition for writs of habeas corpus. Respondents move to dismiss the Petitioners' Rehabilitation Act claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. With

the foregoing legal principle and standards in play, the Court turns to the merits of the motion.

D.   Applicable Habeas Law

"The 'core' habeas corpus action is a prisoner challenging the authority of the entity detaining him to do so, usually on the ground that his predicate sentence or conviction is improper or invalid." McGee v. Martinez, 627 F.3d 933, 935 (3d Cir. 2010) (citing Leamer v. Fauver, 288 F.3d 532, 542 (3d Cir. 2002)). 28 U.S.C. § 2241(c)(3) provides:

> (c) The writ of habeas corpus shall not extend to a prisoner unless—
>
> > (3) He is in custody in violation of the Constitution or laws or treaties of the United States[.]

Within the Third Circuit Court of Appeals, a federal prisoner may challenge the fact, duration or execution of his or her sentence in a petition for habeas corpus under § 2241. Woodall v. Federal Bureau of Prisons, 432 F.3d 235, 241 (3d Cir. 2005). Typically, a challenge to the "fact" of a sentence is an inquiry into the legality of the detention, and relief for unlawful detention is discharge. Leamer,, 288 F.3d at 540-41 (3d Cir. 2002) (citing Powers of Congress and the Court Regarding the Availability and Scope of Review, 114 Harv. L. Rev. 1551, 1553 (2001)). In contrast, a claim alleging a constitutional violation under 42 U.S.C. § 1983 is a species of tort

38

liability. Id. (citing Smith v. Holtz, 87 F.3d 108, 111 (3d Cir. 1996) (discussing Heck v. Humphrey, 512 U.S. 477 (1994))). A claim might properly be brought under either § 2241 or § 1983 if "the deprivation of rights is such that it necessarily impacts the fact or length of detention." Leamer, 288 F.3d at 540. If the resolution of the claim necessarily implies the invalidity of the sentence, in other words, "the fact or duration of detention," a habeas petition is the avenue for relief. Id. The "heart of habeas corpus" is immediate release or speedier release from confinement. Id. at 541. Examples of habeas claims that affect the duration of confinement include parole challenges, loss of good time credits and incorrect sentence calculations. See Eiland v. Warden Fort Dix FCI, 634 F. App'x 87, 89 (3d Cir. 2015) (sentence calculation); Denny v. Schultz, 708 F.3d 140 (3d Cir. 2013) (good time credits); Coady v. Vaughn, 251 F.3d 480 (3d Cir. 2001) (denial of parole). "[W]hen the challenge is to a condition of confinement such that a finding in plaintiff's favor would not alter his sentence oi undo his conviction, an action under § 1983 is appropriate." Id. n.5. These claims have an exhaustion of administrative remedies requirement. In other words, before they can be brought in court, a prisoner must first exhaust his administrative remedies with the BOP. See Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory.")

39

In addition to challenges to the fact and duration of a sentence, habeas jurisdiction exists to challenge the "execution" of a sentence. "[T]he precise meaning of execution of the sentence' is hazy." Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 243 (3d Cir. 2005)In determining the meaning of "execution," the Third Circuit looked "to the plain meaning of the term . . . which is to 'put into effect' or 'carry out.'" Id. (quoting Webster's Third New International Dictionary 794 (1993)).  In Woodall, a case heavily relied upon by the Petitioners, the inmate was challenging the execution of his sentence because decisions concerning placement in community correctional centers ("CCCs") "are part of the phase of the corrections process focused on reintegrating an inmate into society." Id. Looking at the relevant statute, 18 U.S.C. § 3624, which "specifically provides that a prisoner should be placed in a CCC or similar institution at the end of a prison sentence to 'afford the prisoner a reasonable opportunity to adjust to and prepare for ... re-entry into the community[,]'" the Court concluded Woodall's claim was not like "garden variety prison transfers" because "CCCs satisfy different goals from other types of confinement." Id. Thus, the Court held § 2241 jurisdiction was appropriate to challenge[21]

---

[21] The Court analyzed whether the BOP regulations were lawful pursuant to 18 U.S.C. § 3621(b), which describes at least five factors the BOP

However, "the fact that a civil rights claim is filed by a prisoner rather than by an unincarcerated individual does not turn a § 1983 case or a <u>Bivens</u> action into a habeas petition." <u>McGee,</u> 627 at 936.. In <u>McGee</u>, the inmate challenged what appears to be "a condition of confinement" - the BOP plan that enforced payment of "a financial obligation that is part of his sentence." <u>Id.</u> at 936. The Third Circuit held that claim was cognizable under § 2241 persuasively "argue[d] that the payment terms imposed by the Bureau (in the IFRP) are illegal in that they conflict[ed] with the terms imposed by the sentencing court (in the judgment)." <u>Id.</u> at 937.

The Third Circuit, in a precedential decision, next addressed the meaning of "execution" of a sentence for purposes of § 2241 jurisdiction in <u>Cardona v. Bledsoe</u>, 681 F.3d 533 (3d Cir. 2012). Cardona contested his referral to the prison's special management unit ("SMU"), a four-step program that limits an inmate's contact with other prisoners. <u>Id.</u> at 534. The inmate argued that his referral to the SMU was punitive, and thus "illegal" according to a BOP Program Statement. <u>Id.</u>

In <u>Cardona</u>, the Third Circuit disagreed, explaining:

> The petitions in <u>Woodall</u> and <u>McGee</u> both challenged BOP conduct that conflicted with express statements in the applicable sentencing judgment. That is, both petitions

must consider in making prisoner placement decisions. <u>Woodall</u>, 432 F.3d at 235.

claimed that the BOP was not properly "'put[ting] into effect' or 'carry[ing] out'" the directives of the sentencing judgment.

Id. at 536. The Third Circuit reasoned that, unlike Woodall and McGee, Cardona's "claims do not concern the execution of his sentence because the BOP's conduct is not inconsistent with his sentencing judgment." Id. at 537.

More recently, albeit in dicta, the United States Supreme Court addressed the possibility of bringing a "condition of confinement" claim in a habeas petition. Ziglar v. Abbasi, 137 S. Ct. 1843 (2017). In Abbasi, illegal aliens, detained in the wake of the September 11, 2001 terrorist attacks pending determination of whether they had connections to terrorism, challenged "large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners." Id. at 1862. In finding that "special factors counseled hesitation" in allowing them to bring a Bivens action for damages, the Court nonetheless noted an alternative action for injunctive relief was available. Id. at 1865.

The Court further stated

> we have left open the question whether [prisoners] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus. See Bell v. Wolfish, 441 U.S. 520, 526, n. 6 … ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement"); Preiser v. Rodriguez, 411 U.S. 475, 499 … ("When a prisoner is put under

42

> additional  and  unconstitutional  restraints
> during his lawful custody, it is arguable that
> habeas corpus will lie to remove the restraints
> making custody illegal").

Id. at 1862-63.

    E.   Respondents Contend the Court Lacks Jurisdiction Under 28 U.S.C. § 2241

Respondents  contend  the  Court  lacks  jurisdiction  over Petitioners' Eighth Amendment claim under 28 U.S.C. § 2241 and accuse Petitioners  of  seeking  to  use  § 2241  to  circumvent,  not  just established  law,  the  PLRA  and  BOP  regulations,  but  the  recently enacted CARES Act as well. The leitmotif of Respondents' motion is that  Petitioners'  Eighth  Amendment  claim  is  nothing  more  than  a challenge  to  conditions  of  their  confinement,  a  claim  which  is  not cognizable in a petition for writ of habeas corpus.

Habeas  relief  is  available  in  this  Circuit  where  the  alleged deprivation of rights affects the length or duration of imprisonment or  where  the  BOP's  execution  of  a  prisoner's  sentence  somehow conflicts with a command or recommendation in the sentencing judgment. Although Petitioners assert they are challenging the "fact" of their confinement,  Respondents  cry  semantics:  but  for  conditions  related to COVID-19, Petitioners' claim would not exist. Further, Respondents remind that neither the Supreme Court nor the Third Circuit has ever recognized any exceptional circumstance that would allow Petitioners

to challenge their conditions of confinement in a habeas petition. (Gov't Brief, Dkt. No. 28-1 at 48, citing Muhammad v. Close, 540 U.S. 749, 751 n.1 (2004) (observing that the Court has never followed the speculative dicta in Preiser described above)).

Respondents concede, as they must, that some district courts have found habeas jurisdiction based on civil immigration detainees' risk of contracting COVID-19 in detention facilities. Not only are those cases not controlling, Respondents point out, but they are not persuasive because civil immigration detainees do not have the same statutory or regulatory avenues for relief as prisoners who can seek home confinement through the CARES Act or make a compassionate-release request to the BOP and a motion to the sentencing court seeking compassionate relief under 18 U.S.C. § 3582(c)(1)(A). More importantly, Respondents distinguish the constitutional claims of civil immigration detainees from those of prisoners because they fall under the Fifth Amendment, which provides them "more considerate treatment than convicted prisoners." (Gov't Brief, ECF No. 28-1 at 54 (citing Jeferson V.G. v. Decker, No. 20-3644, 2020 U.S. Dist. LEXIS 65905, at *15 n.5 (D.N.J. Apr. 15, 2020) (citing Fuentes v. Wagner, 206 F.3d 335, 344 (3d Cir. 2000))). Respondents suggest that different interests are at stake when considering whether to release a civil immigration detainee or a criminal defendant who is serving a sentence.

Finally, Respondents take issue with Petitioners' reliance on the acceptance of habeas jurisdiction in Wilson v. Williams, No. 20-cv-794, 2020 U.S. Dist. LEXIS 70674 (N.D. Ohio Apr. 22, 2020), where the district court accepted habeas jurisdiction over a seemingly similar claim. Respondents distinguish Wilson: there, COVID-19 infections were described as "rampant among inmates and staff, and numerous inmates have passed away from complications from the virus." (Id. at 55 (quoting Wilson, 2020 U.S. App. LEXIS 14291, at *5 (6th Cir. May 4, 2020)). Availability of testing was also limited. (Id. (citing Wilson, 2020 U.S. Dist. LEXIS 70674, at *5)) Respondents asseverate that FCI Fort Dix stands in sharp contrast because all of the inmates currently at FCI Fort Dix Camp have tested negative for COVID-19. FCI Fort Dix also has far more test kits (approximate 432 test with 250 more a week going forward) than the 50 test kits available at the facility in the Wilson case.

Petitioners disagree with all of Respondents' legal points, first contending that habeas jurisdiction exists here as a challenge to the execution of their sentences because Cardona did not narrow Woodall's scope of habeas jurisdiction but instead offered two separate routes to bring a habeas challenge to execution of a sentence. (Petr's Opp. Brief, ECF No. 30-1 at 17 (citing Mabry v. Warden Allenwood FCI Low, 747 F. App'x 918, 919 (3d Cir. 2019))). According to Petitioners, apart from challenging BOP conduct that is

45

inconsistent with a sentencing court's recommendation, the second way a petitioner can challenge the execution of his sentence is by seeking a change in custody that is more than a "garden variety prison transfer." (Petitioners' Brief, Dkt. No. 30  at 18 (citing Woodall, 432 F.3d at 243)). As in Woodall, Petitioners argue that district courts in the Third Circuit have jurisdiction under § 2241 to hear petitions that seek release from ordinary penal institutions like Fort Dix to different types of custody.

Petitioners press their point by citing to other Third Circuit decisions they say confirm this distinction. (Petr's Opp. Brief, Dkt. 30 at 19.) Petitioners explain that a transfer to home confinement would allow Petitioners to carry out their sentence in a manner that is "very different from carrying out [their] sentence[s]" at Fort Dix (citing Woodall, 432 F.3d at 241) which would result in a "quantum change in the level of custody," as required for habeas jurisdiction. (Petr's Opp. Brief, Dkt. 30 at 19 (citing Ganim v. Prisons, 235 F. App'x 882, 884 (3d Cir. 2007)). Petitioners also rebut Respondents' position regarding civil immigration detainees and assert that district courts in the Third Circuit have, in both the civil immigration detainee and prison context, "concluded that emergency petitions for release, based on COVID-19 are properly construed pursuant to 28 U.S.C. § 2241." (Petr's Opp. Brief, Dkt. 30 at 22-23 (citing Serfass, 2020 WL 1874126, at *3 (construing prisoner's motion

46

"as a § 2241 habeas petition since [petitioner] seeks relief affecting how her sentence is executed, i.e., serving her sentence in home confinement as opposed to confinement in prison to which she was sentenced"); see also Ashby, 2020 WL 2494679, at *6 (same); see also Camacho Lopez, 2020 WL 1689874, at *4-5 (M.D. Pa. Apr. 7, 2020) (acknowledging that a petition for release during the pandemic falls within the subset of challenges to the execution of a sentence recognized by the Third Circuit)).

Petitioners also take issue with Respondents' attempt to distinguish the Sixth Circuit Wilson case on its facts. Petitioners remonstrate that, like the prisoners in Wilson, they too have limited access to testing, live in close quarters, and have faced the rampant spread of the disease.

In reply, Respondents argue that release to home confinement under BOP supervision is not a reduction in the "level of custody" for purposes of habeas corpus jurisdiction. Instead, a prisoner who is not "seeking a judgment at odds with his conviction or with the State's calculation of time to be served" is not raising a claim "on which habeas relief could [be] granted on any recognized theory." (Gov't' Reply Brief, Dkt. No. 33 at 3 (quoting Muhammad v. Close, 540 U.S. 749, 754-55 (2004) (per curiam))). Woodall was not inconsistent with Supreme Court precedent, Respondents contend, because "Woodall was challenging the inconsistency between the sentencing court's

47

recommendation and BOP's refusal to abide by that recommendation."
(Gov't Reply Brief, Dkt. 33 at 3 (quoting Cardona, 681 F.3d at 537)).
Respondents also note that, unlike Woodall, Petitioners do not allege
that BOP is disregarding a statutory command. Because Petitioners
seek only to change *where* they serve their terms of imprisonment,
their claims "also would not necessarily result in a change to the
duration of" their sentences. (Id. (quoting Cardona, 681 F.3d at
537)) Respondents put a Post It note on Petitioners' reliance on non-
precedential opinions and decisions from other district courts,
neither of which are binding. Nor does it matter, Respondents claim,
that § 2241 might theoretically be available in an extraordinary case
to challenge conditions of confinement. This is not such an
extraordinary case, Respondents plead. Because Petitioners cannot
show that the mitigated health risk at FCI Fort Dix is "so grave"
that it would "violate[] contemporary standards of decency to expose
anyone unwillingly to" it, Helling v. McKinney, 509 U.S. 25, 36
(1993), habeas jurisdiction does not lie. As Respondents highlight,
COVID-19 poses risks confronting not only prisoners but law-abiding
citizens nationwide, including front-line workers and vulnerable
nursing home patients. As for prisons, the CDC has issued guidance
for appropriately mitigating the risks in such facilities, explaining
that inmates may continue to be detained in "housing units" in which
bunks "ideally" are separated by at least six feet, but that such

separation and other "social distancing strategies" for recreation, meals, and other activities "need to be tailored to the individual space in the facility." CDC Interim Guidance 11 (emphasis added).[22] Petitioners demur, claiming that such expert guidance is contrary to the view that risks at FCI Fort Dix are so grave that contemporary societal standards wholly forbid them and, thus, they should be granted habeas relief. (See Pet. Motion for Prelim. Inj., Dkt. No. 9-1 at ("Indeed, the design of Fort Dix, in which Petitioners are confined either in large dormitories or in 200- to 300-person buildings, would make it unsafe for Petitioners even if Reeespondents were following guidance from public health experts and the Centers for Disease Control and Prevention ")

F. <u>Jurisdiction Analysis</u>

Petitioners are a class consisting of all current and future FCI Fort Dix inmates 'over the age of 50 or who experience medical conditions that make them vulnerable to COVID-19.'" (Compl. ¶135.) Petitioners assert jurisdiction under § 2241 "for release from custody that violates the Eighth Amendment to the U.S. Constitution." (Compl. ¶13.) "[T]he gravamen of Petitioners' Eighth Amendment claim is that there is no set of protective measures that Respondents can feasibly

---

[22] Available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. (last visited May 26, 2020).

implement to contain the spread of COVID-19 in Fort Dix." (Memorandum of Law in Further Support of Petitioners' Motion for a Preliminary Injunction and in Opposition to Respondents' Motion to Dismiss, Dkt. No. 30 at 38.)

A core habeas challenge is one where "a prisoner challeng[es] the authority of the entity detaining him to do so, usually on the ground that his predicate sentence or conviction is improper or invalid." McGee,, 627 F.3d at 935. (citing Leamer, 288 F.3d at 542.tioners do no present a core challenge; they do not contest the validity of their convictions or sentences. Nor do Petitioners challenge the duration of their confinement, as has been recognized in habeas, such as cases presenting the loss of good time credits, denial of parole or BOP's miscalculation of a prisoner's sentence. True, Petitioners seek early release from prison, but they do not do so on the basis that their convictions or sentences are invalid. Instead, they seek such injunctive relief based on unconstitutional conditions of confinement, a type of challenge that neither the Supreme Court nor the Third Circuit has yet recognized as a cognizable habeas claim.

Petitioners confidently assert that their claims are within the ambit of a challenge to the "execution" of their sentences because they allege they are confined under conditions that violate the Eighth Amendment by subjecting them to a serious risk of contracting COVID-

19. In the Third Circuit, prisoners can challenge the execution of their sentences under § 2241. <u>Woodall v. Federal Bureau of Prisons</u>, 432 F.3d 235, 244 (3d Cir. 2005). ,Petitioners rely upon nonprecedential opinions, <u>Ganim</u> and <u>Mabry</u>, to fit into the Third Circuit's definition of a habeas challenge to the execution of their sentences. To go that route, however, leads to other nonprecedential opinions that are more on point with Petitioners' Eighth Amendment claims. In those opinions, however, the Third Circuit concluded conditions of confinement claims are <u>not</u> cognizable under § 2241.

First, Petitioners' Eighth Amendment claim resembles that in <u>Share v. Krueger</u>, 553 F. App'x 207 (3d Cir. 2014). Share was an 84-year-old prisoner who had served more than two-thirds of his sentence and alleged he was suffering serious illnesses that would qualify as "terminal." <u>Id.</u> at 208. He sought compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) from the Warden at FCI Schuylkill, but his request was denied. <u>Id.</u> Thus, Share filed a petition under § 2241, challenging the execution of his sentencing by alleging the (BOP) "failed to provide and/or sufficiently and adequately provide treatment for his serious, chronic and likely terminal medical maladies, particularly in light of his advanced age of over 84 years, all in violation of his 8th Amendment constitutional rights." <u>Id.</u> The Third Circuit rejected expanding jurisdiction under § 2241 to a challenge to the execution of a sentence where <u>Share</u> did not establish

an inconsistency between BOP conduct and the sentencing court's judgment. Id. at 209.

Second, in Gillette v. Territory of Virgin Islands, 563 F. App'x 191, 192 (3d Cir. 2014), the petitioner alleged he was detained in a territorial correctional facility in violation of his Eighth Amendment rights due to the dangerous and unsanitary conditions in the facility, causing his inability to secure constitutionally adequate medical and mental health treatment. The petitioner asserted his claim fell within the core of habeas because it asked for his release. Id. at 195. The Third Circuit stated, "[a]llowing this type of clever pleading would essentially permit a prisoner to bring any claim within the scope of habeas relief by merely asking for release from custody, thus eviscerating the applicability of civil rights statutes like § 1983." Id. The Third Circuit held that the claim did not meet the stringent Cardona test, requiring an action inconsistent with "a command or recommendation in the sentencing judgment". Id. at 194-95 (quoting Cardona, 681 F.3d at 537). The Third Circuit also found the claim contrary to its holding in Leamer, "which requires a showing that 'a favorable decision ... would necessarily imply that [the petitioner] would serve a shorter sentence.'" Gillette, 563 F. App'x at 195 (quoting Leamer, 288 F.3d at 543).

Certainly, Petitioners' Eighth Amendment claims sound more in the nature of the type of habeas claim the Supreme Court in Preiser

52

hypothesized, but has yet to recognize: "[w]hen a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal." The Supreme Court resurrected this idea more recently in Abbasi. Yet, although the petitioners in Abbasi alleged they were held in tiny, empty, constantly lighted cells for over 23 hours per day without basic hygiene, and subjected to physical abuse, including broken bones, and verbal abuse, including sexual and religious insults, the Supreme Court did not find it was such a case for habeas relief "to remove the restraints making the custody illegal." Abbasi, 137 S. Ct. at 1853. The Court's decision is telling of just how extraordinary the case must be for habeas jurisdiction to lie before a prisoner may be released from lawful custody based on a condition of confinement.

Even accepting Petitioners' allegations as true, BOP has taken measures to reduce the spread of COVID-19, but Petitioners want much more. The relief Petitioners seek, ordering temporary enlargement of custody (or bail pending habeas corpus) with appropriate precautionary public health and safety measures for all Class Members — including the Petitioners, the Class, and the Subclass — and issuing writs of habeas corpus "if temporary enlargement does not bring the conditions at Fort Dix into compliance with the Eighth Amendment and the Rehabilitation Act" would require the Court to "serve as a de

53

facto 'super warden.'" See Livas v. Myers, No. 20-422, 2020 U.S. Dist. LEXIS 71323, *19-22 (W.D. La. Apr. 22, 2020) (declining to exercise jurisdiction over habeas petition challenging conditions related to COVID-19). This Court does not find this case to be that "extraordinary case" where it should expand habeas jurisdiction, more extraordinary than even Abbasi, where the Supreme Court did not see fit to extend habeas jurisdiction over a conditions of confinement claim involving outright alleged physical abuse of prisoners who were not serving a sentence upon conviction of a crime. Abassi, 137 S. Ct. at 1863.[23] t In the final analysis, given the foregoing jurisprudence, this Court finds that this is not the Eighth Amendment "exceptional case" to warrant habeas jurisdiction. To be fair, Petitioners' fear of contracting COVID-19 is not unwarranted. Such a fear permeates American society, and a in a prison environment such fears are most likely heightened. But nothing in the Complaint rises to the level of circumstances that warrant habeas relief. Finally, even if the risk of Petitioners contracting COVID-19 is as serious as they

---

[23] The Court digresses to make an observation:  it is worth noting that Petitioners seek this extraordinary relief without attempting to work alongside the BOP to bring about changes that are important to them. It seems they would have an interest in doing so.  This, in turn, awakes the suspicion that Respondents have: Petitioners are attempting to evade the PLRA exhaustion requirement by not bringing an Eighth Amendment claim in a Bivens action.

contend, a risk that is not unique to individuals in custody[24] and a risk this Court does not take lightly, there are other avenues for an inmate to obtain release from FCI Fort Dix, such that "bail pending habeas" under the Eighth Amendment is not warranted. Petitioner can request home confinement primarily under the CARES Act and compassionate release under 18 U.S.C. § 3582(c)(1)(A). (Insofar as BOP decisions under the CARES Act or compassionate release affect the execution of Petitioners' sentences, Petitioners do not allege BOP violated any statute or regulation.) Thus, there is no basis for this Court to grant "bail pending habeas." The circumstances must be so exceptional, such as immediate, concrete and non-speculative, to make the grant of bail necessary to make the habeas remedy effective. Landano v. Rafferty, 970 F.2d 1230, 1239 (3d Cir. 1992). Because Petitioners have other avenues available for immediate relief, those exceptional circumstances are not present here.

For the foregoing reasons, this Court holds that habeas jurisdiction does not lie for Petitioners' Eighth Amendment claims.

IV.     **THE MOTION FOR PRELIMINARY INJUNCTION**

As set forth above, Petitioners' claims are not cognizable under 28 U.S.C. § 2241. Inmates seeking injunctive relief challenging the conditions of confinement, whether for monetary or injunctive relief,

---

[24] Day in and day out, front line health workers and first responders, no name a few, are at serious risk of contracting this awful disease.

fall outside of federal habeas corpus relief. Nelson v. Campbell, 541 U.S. 636, 643 (2004). Nor is this an exceptional case under the Eighth Amendment justifying habeas jurisdiction. Even assuming this Court has habeas jurisdiction, however, the Court finds, in the alternative, that Petitioners have not met their burden to obtain preliminary injunctive relief.

In order to obtain preliminary injunctive relief, a party must show (1) a reasonable likelihood of success on the merits, (2) irreparable injury if the injunction does not issue, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. Fulton v. City of Philadelphia, 922 F.3d 140, 152 (3d Cir. 2019). Petitioners contend they meet this criteria and ask this Court to order immediate "temporary enlargement of custody." (Dkt. No. 9-1, at 32.)[25] The Court turns to each of the factors.

A.   Success on the Merits

As the Supreme Court has held, the "cruel and unusual punishments" clause of the Eighth Amendment guarantees prisoners "humane conditions of confinement." Farmer v. Brennan, 511 U.S. 825,

---

[25] It is not clear to this Court what such an order would like as the place to which the inmate would be released – the so-called temporary enlargement of custody - would vary by inmate.  During a conference call, counsel for Petitioners suggested the Court might appoint a Special Master to make such individual determinations. It is hard to see how that is "immediate" to address Petitioners' pressing concerns.  Because the Court will deny the relief requested, it need not delve into such issue.

832 (1970). See also Helling, 509 U.S at 36. Deliberate indifference to the serious medical needs of prisoners is unconstitutional. Estelle v. Gamble, 429 U.S. 97, 104 (1976). In the context of exposing inmates to risk of disease, conditions that are so "contrary to current standards of decency for anyone to be exposed" violate the Eighth Amendment. Helling, 509 U.S. at 35. An Eighth Amendment claim as it pertains to conditions of confinement has two components: one objective, the other subjective. Farmer, 511 U.S. at 825; see also Natale v. Camden County Correctional Facility, 318 F.3d 575, 582 (3rd Cir. 2003). To satisfy the "objective component," a prisoner must show an "objectively intolerable risk of harm." Id. To satisfy the subjective requirements, a plaintiff must show that the defendant (1) was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," (2) subjectively "dr[ew] the inference" that the risk existed, and (3) "disregarded the risk." Farmer, 511 U.S. at 837; Ricks v. Shover, 891 F.3d 468 (3d Cir. 2019). See also Pearson v. Prison Health Services, 850 F.3d 526, 534 (3d Cir. 2017) (describing objective and subjective components of Eighth Amendment claim for inadequate medical care).

Petitioners argue that even though "Respondents may subjectively believe that their containment measures are the best they can do, these measures remain 'contrary to standards of decency for anyone to be so exposed' because they fail to meaningfully mitigate the risk

of COVID-19 transmission and attendant serious illness and death the Petitioners face." (Dkt. No. 30, at 69.) Petitioners complaints' are described in detail above. In general, they introduce the declarations of inmates who say they are showing symptoms of COVID-19. They contend that in some cases the inmates' needs, both medical and hygienic, are not being met. Petitioners complain that Respondents have not tested every prisoner. Instead, the prison only tests those inmates who exhibit symptoms and are then determined eligible for testing by medical staff. Petitioners even take aim at the "significant false negative rate" of the Abbott Laboratories testing. Lastly, and perhaps most telling of Petitioners' position, Petitioners contend that the prison's current containment measures do not include social distancing or self-quarantining, which Petitioners insist are "the only two effective means of preventing COVID-19 transmission." (Id. at 71) (emphasis added). In sum, Petitioners stand firm that "[h]aving failed to contest their knowledge of serious health dangers that COVID-19 presents, Respondents' implementation of flawed containment measures constitutes deliberate indifference." (Id.)

The Court is aware of the need to make findings of fact, Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir. 2006). as noted throughout this Opinion, the parties do not disagree about most of the measures the Respondents are taking to address the COVID-19 crisis. Rather, Petitioners persist in their claim that no amount of measures absent

release are adequate.   Thus, although Petitioners introduce some evidence of their disputes regarding, for example, testing, staff movement, and supplies (all set forth above), these disputes - even resolving them all in favor of Petitioners[26]- do not establish the deliberate indifference prong.   The Court's reasoning follows.

First, with regard to the objective component of the Eighth Amendment claim, it does not seem that the parties have a quarrel. Nor could they. Nor could this Court. COVID-19 is an indiscriminate and cruel disease that poses a risk to anyone and everyone, including prison inmates. The Court thus turns its focus to the subjective component of the Eighth Amendment inquiry.

As an initial matter, Petitioners' clear concession that "Respondents may subjectively believe their containment measures are the best they can do," _supra_, should alone settle the score: Petitioners admit they cannot show at this juncture a likelihood of

---

[26] The Court notes one important exception. Petitioners have introduced declarations from various inmates.   Two inmates, in particular (Scronic and Telfair) state that "to [their] knowledge" none of the inmates have been evaluated by a nurse or doctor, and Scronic believes that inmates have COVID-19 and are not being tested. Respondents have attempted to respond to these conclusory and abstract opinions, contending that no medical attention is being denied.   To the extent that Petitioners wish to press this position to show that more than a few isolated incidents of failure to address medical needs exists, they may seek to supplement the record and the Court will reconsider its Opinion and engage in fact-finding provided Petitioners can show that a favorable finding in this regard would alter the Court's conclusion.

success on their Eighth Amendment claim. That is, Petitioners acknowledge they have no evidence of Respondents' liable state of mind. Cf. Swain v. Junior, 2020 WL 2161317, at *4 (11th Cir. May 12, 2020) ("defendants are also likely to succeed on appeal because the plaintiffs offered little evidence to suggest that the defendants were deliberately indifferent. Indeed, the evidence supports that the defendants are taking the risk of COVID-19 seriously"); Valentine v. Collier, 956 F.3d 797, 802 (5th Cir. April 22, 2020) ("the district court cited . . . no evidence that [the defendants] subjectively believe the measures they are taking are inadequate. To the contrary, the evidence shows that [the prison] has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus."). Even absent such concession, Petitioners seem to hang the presence of COVID-19 at Fort Dix on the Respondents' deliberate indifference hook. The Supreme Court, however, has made it clear that a resultant harm does not itself establish a liable state of mind. Cf. Farmer, 511 U.S. at 844 ("prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted")

Moreover, neither the allegations as pled nor the evidence presented to the Court again, most of which is not disputed , demonstrates that the Respondents have been deliberately indifferent

60

to the inmates' risks of contracting COVID-19. As set forth above, since January 2020, the BOP has been coordinating with multiple organizations, including the World Health Organization and the CDC. The BOP implemented a multi-phased operational plan called the "Action Plan." As described earlier, the Action Plan seeks to "mitigate the spread of COVID-19" among inmates and staff, continue effective operations of the federal prison system, and ensure that staff remain healthy and available for duty.  BOP is currently in "Phase 7" of its Action Plan, which is an extension of the nationwide action plan in Phase 6. This Phase is in effect until June 30, 2020. All inmates in every BOP institution must be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of COVID-19. Only limited group gatherings are afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, computer access, and law library usage. The usage of face masks and PPE is in effect. Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms, and remains in quarantine for 14 days. So too are asymptomatic inmates with risk of exposure. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. Any inmate who tests positive is put into isolation in Unit 5851 until he recovers. In addition, all staff are subjected to enhanced health screening in

areas of "sustained community transmission," as determined by the CDC, and at medical referral centers. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.    In addition, contractor access to BOP facilities is restricted to only those performing essential services (e.g., medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. Social and legal visits (except if attorney has been screened) were stopped as of March 13, 2020, and remain suspended until at least June 30, 2020, to limit the number of people entering the facility and interacting with inmates.

To date, no inmate at FCI Fort Dix Low has tested positive for COVID-19, although Respondents concede that they have not and are not testing all inmates in the Low. However, if an inmate were to manifest or complain about symptoms associated with COVID-19, Respondents advise that he immediately would be escorted to the Health Services building and examined by a clinician. And if  COVID-19 is suspected, he would be tested immediately using the Abbot machine. If the inmate tested positive, he would be  immediately isolated in Unit 5851.

As noted, and it bears repeating, that much of what Respondents say about the protective measures they are taking at Fort Dix is not disputed by Petitioners. Rather, Petitioners take issue

with the effectiveness of such measures. Dr. Goldenson, on behalf of Petitioners, opines that inmates are at a "significantly increased risk" of contracting COVID-19 than if the individual was in home confinement. (Goldenson Decl. ¶37, Dkt. No. 30-1.). He recommends that a "public health expert" be appointed to oversee operations until it is "possible to maintain consistent social distancing." (Id. ¶41.) Dr. Goldenson is critical of Respondents' Medical Director, Dr. Turner-Foster, using her silence about certain measures to "reinforce[] his conclusion that the prison is failing to take necessary steps to protect inmates." (Id. ¶51.) Yet, Dr. Turner-Foster has responded to the lacunae identified by Dr. Goldenson in her Supplemental Declaration. She has also responded to the individual inmate's declarations submitted by Petitioners. For example, she explained that all inmates who came into contact with the Food Service staff member who tested positive were assessed and, if appropriate, were tested. As for the Abbott test criticism, she acknowledged that the tests can provide a false negative, but a positive is a positive. Moreover, as common sense seems to dictate, the margin error rates were likely considered by the FDA when it approved such testing. While Dr. Goldenson may have his differences of opinion with Dr. Turner-Foster, nowhere does he opine that the Respondents are being deliberately indifferent. This omission is significant. The same is

63

true with respect to the other evidence presented by Petitioners; it does not rise to deliberate indifference.

What the Petitioners' Eighth Amendment claim boils down to is the prison's failure to provide social distancing. That is the heart of the case. Indeed, Petitioners beat the distancing drum throughout their papers. The only remedy is release of inmates to achieve that objective. They fault Respondents for not providing them with physical distancing. Yet, as the Supreme Court has cautioned, the inability of a defendant to take an action that a plaintiff seeks will likely not constitute a reckless state of mind. Farmer, 511 U.S. at 835 (noting difference between medical negligence, which cannot establish an Eighth Amendment violation, and deliberate indifference to a prisoner's serious medical need). In the end, the ugly picture Petitioners paint of FCI Fort Dix is not really a fair one. Petitioners' bold statement that the mitigated health risk at FCI Fort Dix is so grave that it violates "standards of decency for anyone to be so exposed" ignores almost the entire record presented before this Court. As does Petitioners' statement that "Respondent Ortiz has recklessly failed to follow or implement CDC guidance or directives from Attorney Barr or the BOP." (Dkt. No. 9-1, at 40.) This is not to say that Petitioners do not have genuine fears or concerns. These are worrisome times for sure. The record simply does not support that the Respondents have been deliberately indifferent to the inmates'

concerns.  That  physical  distancing  is  not  possible  in  a  prison setting, as Petitioners urge, does not an Eighth Amendment claim make and, as such, Petitioners are not likely to succeed on the merits [27]

B.  Irreparable Injury

In  the  face  of  statutory  relief  available  to  individual  inmates, it is hard to see how Petitioners will suffer irreparable injury if an injunction does not issue.  First, as set forth above, an inmate may seek prerelease custody under the CARES Act which includes home confinement.   After reviewing its inmates for eligibility under the CARES Act, FCI Fort Dix referred 56 inmates for transfers to home confinement. (Reiser Decl. ¶¶24-25.)[28] Twenty-four of those inmates have already transferred to home confinement, and 15 are scheduled to transfer to home confinement through the end of May. (Id. ¶25.) Moreover, BOP is undertaking similar efforts in all of its facilities to determine which inmates meet the criteria established by the Attorney General, resulting in the transfers of 2,799 inmates to home confinement. See  https://www/bop.gov/coronavirus/ (last visited May

---

[27]   Indeed, the CDC has issued guidelines for mitigating the risks in correctional facilities, recognizing that six feet distancing may not always be feasible.  CDC Interim Guidance 11.  Petitioners have offered no evidence that interim guidance is being ignored by Respondents.
[28] Petitioners' claim at ¶99 of their complaint that Fort Dix has not released any prisoners to home confinement is not supported by the record.

18, 2020). Additionally, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager. (Id. ¶¶16, 24.) According to Respondents, the BOP either has transferred or expects to transfer to home confinement by May's end 39 inmates using its CARES Act authority.

Moreover, pursuant to 18 U.S.C. § 3582(c)(1)(A), the First Step Act, an inmate may seek a reduction in sentence through compassionate or early release. An inmate may make a motion to his sentencing court to reduce a term of imprisonment in the event the BOP does not grant his request within 30 days or denies it. BOP uses that statutory authority in "extraordinary or compelling circumstances that could not reasonably have been foreseen by the court at the time of sentencing." See BOP Program Statement 5050.50, Compassionate Release/Reduction In Sentence Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g). The sentencing courts have released ten inmates from FCI Fort Dix since April 7, 2020, under these statutory procedures. Thus, an at-risk inmate who is truly vulnerable to contracting COVID-19 has an avenue of release.

Thus, in the absence of the preliminary injunction that Petitioners seek, all of the foregoing statutory provisions still afford a vulnerable inmate an opportunity to present his individual

case for a careful and individualized assessment by either the BOP or a court. A vulnerable inmate who is truly at risk not only deserves but receives a prompt and fair review.

   C.   Equities and Public Interest

   Petitioners aver that their release is the only way to protect them from the "COVID-19 deathtrap" that Fort Dix has become. (Memorandum of Law in Support of Petitioners' Motion for a Preliminary Injunction,. No. 9-1, at 42 citing Goldenson Decl. ¶36.)  Moreover, they prophesy that their removal, as well as the removal of potentially hundreds of other similarly situated inmates, would further the public interest by giving more social distance to Fort Dix staff and to the community which, in turn, would render local hospitals less overwhelmed by potential Fort Dix cases. (Id. at 45.) Conspicuously absent in Petitioners' analysis is any meaningful discussion of the risks associated with a large scale release of inmates. What would be the plan that addresses the safety and security of the communities to where they are released? Is the proper supervision even available given that the current COVID-19 crisis is just as real to the law enforcement officers in charge of safety and supervision? In the end, the Court finds that the balance of equities and the public interest favor the Respondents who have been charged with maintaining the administration of FCI Fort Dix to include the

67

safety of its inmates. "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Turney v. Safley, 482 U.S. 78, 84-85 (1987). "Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint" by this Court. Id.

Because the Petitioners cannot establish the criteria for a preliminary injunction, the Court will deny the motion.

V.    **THE REHABILITATION ACT CLAIM**

Petitioners seek to represent "a subclass consisting of all current and future people in post-conviction custody at Fort Dix who have qualifying disabilities within the meaning of the Rehabilitation Act" of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794. (Compl. ¶136.) Petitioners allege they, like other members of the Subclass, have qualifying disabilities that entitle them to accommodations that they are not receiving in violation of the RA. (Id. ¶142.)

A.    Applicable Law

"The Rehabilitation Act assures 'meaningful access' to federally funded programs, Alexander v. Choate, 469 U.S. 287, 301 … (1985)" and "[w]hen necessary to realize that access and enjoyment, the [RA] require[s] 'reasonable accommodations,' Choate, 469 U.S. at 301, 105

S. Ct. 712, or 'reasonable modifications,' 42 U.S.C. § 12182(b)(2)(A)(ii), to be made by actors within the statute['s] reach." Berardelli v. Allied Servs. Inst. of Rehab. Med., 900 F.3d 104, 110 (3d Cir. 2018), reh'g denied (Sept. 12, 2018). The elements of a Rehabilitation Act claim are that "(1) [the plaintiff] has a disability; (2) that he is otherwise qualified for the benefit that has been denied; (3) that he has been denied the benefit solely by reason of his disability; and (4) that the benefit is part of a program or activity receiving Federal financial assistance." Baxter v. Pennsylvania Dep't of Corr., 661 F. App'x 754, 757 (3d Cir. 2016); see also Dahl v. Johnston, 598 F. App'x 818, 819–20 (3d Cir. 2015) (citing 42 U.S.C. § 12132 in an inmate case involving an ADA claim).[29] Whether an accommodation is reasonable is determined on a case-by-case basis. Berardelli, 900 F.3d at 123. A public agency may "resist modifications that entail a 'fundamenta[l] alter[ation]' of [it's] services and programs." Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 603 (1999) (quoting 28 C.F.R. § 35.130(b)(7)).

    B.   The Parties' Arguments

---

[29] Claims under the Rehabilitation Act and the Americans With Disabilities Act ("ADA") are generally subject to the same standards. See Yeskey v. Pa. Dep't of Correc., 118 F.3d 168, 170 (3d Cir. 1997) ("all the leading cases take up the statutes together"), aff'd Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206 (1998).

Respondents seek dismissal of Petitioners' Rehabilitation Act claims under Rule 12(b)(6) for failure to state a claim. Respondents further argue that even if Petitioners had stated a claim, they failed to exhaust their administrative remedies.[30]

Petitioners propose the following accommodations, on a class-wide basis:

> separate living spaces rather than high-capacity shared rooms and dorms with people in close proximity; free distribution of adequate cleaning supplies, including soap; free distribution of adequate personal protective equipment, including masks and gloves; staggered access to bathrooms, meals, and other shared resources; assignments of correctional staff that mitigates the possibility staff will transmit COVID-19, even asymptomatically, from one building to another; and adequate access to tests and information about risk.

Respondents assert that these accommodations could potentially compromise BOP's ability to manage COVID-19 with its limited resources or alter the safety and security of FCI Fort Dix or the community.

---

[30] Respondents correctly note that federal courts frequently require civil rights actions and actions for declaratory relief be brought separately from petitions for habeas corpus. See Johnson, 2012 WL 5880344, at *8 and n.5 (habeas petitioner brought multiple civil rights complaints, including a putative claim under the Rehabilitation Act). Because the Court concludes that Petitioners fail to state an RA claim upon which relief may be granted, the issue is moot.

The Rehabilitation Act does not permit individuals to effect broad-based, fundamental changes to policies and practices.

As to the third element of a Rehabilitation Act claim, Respondents suggest Petitioners' allegation that BOP had discriminatory animus against them based on their disabilities is wholly conclusory. Even the conclusory allegations are implausible, Respondents argue. Facially, BOP's actions are motivated to combat the spread of COVID-19, while at the same time fulfilling its duty to protect inmates and the public. Plaintiffs have not plead any facts to support their conclusion that the Government is intentionally discriminating against them based on their disabilities. (Gov't Brief, Dkt. No. 28-1, at 60 citing, e.g., Brown v. Pennsylvania Dep't of Corr., 290 F. App'x 463, 467 (3d Cir. 2008); Jenkins v. Glover, Civ. No. 09-2145-FSH, 2009 WL 2391278, at *5-6 (D.N.J. July 31, 2009) ("Plaintiff has not alleged facts indicating that he was excluded from the work program based on his disability")).

Even if Petitioners could state a Rehabilitation Act claim, Respondents note they failed to exhaust their administrative remedies. Petitioners do not allege that they satisfied the administrative exhaustion requirement by filing a claim with the appropriate BOP and Department of Justice officials, and the BOP has no records of any such claim. (Id. at 61, citing Clark Decl. ¶5 and Exs. 1-3.)

71

Petitioners, who do not seek preliminary injunctive relief on their Rehabilitation Act claims, assert that they have adequately pleaded their Rehabilitation Act claims for the purposes of a motion to dismiss. Contrary to Respondents' arguments, Petitioners assert they need not show intentional animus because they are not seeking compensatory damages. (Memorandum of Law in Further Support of Petitioners' Motion for a Preliminary Injunction and in Opposition to Respondents' Motion to Dismiss, Dkt. No. 30 at 74 citing, e.g., S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 265 (3d Cir. 2013)) ("two courts of appeals have suggested that [Rehabilitation Act] plaintiffs seeking compensatory damages must demonstrate a higher showing of intentional discrimination than deliberate indifference"); see also Furgess v. Pa. Dep't of Corr., 933 F.3d 285, 289 (3d Cir. 2019) (setting out "intentional discrimination" from the base elements of the Rehabilitation Act claim, "because he seeks compensatory damages"). Instead, Petitioners contend that they have sufficiently alleged deliberate indifference, the failure to take affirmative steps to protect the Rehabilitation Act Subclass. Petitioners' theory is that virtually everything in a prison is a service for purposes of the Rehabilitation Act. (Id. at 75, citing, e.g., Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and

72

vocational 'programs,' all of which at least theoretically 'benefit' the prisoners.…")).

Thus, Petitioners conclude that the following allegations are sufficient to state a Rehabilitation Act claim: (1) the Subclass is comprised of people whose particular conditions qualify them under the Act; (2) that safe conditions at Fort Dix and adequate preventative measures to combat COVID-19, "are programs or services that Fort Dix must provide—but is not presently providing;" and (3) that Respondents have denied them reasonable accommodations in deliberate indifference to their medical conditions. Petitioners further contend that the complaint is replete with facts demonstrating Respondents' knowledge of Petitioners' rights and failure to act to protect Petitioners and the Subclass members from exposure to COVID-19. Petitioners note that the Court may not determine disputed facts in deciding a motion to dismiss.

In reply, Respondents argue that pleading "deliberate indifference" by BOP is not enough to meet that statutory requirement for an Rehabilitation Act claim because Petitioners' allegations of deliberate indifference to inmates with disabilities are indistinguishable from their allegations of Eighth Amendment deliberate indifference to the entire population of FCI Fort Dix. This cannot qualify as discrimination "solely by reason of their disability," as is required under the Act. In other words, the

73

subclass is subject to the same conditions as every other inmate at FCI Fort Dix. Petitioners never specify what aspects of life or services at FCI Fort Dix are unequal for them or what requested accommodations BOP denied them.

Finally, Respondents lament the idea that the Rehabilitation Act entitles Petitioners to be released from incarceration unless BOP provides physical facilities that virtually eliminate all risks from COVID-19. This, they claim,  would essentially transform the statute from a remedial civil rights law into a comprehensive legal duty to protect disabled inmates in a manner that exceeds the statutory and constitutional duties owed to other inmates. They insist that the Rehabilitation Act does not require such exceptional protections.

C.   Analysis

Petitioners declare that they, and the subclass they seek to represent, have underlying medical conditions that make them more vulnerable than young, healthy inmates to serious illness or death from COVID-19. A disability under the Rehabilitation Act is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(1)(a). The broadly-defined disability alleged by Petitioners qualifies only under the general sense of the definition, that their underlying medical conditions limit their life activities because they must be more cautious to guard against contracting COVID-19 than

74

others. It is a novel claim for sure, and although the Court hesitates to find this element is satisfied because it lacks precision, it will assume this element is satisfiedwithout deciding the issue.  The second element requires that Petitioners be qualified for the benefit they seek. Insofar as they seek additional measures to protect them from contracting COVID-19 at FCI Fort Dix, the Court will likewise assume this element is satisfied.  Petitioners, however, fail to establish the third element of an Rehabilitation Act claim, that they were denied the benefit of additional measures to protect them from contracting COVID-19 solely by reason of their disabilities. Even under the lesser "deliberate indifference" standard, they have not pled facts suggesting Respondents failed to take measures that protect them from exposure to COVID-19 because they are disabled.

Petitioners urge this Court to find that  they can meet the deliberate indifference standard because Respondents failed to "level the playing field;" in other words, to put them in the same position as healthy inmates. Within the separate units where FCI Fort Dix inmates are housed, Petitioners are exposed to the same risk of contracting COVID-19 as healthy inmates. What is different is how serious the complications may be for Petitioners. Thus, to level the playing field, Petitioners seek conditions that are not available at FCI Fort Dix, virtually complete protection against contracting

COVID-19. The alternative to providing those conditions is release to home confinement.

Petitioners' bold request to release any and all inmates who may have any disability is simply not a reasonable accommodation within the meaning of the Rehabilitation Act. It is an all or nothing approach that deprives the prison from conducting an independent analysis of each inmate's individual circumstances and an accommodation that may address the inmate's needs. That is what the Act requires. Therefore, because Petitioners have failed to allege that Respondents have acted in disregard of Petitioners' rights because they are disabled and the relief Petitioners seek goes well beyond what the Rehabilitation Act expects, the motion to dismiss for failure to state a claim will be granted.

VI.      **CLASS ALLEGATIONS**

Lastly, the Court turns to Petitioners' class allegations. Respondents contend that Petitioners are not entitled to class relief because they cannot satisfy the various provisions under Federal Rule of Civil Procedure 23. The Court agrees.

A. <u>Legal Standard</u>

In <u>Reinig v. RBS Citizens, N.A.</u>, 912 F.3d 115 (3d Cir. 2018), the Third Circuit reiterated that "'[t]he class action is an exception

76

to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Reinig, 912 F.3d at 124 (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348 (2011) (internal citations omitted)). To invoke this exception, petitioners moving for class certification bear the burden of affirmatively demonstrating by a preponderance of the evidence that the proposed class is ascertainable and meets the requirements of Federal Rule of Civil Procedure 23. Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015), as amended (Apr. 28, 2015).

Courts determine whether class certification is appropriate by conducting a two-step analysis. First, the court must evaluate whether the putative class satisfies the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. Marcus v. BMW of North America, LLC, 687 F.3d 583, 590 (3d Cir. 2012) (citing Fed. R. Civ. P. 23(a)-(b)). If the court is satisfied that the requirements of Rule 23(a) have been met, it must then proceed to the second step and determine whether "the class fits within one of the three categories of class actions in Rule 23(b)." Reinig, 912 F.3d at 124-25 (internal citations omitted). Class certification is proper only if the district court is satisfied, after a "rigorous analysis," that petitioners have established each element of Rule 23 by a preponderance of the evidence. Reinig, 912 F.3d at 25 (citing Marcus, 687 F.3d at 591).

B. <u>Analysis</u>

Here, Petitioners seek certification of a class consisting of all current and future inmates "over the age of 50 **or** who experience medical conditions that make them vulnerable to COVID-19." (Compl. ¶135) (emphasis added). In this matter, they bear the burden of proving that this proposed class meets the four requirements of Rule 23(a) and fits within one of Rule 23(b)'s three subcategories. The Third Circuit has emphasized that Rule 23 "calls for a rigorous analysis in which factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." <u>Mielo v. Steak 'N Shake Operations, Inc.</u>, 897 F.3d 467, 483-84 (3d Cir. 2018).

1. <u>Rule 23(a) Requirements</u>

Under Rule 23(a), Petitioners must establish that four requirements – commonly referenced as numerosity, commonality, typicality, and adequacy – are satisfied.

a. <u>Numerosity</u>

Rule 23(a)'s first prerequisite, numerosity, is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Determinations of whether numerosity is met must be "based upon common sense." <u>Walling v. Brady</u>, 1995 WL 447658, at *2 (D. Del. July 19, 1995). "No minimum number of

78

plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds [forty], the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001). The Court finds that numerosity is satisfied in this instance, as the proposed class conceivably could consist of a majority of those currently incarcerated.

### b. Commonality

The second prerequisite of Rule 23(a) is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[T]hat bar is not a high one;" it requires identification of only one common question of fact or law. Rodriguez v. Nat'l City Bank, 726 F.3d 372, 382 (3d Cir. 2013). However, the claims of the class members "'must depend upon a common contention . . . [which] must be of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims **in one stroke**.'" Mielo, 897 F.3d at 489 (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349-50 (2011) (emphasis added).

The Third Circuit previously held that a district court's "reasoning was problematic" in failing to certify a class of inmates who suffered a range of physical injuries (and some none at all)

79

during an outbreak of a "serious, communicable disease" at a prison facility, holding that (on the limited basis of the district court opinion) the alleged threat of injury to inmates met the commonality requirement. Hagan v. Rogers, 460 F.3d 146, 158 (3d Cir. 2009).

Similarly, in this case Petitioners and the proposed class share several common issues of fact, including: (1) their incarceration at Fort Dix during the COVID-19 pandemic; (2) that incarceration subjecting them to the same allegedly harmful inadequate protective measures by Defendants; and (3) their inclusion in one or more age or other medical categories considered "high risk" for a severe progression of the disease.

However, in Hagan the inmates were seeking redress for violation of constitutional rights, something that a court could resolve "in one stroke." It seems extremely unlikely to this Court that the issues in common here are capable of class-wide resolution "in one stroke," short of ordering the BOP to throw open the gates of Fort Dix. Rather, the Court would be required to engage in an intensive, multi-step, individualized inquiry as to whether each prisoner met criteria for conditional release. See also 23(b) analyses re: predominance and superiority infra.  The Court thus does not find that the commonality requirement has been satisfied.

c. Typicality

80

The third prerequisite of Rule 23(a) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Factual differences will not defeat typicality if the named plaintiffs' claims arise from the same event or course of conduct that gives rise to the claims of class members and are based on the same legal theory." Frank v. Gov't of Virgin Islands, 2010 WL 1286077, at *3 (D.V.I. Mar. 31, 2010) (citing Danvers Motor Co. v. Ford Motor Co., 543 F.3d 141, 150 (3d Cir. 2008)).

Here, Petitioners claim that Respondents have subjected Petitioners and all proposed class members to the same potentially injurious treatment. Therefore, the Court finds that Petitioners' claims arise from the same conduct, and are based on the same legal theory, as the claims of the putative class, and the typicality requirement of Rule 23(a)(3) is satisfied.

### d. Adequacy

The fourth and final prerequisite of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy requires the district court to find that (1) the class representatives' interests do not "conflict with those of the class" and (2) proposed class counsel are "capable of representing the class." Newton v.

Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 185 (3d Cir. 2001) (citing Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982)).

Here, Petitioners have the same interests as the other proposed class members, as all are confined at Fort Dix and subject to the same potentially injurious treatment. Thus, Petitioners suffered the same injury and have the same claims as all proposed class members, raising no potential conflict of interest. Additionally, the Court has no cause to doubt the capability of Petitioners' counsel. Therefore, the Court finds that the adequacy requirement of Rule 23(a)(4) is satisfied.

### 2. Rule 23(b) Requirements

Having concluded that Petitioners have established some, though not necessarily all, of the prerequisites of Rule 23(a), the Court must also evaluate whether they have satisfied one of the Rule 23(b) subsections. Under Rule 23(b)(3), a party seeking class certification must "prove by a preponderance of the evidence that the class is ascertainable." Byrd, 784 F.3d at 163. Additionally, a party seeking certification must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the

82

controversy." Fed. R. Civ. P. 23(b)(3). These criteria are referred to as Rule 23(b)(3)'s ascertainability, predominance, and superiority requirements. See, e.g., Byrd, 784 F.3d at 162.

### a. Ascertainability

In addition to Rule 23's explicit requirements, Petitioners must demonstrate that the proposed class is clearly defined and objectively ascertainable. See Marcus, 687 F.3d at 591. A class is ascertainable if it is (1) "defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." Byrd, 784 F.3d at 163. However, "a plaintiff [need not] be able to identify all class members at class certification – instead, a plaintiff need only show that class members can be identified." Id.

Here, the proposed class is ascertainable because it is defined in objective terms (prisoners over age 50 or suffering from medical conditions making them "high-risk") and class members can be identified by review of prison medical records. The Court finds that the proposed class is ascertainable.

### b. Predominance

The predominance element of Rule 23(b)(3) is closely related to the commonality element of Rule 23(a). Rule 23(b)(3) requires a district court to find that the "questions of law or fact common to class members predominate over any questions affecting only individual members." See Fed. R. Civ. P. 23(b)(3). But "[w]hereas 'Rule 23(a)(2)'s commonality element requires that the proposed class members share at least one question of fact or law in common with each other,' the Rule 23(b)(3) predominance element 'requires that common issues predominate over issues affecting only individual class members.'" In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 266 (3d Cir. 2009) (quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527-27 (3d Cir. 2004)). When examining predominance, the court must undertake a "rigorous analysis" to determine whether class-wide issues outweigh individual issues. See Williams v. Jani-King of Phila. Inc., 837 F.3d 314, 319 (3d Cir. 2016) (quoting Dukes, 564 U.S. at 351).

As explained by the Third Circuit, "the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." Sullivan v. DB Investments, Inc., 667 F.3d 273, 298 (3d Cir. 2011). Here, although the implementation of allegedly harmful prison procedures by Respondents was common to all class members, Respondents' treatment of individual class members

(and even of named Petitioners) has **not** been. Instead, some prisoners have been evaluated on an individual basis, and in some cases have been recommended for home confinement. As such, the Court finds that the predominance requirement has not been met.

      c. <u>Superiority</u>

  Rule 23(b)(3) also requires that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In making its superiority determination, the Court considers four nonexclusive factors: "(1) the interest of individual members of the class in individually controlling the prosecution of the action; (2) the extent of litigation commenced elsewhere by class members; (3) the desirability of concentrating claims in a given forum; and (4) the management difficulties likely to be encountered in pursuing the class action." <u>In re Prudential Ins. Co. of Am. Sales Practice Litig.</u>, 962 F. Supp. 450, 522 (D.N.J. 1997). "[T]he superiority requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" <u>Beneli v. BCA Fin. Sen's., Inc.</u>, 324 F.R.D. 89, 99 (D.N.J. 2018) (quoting <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 316 (3d Cir. 1998)).

In this case, were Petitioners seeking a change in Fort Dix policies regarding sanitization of facilities or the like, concentrating the claims of a large prison population in this court would be an efficient means of adjudication. However, as Petitioners are seeking the remedy of home confinement or early release, concentration of these claims seems a grossly inefficient method of processing and evaluating individual prisoners for suitability of release. Moreover, class members arguably have an interest in being able to submit individual petitions for compassionate release immediately, highlighting their particular conditions and suitability, rather than being required to wait for class-wide resolution. Such petitions could be processed and evaluated by the various district courts in the District of New Jersey as they are received. Accordingly, to the extent that any of Petitioners' claims survive over which this Court has jurisdiction, they could not be brought on a class-wide basis.

Therefore, the Court finds that the superiority requirement has not been met.

VII. **CONCLUSION**

For the foregoing reasons, Respondents' David E. Ortiz and Michael Carvajal Motion to Dismiss for Lack of Jurisdiction and for Failure to State a Claim is GRANTED. Petitioners' Troy Wragg, Michael

Scronic, Leonard Bogdan, and Eliezer Soto-Concepcion Emergency Motion
for Preliminary Injunction is DENIED.


Dated: May 27, 2020

                                    RENEE MARIE BUMB
                                    United States District Judge